**UNITED STATES DISTRICT COURT**
**CENTRAL DISTRICT OF ILLINOIS**
**URBANA DIVISION**

| | | |
|---|---|---|
| SHARON JACKS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. : 04-2230 |
| | ) | |
| CONAIR CORPORATION, | ) | Judge Michael P. McCuskey |
| | ) | Magistrate Judge David G. Bernthal |
| Defendant. | ) | |

**DEFENDANT CONAIR CORPORATION'S MEMORANDUM**
**OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY**
**JUDGMENT PURSUANT TO FED. R. CIV. P. 56 AND CDIL LR 7.1(D)**

## I.    INTRODUCTION

Plaintiff Sharon Jacks worked at Defendant Conair Corporation's manufacturing facility in Rantoul, Illinois for some two years before she was discharged for excessive absenteeism in June 2003.  In this lawsuit Plaintiff contends that her discharge violated the Family and Medical Leave Act (FMLA), because she believes her final absence, which called for her discharge under Conair's attendance policy, was protected by the FMLA.

However, the FMLA medical certification on which Plaintiff relies clearly did *not* authorize her to miss work on the occasion that resulted in her discharge.  The medical certification, completed by her husband's physician, stated that Plaintiff required FMLA leave only to transport her husband when he was "unable to drive due to pain level and medication."  It did not authorize Plaintiff to miss work when she was *not* needed to transport her husband.

Conair could have simply relied on the medical opinion as a 'negative certification, that is, as negating her request for to be off work full-time, based on the clear and unambiguous statement that Plaintiff's husband did not require Plaintiff's round-the-clock care.  Instead, while

not legally required to do so, Conair took additional measures to ensure that it did not violate the FMLA. Conair *told* Plaintiff that the certification did not support her request for full-time leave in that it stated she was only needed to assist her husband when he required transportation. In fact, *both* parties clarified that matter with the physician's clinic, which confirmed to both of them that Plaintiff was needed only to drive her husband, but was not needed to care for him when he was home. Then, Conair forewarned Plaintiff that she would be subject to discharge if she did not report to work after she was finished transporting her husband.

On the date of Plaintiff's final absence that resulted in her discharge, Plaintiff admits that she and her husband were home in time for her to have reported for at least the bulk of her normally scheduled shift. Yet she admits she refused to report, even though forewarned by Conair that the absence would mean her discharge. Still, Conair did not terminate Plaintiff until after it ensured that her absence was not otherwise covered under the FMLA, and after she failed to work *any* of her regular scheduled shift, which did not end until 12:15 a.m. the next morning. Accordingly, Plaintiff cannot possibly prevail on her FMLA complaint, and because there is no genuine issue as to these material facts, Conair is entitled to judgment as a matter of law.

## II.   UNDISPUTED MATERIAL FACTS[1]

### A.   THE PARTIES

1.      Defendant Conair Corporation ("Conair") operates a facility in Rantoul, Illinois which manufactures personal care and beauty products such as shampoo, deodorants, lotions and

---

[1]      The following facts, taken mostly from Plaintiff's sworn deposition testimony, are undisputed for purposes of this motion for summary judgment. However, Conair reserves the right to dispute Plaintiff's assertion at trial, if necessary.

creams. Affidavit of Stephanie Burris, ¶2.[2]

2.      Plaintiff Sharon Jacks ("Sharon") was employed as a machine operator at Conair's Rantoul facility from May 24, 2001 until June 9, 2003 when her employment was terminated under Conair's attendance policy.  Deposition of Sharon Jacks, hereinafter "Jacks dep.," at 10:23-11:2, 21:10-22, 22:23-29:4; Affidavit of Stephanie Burris, ¶3.

3.      To obtain the job with Conair, Sharon completed and signed a job application in which she acknowledged that either she or Conair could terminate the employment relationship at any time for any reason.  See Jacks dep. at 10:23-11:2 and dep. ex. 1.

4.      Throughout her employment with Conair, Sharon worked the second shift with regularly scheduled hours of 3:45 p.m. to 12:15 a.m., Monday through Friday.  Jacks dep. at 21:23-22:22.

### B.      PLAINTIFF'S WARNINGS UNDER CONAIR'S ATTENDANCE POLICY

5.      During Sharon's employment, she received a copy of and was familiar with Conair's "House, Attendance and Safety Rules," which included Conair's attendance policy for all employees at the Rantoul facility.  Jacks dep. at 22:23-24:23 and dep. ex. 2.  See, also, deposition of Stephanie Burris, hereinafter "Burris dep.," at 15:17-16:4.

6.      The Conair attendance policy stated that "regular and punctual attendance by all employees is an essential part of responsible employment," and that employees failing to meet company attendance standards were subject to progressive discipline up to and including discharge.  For convenience, a copy of the attendance policy is separately attached hereto as Appendix 5.

---

[2]      The pleadings, affidavits and deposition excerpts referred to herein are attached as appendices to this Memorandum, covered by an index.

7.    Under Conair's attendance policy, some employee absences are considered excused, such as those covered under an employee's sick time allotment, planned vacations, holidays, and leaves under the FMLA. Otherwise, absences even of less than a full day count as "occurrences" under the policy. See, Appendix 5 and Burris dep. at 13:17-14:12; 16:4-17:21; 18:4-19:3; 45:19-46:2.

8.    Once an employee completes her new-employee probationary period at Conair, the attendance policy calls for escalating levels of disciplinary warnings as the employee accrues certain numbers of absence "occurrences" during any consecutive 12-month period. Specifically, two occurrences during a twelve-month period result in a "verbal warning;" three occurrences during a 12-month period calls for a "written warning;" four occurrences in a 12-month period result in a "final warning;" and five occurrences in a 12-month period result in "termination" of employment. Appendix 5 at III. In addition, the policy provides that, even if an employee stops short of accruing five occurrences in a 12-month period:

> Any employee receiving three final warnings within a one-year period will be terminated.

Id. Sharon was aware of these policy provisions and agrees that Conair kept her periodically informed of how many "occurrences" she was accruing. Jacks dep. at 24:13-25:14.

9.    Sharon received and signed final warnings for excessive absenteeism under Conair's attendance policy on December 18, 2002 and April 23, 2003. Jacks dep. at 25:15-27:17 and dep. exs. 3 and 4. On May 5, 2003, Sharon received and signed another written (but not final) warning for another attendance occurrence. Jacks dep. at 27:18-28:20 and dep. ex. 5. That May 2003 warning specifically reminded Sharon that if she either accrued a fifth occurrence or received a third final warning within a 12-month period, it would mean her discharge. Jacks dep. at 28:11-20.

4

10.     In fact, each disciplinary warning for attendance received and signed by Sharon informed her "if you attain five or more occurrences within a one-year period or three final warnings within a one-year period, it will mean immediate discharge." Jacks dep. at 26:19-27:17 and dep. exs. 3-5.

11.     Thus, as of the beginning of June 2003, Sharon knew that any further unexcused absence under the Conair policy could result in the immediate termination of her employment. Jacks dep. at 50:5-23.

C.     **PLAINTIFF SEEKS FMLA PROTECTION FOR FURTHER ABSENCES**

12.     Under Conair's attendance policy, absences that are due to conditions qualifying under the FMLA are not counted as "occurrences." Burris dep. at 13:17-14:12; 16:4-17:21; 18:4-19:3.

13.     During her employment, Conair had informed Sharon and its other employees about the FMLA. Jacks dep. at 51:5-52:1. However, prior to June of 2003 Sharon never had requested a leave or attempted to excuse an absence under the FMLA. Jacks dep. at 30:4-10.

14.     Sharon says that on Thursday, May 29, 2003, her husband Kenny Jacks ("Kenny") hurt his back. On the morning of Monday, June 2, 2003, Sharon says she drove Kenny to a clinic in Rantoul because his back still was hurting. Jacks dep. at 31:8-32:11. From the clinic, Sharon says she drove Kenny to Provena Covenant Medical Center, arriving at approximately 2:00 p.m. Jacks dep. at 35:5-19.

15.     Therefore, Sharon did not report to work for her regular evening shift, beginning at 3:45 p.m. on June 2, 2003. Instead, Sharon contacted Stephanie Burris, Conair's Human Resource Manager, because Sharon knew that she could be terminated for another absence occurrence. Jacks dep. at 50:5-23; Burris dep. at 59:10-60:11.

5

16.    Because Sharon told Burris that she would need to be off work to care for her injured husband, Burris made an FMLA medical certification form available for Sharon to pick up at work and take to Kenny's physician for completion.  Burris dep. at 61:10-62:9; Jacks dep. at 52:2-22.

17.    Sharon was scheduled to work her regular second shift hours at Conair from Monday, June 2 through Friday, June 6, 2003, but did not report to work at all during that week. Jacks dep. at 30:20-31:10.  Sharon also had no further contact with Burris the remainder of that week; she did not speak to Burris again until Monday, June 9.  Burris dep. at 61:10-16; Jacks dep. at 64:17-23 and 64:13-15.

18.    On June 4, 2003, Sharon's husband Kenny was referred by Provena Covenant Medical Center to Dr. Keith Kattner in Bloomington, Illinois for evaluation and treatment.  Jacks dep. at 48:5-49:10, 52:23-54:1.  Sharon drove Kenny to his appointment with Dr. Kattner on June 5, 2003, and took with her the FMLA Medical Certification form that Conair had given her. Jacks dep. at 53:3-12.

**D.    PLAINTIFF'S COMPLETED FMLA MEDICAL CERTIFICATION FORM FAILED TO JUSTIFY HER FINAL ABSENCE**

19.    Plaintiff identified at her deposition the completed FMLA medical certification form that was submitted to Conair on her behalf.  Jacks dep. at 55:6-60:4 and dep. ex. 6.  For convenience, a copy of the completed medical certification form is separately attached hereto as Appendix 6.

20.    Sharon completed the employee portion of the medical certification form while at Dr. Kattner's office, including the sections titled "employee name," and "patient name."  Sharon

6

also wrote the address and facsimile number for Conair on top of the form, and signed the line marked "employee signature." Jacks dep. at 55:6-60:4. See, also, Appendix 6.

21.    After Dr. Kattner saw Kenny on June 5, Dr. Kattner told Sharon that his nurse would take care of her FMLA paperwork. Accordingly, Sharon handed Dr. Kattner's nurse the medical certification form, and did not again see the form as completed by Dr. Kattner's office until after Dr. Kattner's office faxed it to Conair. Jacks dep. at 60:10-62:16.

22.    The completed FMLA medical certification form was faxed to Conair late in the day on Friday, June 6, 2003, but Burris first saw the facsimile early on the morning of Monday, June 9, 2003. Burris dep. at 63:1-23.

23.    Paragraph 8 of the FMLA Medical Certification form asked Dr. Kattner's office to answer the following question:

> If leave is required to care for a family member of the employee with a serious health condition, does the patient require assistance for basic medical or personal needs or safety, or for transportation?

See, Appendix 6, p. 2. In the completed form faxed to Conair, that question was answered:

> Yes. Unable to drive due to pain level and medication.

*Id.* The completed form received by Conair did *not* state that Sharon was needed to care for or assist Kenny at any time other than when Kenny needed to be driven somewhere. *Id.*

24.    On the morning of Monday, June 9, 2003, Burris attempted to phone Sharon to discuss with her that the completed FMLA medical certification received by Conair indicated that Sharon might need to miss work only when needed to drive Kenny. Sharon did not answer the telephone, however, so Burris left her a message. Burris dep. at 70:19-72:4.

25.    On Monday, June 9, 2003, Kenny did not have any scheduled doctor appointments or seek additional medical care. Jacks dep. at 64:13-23. However, Kenny was

7

scheduled to appear that day in Champaign County Circuit Court, in Urbana, Illinois.  Sharon

says she drove Kenny to that court appointment, which she says was at either 10:00 a.m. or 1:00

p.m.    Jacks dep. at 65:4-66:2.    Sharon says she and her husband left home for court

approximately 30 to 45 minutes before the scheduled hearing, that being the customary travel

time between the Jacks' residence and the Urbana courthouse.  Jacks dep. at 65:4-66:2.

26.    While Sharon was with Kenny at court on June 9, Sharon says she phoned Burris

regarding the FMLA paperwork submitted by Dr. Kattner's office.  Jacks dep. at 62:17-63:15

and 66:13-67:4.  Burris recalls that phone conversation as occurring right after lunch, not later

than 1:00 p.m., on June 9.  Burris dep. at 71:9-72:21.

27.    During that phone conversation, Burris told Sharon that the completed medical

certification form indicated that Sharon qualified for FMLA leave only when Sharon was needed

to drive or transport Kenny, but that she did not qualify for FMLA leave to care for him around

the clock.  Therefore, Burris told Sharon that Sharon would otherwise need to report for work as

usual.  Jacks dep. at 66:20-68:11; Burris dep. at 72:16-73:8.  However, Sharon reiterated to

Burris that Sharon wanted to be off work to care for Kenny around the clock.  Jacks dep. at 68:4-

7; Burris dep. at 73:9-19.  Accordingly, Sharon told Burris that Sharon would ask Dr. Kattner's

office to change or clarify the medical certification.  Jacks dep. at 68:12-19; Burris dep. at 74:10-

15.

28.    Sharon did phone Dr. Kattner's office and spoke to a nurse about the completed

FMLA medical certification the office had faxed to Conair; however, Sharon is unclear about the

details of that conversation.  Jacks dep. at 68:18-70:6.  After speaking to Sharon, Burris also

talked to Dr. Kattner's nurse, solely for purposes of clarifying the information stated on the

8

certification form about when Sharon was needed to assist Kenny. Burris dep. at 69:5-70:9, 75:305.

### E.    DR. KATTNER'S NURSE CONFIRMS THAT KENNY JACKS DOES NOT REQUIRE ROUND-THE-CLOCK CARE

29.    The nurse answering patient phone calls at Dr. Kattner's office in June 2003 was Martha Jo Scott, RN ("Nurse Scott"). Affidavit of Martha Jo Scott, hereinafter "Scott Affidavit," ¶6. For convenience, a copy of the Scott Affidavit and exhibits is attached as Appendix 7.

30.    On June 9, 2003, Nurse Scott was informed that both Sharon Jacks and Stephanie Burris had phoned Dr. Kattner's office concerning the completed FMLA medical certification the office had sent to Conair for Sharon. When Nurse Scott returned Burris' call, Burris asked her the meaning of the notation "Unable to drive due to pain level and medication" in relation to Sharon's leave request. Burris did not ask about any medical information relating to Kenny Jacks. Scott Affidavit, ¶¶10-11 and Burris dep. at 68:22-69:6; 69:20-70:9.

31.    Consulting both Dr. Kattner and Kenny's medical records, Nurse Scott determined that Kenny did not need constant care. As her affidavit states:

> Therefore, as reflected in my June 9, 2003 notes [appended to her affidavit], I told Ms. Burris that Mr. Jacks only required transportation by his wife, not full-time care.

Scott Affidavit, ¶12.

32.    As Burris was speaking to Nurse Scott on June 9, Burris underlined the word "transportation" in paragraph 8(a) of the FMLA medical certification form and wrote "for dr. appts, therapy, etc. Per nurse, patient does not require 24/7 care." Burris dep. at 68:22-69:6; 69:20-70:9.

33.    Shortly thereafter, Burris again spoke by telephone with Sharon, and told Sharon that Dr. Kattner's office had confirmed to Burris that Sharon did not need to provide round-the-

9

clock care for her husband, but was needed only to transport him when he needed to be driven somewhere. Accordingly, Burris told Sharon that Sharon must come in to work later that day. Burris dep. at 75:1-76:1. Sharon agrees that Burris told her on June 9 that Sharon would have to come in to work that night. Jacks dep. at 66:13-67:10.

34.     At around 3:38 p.m. on June 9, 2003, Nurse Scott received another call from Sharon, in which Sharon asked that the clinic *change* the FMLA medical certification form to state that Sharon needed to care for her husband on a full-time basis, rather than only when he needed transportation. Nurse Scott told Sharon that, based on confirmation from Dr. Kattner, the completed document accurately reflected Kenny's medical condition, in that Kenny could stay home alone and merely should not drive. Scott Affidavit at ¶¶13, 19.

**F.     DESPITE SPECIFIC NOTICE THAT ABSENCES UNRELATED TO HER HUSBAND'S TRANSPORTATION NEEDS WERE NOT PROTECTED UNDER THE FMLA, PLAINTIFF FAILED TO REPORT FOR ANY OF HER SHIFT THE EVENING OF JUNE 9, 2003**

35.     Although Sharon does not recall precisely when she and her husband left the courthouse on June 9, 2003, she says she drove her husband directly home after the court hearing and arrived at their residence "before dinner." Jacks dep. at 74:23-75:9.

36.     However, on June 9, 2003, Sharon did not report for her regularly scheduled shift or work any of the remainder of her shift, which started at 3:45 p.m. and ended at 12:15 a.m. the next morning. Jacks dep. at 75:10-12. Sharon testified as follows:

> Q:     So you were done transporting Kenny when you got him home before dinnertime correct, on June 9[th]?
> A:     Possibly, yeah.
> Q:     But you didn't come to work?
> A:     No.
> Q:     And you didn't call anybody at work, did you?
> A:     I don't think I talked to her that evening. I'm not sure.

10

| Q: | Now, after – when were you informed that Conair had terminated your employment? |
|---|---|
| A: | Well, I was assuming they fired me that day because she said if I didn't make it in that night, I would be fired. |

Jacks dep. at 76:20-77:14.

37.    Sharon's failure to report for work even after she completed transporting Kenny on June 9, 2003, constituted another absence "occurrence" under Conair's attendance policy, calling for a third "final warning" in the last twelve consecutive months.  Therefore, Sharon was terminated under Conair's attendance policy for accruing three final warnings in a year period. Jacks dep. at 26:19-27:17; 30:4-10; 50:5-23; 77:7-14; Burris dep. at 44:10-45:11; 46:3-48:19, 83:11-86:18.

38.    However, Burris did not terminate Sharon until June 10, 2003, after waiting to see if Sharon would arrive to work any of her shift on the evening of June 9, 2003.  Burris dep. at 76:20-77:23.

39.    Sharon would not have been terminated if she had reported to work for at least part of her shift on the evening of June 9, 2003; Conair would have excused that portion of Sharon's absence due to the legitimate transportation needs of her husband to and from court on that date, consistent with the FMLA medical certification completed by Dr. Kattner's clinic. Burris dep. at 76:2-12.

40.    On June 10, 2003, Sharon again contacted Dr. Kattner's clinic regarding the FMLA form completed by Dr. Kattner.  Once again, Dr. Kattner's Nurse Scott refused on behalf of the clinic to change the document and reiterated that, although Sharon might need to take off work to transport Kenny to scheduled appointments, Kenny's "other needs could be handled before and after work."  Scott Affidavit at ¶¶14-17.

41.    Sharon never again contacted Burris regarding the FMLA medical certification form.  When Sharon returned to the Rantoul facility to collect her personal belongings after her termination, Sharon told Burris that Sharon "blamed her husband for losing her job."  Burris dep. at 79:7-23.

## III.    ARGUMENT

### A.    STANDARD OF REVIEW

Conair is entitled to summary judgment in its favor as a matter of law if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact."  Fed. R. Civ. P. 56(c).  Although Conair bears the initial burden to demonstrate the absence of any material fact, summary judgment enables the court to pierce plaintiff's pleading and assess the elements a plaintiff must prove to support her claim FMLA interference claim.  *See* Fed. R. Civ. P. 56(c) Advisory Notes.  Although a court must construe all facts and reasonable inferences in favor of the non-moving party, the non-moving party cannot rest on bare pleadings alone but must adduce evidence to prove that a genuine issue of material fact exists for trial.  *Celotex Corp. v. Cantrett*, 477 U.S. 317, 324 (1986); *Insolia v. Philip Morris Inc.*, 216 F. 3d 596, 598 (7th Cir. 2000).  Unsupported contentions, conjecture, speculation, and metaphysical doubt are never sufficient to create a genuine issue of material fact.  *Koszola v. Board of Educ.*, 385 F.3d 1104, 1111 (7th cir. 2004); *See Bellaver v. Quanaz Corp.*, 200 F.3d 485, 492 (7th Cir. 2000).  Therefore, in claims alleging that an employer unlawfully disregarded an employee's entitlement under the FMLA, an employer is entitled to the entry of summary judgment in its favor when the undisputed evidence, including the medical certification submitted to the employer, establishes that the plaintiff was not entitled to the requested leave.  *See Collins v. Merck-Medco RX Serv.,* 2001 U.S. Dist.

12

LEXIS 15143 at *10 (N.D. Tex. Sept. 24, 2001); *Dowell v. Indiana Heart Physicians, Inc.* 2004 U.S. Dist. LEXIS 26431 at *1 (S.D. Ind. Dec. 22, 2005) (granting summary judgment where undisputed evidence, including the certification of the treating physician, did not support the claimed entitlement).[3]

### B. THE UNDISPUTED FACTS ESTABLISH THAT PLAINTIFF'S REFUSAL TO REPORT FOR WORK ON JUNE 9, 2003, EVEN AFTER SHE WAS FINISHED TRANSPORTING HER HUSBAND, WAS UNPROTECTED BY THE FMLA

As the facts recited above reflect, Plaintiff admits being familiar with Conair's attendance policy and knowing that, as of June 9, 2003, she was subject to discharge under the policy if she incurred just one additional absence "occurrence."  Plaintiff already had received two final warnings in the last year under the policy and, with any additional absence occurrence, would receive a third final warning for the year.  The policy provided, and Plaintiff's warnings had specifically reminded her, that a third final warning within a one-year period meant immediate discharge.  In short, there is no question Plaintiff understood the implications of incurring another unexcused absence.

The facts also reflect that Conair had informed Plaintiff about the FMLA, and that under Conair's policy, absences protected by the FMLA did not count as absence "occurrences." Plaintiff was absent from work the entire week of June 2 through June 6, 2003, having told Conair that she was needed to care for her husband who had injured his back.  Because Conair recognized that excuse – caring for an injured spouse – as potentially qualifying for protection under the FMLA, Conair gave plaintiff a blank FMLA medical certification form to have completed and returned by her husband's physician, so Conair could determine whether in fact Plaintiff's absences were protected by the FMLA.  In the meantime, Conair did not treat Plaintiff

---

[3]    Copies of all electronic case authority cited herein are attached in Appendix 8.

as having incurred another absence "occurrence," while it awaited receipt of the completed medical certification.

Once Conair reviewed the completed medical certification on June 9, 2003,[4] Conair saw that the form seemed to authorize Plaintiff to miss work only when she was needed to transport her husband somewhere, as he was deemed medically unable to drive himself. Both Conair and Plaintiff then confirmed with the clinic that this in fact was what the completed form stated. Conair's Human Resource Manager, Stephanie Burris, then spoke with Plaintiff and informed Plaintiff that Plaintiff would be expected to report for work that evening (her shift extended to past midnight) after she was finished transporting her husband from court. Plaintiff admits that she and her husband returned to their home directly from his court appearance in Urbana and arrived home before dinner. Some six hours or three-fourths of her shift then remained to be worked, yet Plaintiff did not report or call in with any further excuse. Accordingly, the next day (June 10), after verifying that Plaintiff failed to report for any of her regularly scheduled shift, Burris terminated Plaintiff's employment under Conair's attendance policy.

Under these circumstances, since it is undisputed that Conair discharged Plaintiff for missing work on June 9, the outcome of Plaintiff's FMLA case turns on whether Plaintiff was entitled to FMLA leave for her entire shift on that date. *Kauffman v. Federal Express Corp.*, 425 F.3d 880, 885 (7th Cir. 2005). As a threshold matter, for purposes of summary judgment, Conair is not disputing that Plaintiff's husband had a "serious health condition." However, it should be noted that a boilerplate reference to a "serious health condition" on a certification form does not estop an employer from challenging the existence of a "serious health condition," and Conair is

---

[4]     Although Dr. Kattner's clinic faxed the completed form to Conair late on Friday, June 6, 2003, Conair's Stephanie Burris did not see it until early Monday, June 9, as set forth above.

14

preserving this issue for trial if necessary. *See Marchiesheck v. San Mateo*, 199 F.3d 1068, 1076-77 (9th Cir. 1999).

Where it is uncontested that an employer terminated an employee for missing work, the outcome turns on the narrow issue of the employee's entitlements, based on the paperwork certifying the claimed entitlement. *Kauffman*, 425 F.3d at 885. Therefore, whether Plaintiff was entitled to FMLA leave for her entire shift depends on whether Plaintiff's FMLA medical certification form certified that her absence from work was medically required. *Id.*[5]  In such a case, a plaintiff's FMLA claim fails as a matter of law if the employee is terminated due to her own failure to obtain a medical certification covering the duration of the absence in question. *Dittle v. United States Postal Serv.*, 2005 U.S. Dist. LEXIS 1487 at *25 (D. Minn. Feb. 2, 2005) (granting summary judgment when certification form submitted by employee covered only a three day period, not a two-month absence).  Plaintiff cannot establish that her entire absence was medically necessary on June 9, 2003 due to a qualifying reason under the FMLA or that Conair denied her benefits to which she was otherwise entitled.  Rather, Conair is entitled to summary judgment as a matter of law because it is undisputed, based on the certification form completed by Plaintiff's husband's health care provider, that the only care her husband required from Plaintiff was for "transportation" because he was "unable to drive due to pain level and medication."

---

[5]      As in *Kauffman*, there is no question in this case that Conair is an "employer" or that the Plaintiff is otherwise an eligible employee under 29 U.S.C. §2611(2) and §2611(3).  *See Kauffman*, 429 F.3d at 885. However, the similarities between this case and *Kauffman* end there. Unlike the employer in *Kauffman*, Conair clearly notified Plaintiff that any unrelated absence would not be protected under the FMLA and further provided her with an opportunity to cure the certification form, but she was unable to do so. *Compare Kauffman*, 429 F.3d at 887.

15

An employee is entitled to a leave under the FMLA if such leave is medically necessary "in order to care for" a spouse, son, daughter, or parent with a serious health condition (as defined by §2611(11) of the Act). *See* 29 U.S.C. §2612(a)(1)(C). However, to define the proper scope of an employee's entitlement under the Act, the FMLA provides employers with a compliance tool, namely, the option to require documentary certification. Under 29 U.S.C. §2613(a), an employer may specifically require an employee requesting a leave to care for a spouse, child, or parent to submit a certification, completed by the patient's health care provider, describing the "appropriate medical facts" regarding the patient's medical condition, including "the amount of time that such employee is required to care for the son, daughter, spouse or parent." 26 U.S.C. §2613(b)(4)(A).

Many employers, including Conair, have chosen to use the optional form issued by the U.S. Department of Labor as an Appendix to the Act, form WH-380, entitled "Certification of Health Care Provider." *See Hoffman v. Professional Med Team*, 394 F.3d 414, 419 (6th Cir. 2005); 29 CFR §825.306. (Conair's adoption of the U.S. DOL's prescribed form can readily be seen by comparing the medical certification form in this case with the model published by the U.S. DOL at 29 CFR Part 825, App. B.) When, as in this case, the leave requested by the employee is not reasonably foreseeable, or the employee is unable to provide prior notice or medical certification, the implementing regulations of the Act instruct employers to make a "preliminary designation" that the leave qualifies under the FMLA until receiving the requisite medical certification. 29 CFR §825.308(e)(2). This is precisely the course of action undertaken by Conair in this case.

When Plaintiff called stating that she would not be reporting to work on June 2, 2003 because her husband had hurt his back, Conair made a FMLA certification form available to

16

Plaintiff and preliminarily designated her leave request as qualified under the FMLA, pending receipt of documentation certifying that her absence from work was medically necessary to care for her husband. Even though Plaintiff never again contacted Conair during the entire week of June 2, 2003, Conair preliminarily designated her absence as a leave under the FMLA, and did not count Plaintiff's otherwise unscheduled absences as "occurrences" under its attendance policy. Other than following the "preliminary certification" procedure outlined within the FMLA regulations, Conair took no action with regards to Plaintiff or her claimed FMLA entitlement until receiving the Certification of Health Care Provider form, which was faxed late in the day on Friday, June 6, 2003, and reviewed by Conair on the morning of June 9, 2003.

When the completed medical certificate was reviewed, however, it obviously failed to support Plaintiff's assertion that her husband required round-the-clock medical care. To the contrary, the form stated that Plaintiff's husband was being treated for pain management with injections and undergoing physical therapy. The medical certification further stated that Plaintiff's husband's next office visit with Dr. Kattner, his health care provider, was scheduled almost a month later on June 23, 2003 and further, that Plaintiff's husband was "unable to drive due to pain level and medication." Nothing on the form indicated that Plaintiff's husband was unable to care for himself or that round-the-clock care by his wife was medically necessary or required.

### C. AS A MATTER OF LAW, CONAIR DID NOT VIOLATE THE FMLA BY RELYING ON THE 'NEGATIVE CERTIFICATION' SIGNED BY DR. KATTNER

In *Stoops v. One Call Communications*, 141 F.3d 309 (7th Cir. 1997), the Seventh Circuit expressly held that, when an employee provides her employer with a reason for an absence that the employer knows not to be "qualifying" under the FMLA based on the physician's

certification, the Act and the regulations place no obligation on the employer to grant the employee FMLA leave. *Id.* at 314. Significantly, the Act's implementing regulations expressly state that even if an employer makes a "preliminary designation" that a requested leave may qualify under the Act, the employer cannot designate any portion of a leave as qualifying under the FMLA if the medical certification later submitted indicates that portion of the requested leave does not qualify under the FMLA. *Id.* at 312, *citing* 29 CFR §825.208(e).

The *Stoops* court explicitly rejected the contention that an employer faced with a "negative certification" that does not support the employee's requested leave faces the Hobbesian choice of either giving the employee the FMLA leave or requesting additional information. *Id.* at 313. Where an employer receives a medical certification that indicates that the employee does not need to miss work, the employer may reasonably rely on that certification. *Id.* In such a case, the employer does not violate the FMLA by terminating the employee consistent with its attendance policy when the employee fails to provide a certification supporting her claimed entitlement. *Id.* An FMLA claim fails as a matter of law when an employee submits nothing to the employer to contradict an initial medical certification indicating that the absence in question was *not* due to a qualifying reason under the FMLA. *Id.* at 314. While the certification issue in *Stoops* arose in relation to the employee's own serious health condition, its reasoning is equally persuasive in this case, and conclusively dispels the viability of Plaintiff's allegations as a matter of law.

Like Conair, the *Stoops* employer terminated the plaintiff under an "occurrence" or points-based attendance policy after receiving a Certification of Health Care Provider form that did not support the employee's contention that it was medically necessary for him to miss work. *Id.* at 310. In striking similarity to the *Stoops* employee, who "knew that [his employer] was

18

relying on [his health care provider's] negative certification and knew that his continued absences would lead to his being fired under the no-fault attendance program" (*Stoops*, 141 F.3d at 313), Plaintiff in this case acknowledges that she was aware that she would incur an occurrence under Conair's attendance program for any absence not protected by her medical certification form. She further admitted that she specifically knew that her unprotected failure to work her shift on that date could result in her termination, due to her already unacceptable attendance record. Like the *Stoops* employee, Plaintiff in this case cannot sustain an FMLA interference claim because, even after being placed on notice by Conair that it was denying any leave request not related to the transportation of her husband based on medical certification completed by Dr. Kattner, she failed to obtain any contradictory medical opinion to correct any "mistake" she perceived in the initial certification. *See Stoops* 151 F.3d at 313, 314.

Indeed, even if Plaintiff had submitted a subsequent certification, which she never did, Conair could have legally terminated Plaintiff under its attendance policy after receiving a certification that indicated that her requested leave was not FMLA qualifying. *See Collins v. Merck-Medco Rx Servs.*, 2001 U.S. Dist. LEXIS 15143 at *8-9 (plaintiff could not sustain FMLA interference claim when employer properly terminated employee after receiving a "negative certification" from a health care provider). In this case, Conair did not terminate Plaintiff based solely on the face of the medical certification signed by Dr. Kattner. Indeed, the facts in this case are even more compelling than *Stoops* or other 'negative certification' case because Conair took further affirmative action after receiving the medical certification form to ensure that it did not violate the FMLA or interfere with any entitlement that might otherwise exist under the Act. Conair terminated Plaintiff only as a last resort, after speaking to Plaintiff at least two times, first to offer her the opportunity to cure any deficiencies stated on the

19

certification form, and again after receiving confirmation from Dr. Kattner's nurse that the form, as stated, was correct. Conair ended Plaintiff's employment only after giving her the full benefit of the doubt and waiting to see whether she would report to work *any* of her scheduled shift on the evening of June 9, 2003. *Id.*

### D. DR. KATTNER'S MEDICAL CERTIFICATION WAS NOT INCOMPLETE OR AMBIGUOUS BUT, IN ANY EVENT, CONAIR PROVIDED PLAINTIFF AN OPPORTUNITY TO CURE AND SOUGHT CLARIFICATION BEFORE TERMINATING PLAINTIFF'S EMPLOYMENT

Moreover, after recognizing that the medical certification form did not support Plaintiff's contention that her husband required her full-time care, Conair immediately contacted Plaintiff, well before her shift, to notify her of this apparent discrepancy, and urge her to report to work later that evening. The FMLA regulations state that when an employer receives a certification containing information it views as "incomplete" or inadequate to certify the leave requested by the employee, it "shall advise" the employee and "provide the employee with a reasonable opportunity to cure such deficiency." 29 CFR §825.305(d). Under some circumstances, an employer may directly attempt to "clarify" the information stated on the medical certification form before determining whether a requested leave qualifies under the FMLA. 29 CFR §825.307(a). While, as discussed above, Seventh Circuit precedent holds that Conair could have simply considered Dr. Kattner's medical opinion as a "negative certification," because the document clearly indicated that the absence requirements of Plaintiff's husband's health condition did not support her leave request, Conair clearly notified Plaintiff that the medical certification of her husband's health care provider did not support Plaintiff's absence when not transporting her husband. Thus, Conair gave Plaintiff the opportunity to cure any deficiency in the certification prior to the end of her regularly scheduled shift.

20

The law requires nothing more than such a good faith effort by Conair. *See Dillon v. Carlton*, 977 F. Supp. 1155, 1157 (M.D. Fla. 1997) (granting summary judgment in favor of employer who notified employee with existing attendance problems that it was denying FMLA leave and would terminate employee if she did not work her full shift that day). Indeed, Conair not only offered Plaintiff the opportunity to correct any deficiencies relating to the medical certification, but also spoke to Dr. Kattner's nurse to confirm its understanding of the certification after discussing with Plaintiff that it would do so. This conversation was limited to the information on the certification about when Plaintiff might be needed to assist her husband; Stephanie Burris did not speak to the doctor at all or ask anything about Mr. Jacks' medical condition. Nurse Scott told Burris, as she also told Plaintiff, that the completed certification meant just what it said, namely, that Plaintiff might need to be absent from work to drive her husband to appointments, but that she was not needed to miss work to provide him the "24/7" or round-the-clock care Plaintiff sought.

Thus, as a matter of law, even if the completed certification were deemed ambiguous, Conair's notifications to Plaintiff provided her ample opportunity to cure or correct the medical certification. *See Dowell*, 2004 U.S. Dist. LEXIS 26431 at *25 (employer did not violate the FMLA by terminating an employee for failing to report to work after denying a leave request based on a medical certification that did not qualify her for the requested leave and telling the employee that she was expected to return to work). In fact, since *Plaintiff also* spoke with Nurse Scott and was told that the medical certification said exactly what Dr. Kattner meant it to say, and that it would not be altered to say what Plaintiff wanted it to say, it is clear that any further opportunity to clarify the matter would have been pointless and futile.

21

Consequently, when Plaintiff failed to report to work for any of her June 9, 2003 shift, Conair had every right and, in fact, no alternative than to discharge her for incurring another absence occurrence when she had already received two final warnings in the last twelve months under the attendance policy.  As Stephanie Burris testified, Conair would *not* have discharged Plaintiff if she had submitted a medical opinion supporting her belief that her husband required round-the-clock care, or if she had worked a sufficient number of hours on June 9, 2003 after she finished driving her husband to and from court.  Plaintiff admitted that she and her husband arrived home from his court appearance sometime "before dinner."  As her shift did not end until 12:15 a.m. the next day, June 10, 2003, Plaintiff could have worked at least part, if not the majority of the evening, regardless of what time she actually returned home after driving her husband to his scheduled court hearing, which was, at most, 30-45 minutes away from her home.

Therefore, Conair is entitled to summary judgment as a matter of law because there is no evidence supporting Plaintiff's claim that she was entitled under the FMLA to refuse to report for work on June 9, 2003 as instructed after she completed transporting her husband.  To the contrary, all of the undisputed facts in this case establish that Conair reasonably relied on the information stated on the medical certification signed by Dr. Kattner. Further, and even though it was not otherwise legally required to do so, Conair took extra measures to ensure that it *did not* violate the FMLA by:  (a) notifying Plaintiff of the "negative certification" it received; (b) allowing her the opportunity to cure any perceived deficiencies; (c) confirming the meaning of the medical certification with Dr. Kattner's clinic at Plaintiff's request; and (d) waiting to see if Plaintiff would work *any* of her regularly scheduled shift prior to terminating her under its attendance policy.

## IV.    CONCLUSION

WHEREFORE, Defendant Conair Corporation respectfully requests that the Court grant summary judgment in its favor on Plaintiff's Complaint in its entirety because there is no genuine issue of material fact and Conair is clearly entitled to judgment as a matter of law.

Respectfully submitted,

CONAIR CORPORATION

Date:  <u>May 1, 2006</u>              By:    <u>*s/ Kerry Lin Davidson*</u>
                                              Kerry Lin Davidson Bar Number:  6277341
                                              Attorney for Defendant
                                              Meckler Bulger & Tilson LLP
                                              123 North Wacker Drive
                                              Chicago, Illinois  60606
                                              Tel:    312/474-7900
                                              Fax:    312/474-7898
                                              email:  kerry.davidson@mbtlaw.com

N:\4161\pleading\SJ_Memo.doc

# IN THE UNITED STATES DISTRICT COURT
# FOR THE CENTRAL DISTRICT OF ILLINOIS

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on May 1, 2006, I electronically filed **Defendant Conair Corporation's Memorandum of Law in Support of Its Motion For Summary Judgment** with the Clerk of the Court using the CM/ECF system which will send notification of such filing to: David A. Kleczek, Kleczek Law Offices, 321 NE Madison, Peoria, Illinois 61603.

By:    *s/Kerry Lin Davidson*
       Kerry Lin Davidson
       Meckler Bulger & Tilson LLP
       123 North Wacker Drive
       Chicago, Illinois 60606
       Tel:    (312) 474-7900
       Fax:    (312) 474-7898

N:\4161\pleading\COS-SumJdgmntMemo.doc