E-FILED
Monday, 01 May, 2006  03:47:07 PM
Clerk, U.S. District Court, ILCD

# APPENDIX 4

**Deposition of Stephanie Burris, excerpts and exhibits**

Page 13
1  to usually that department supervisor or manager
2  and then I work with that supervisor/manager after
3  the interviews to select the candidate.
4     Q.   Do you have sole discretion in
5  terminating employment?
6     A.   No. In attendance it's pretty clear
7  cut, our policy is pretty clear cut, when you get
8  occurrences you know where you are. If you're
9  doing a termination for performance or a violation
10 of another rule that starts with the supervisor,
11 they're the ones that start that ball rolling. Am
12 I the person that says ultimately we're
13 terminating, yes, I do.
14    Q.   Okay. How is the attendance policy
15 maintained?
16    A.   I'm not sure what you're asking.
17    Q.   Who keeps track of an employee's
18 absences?
19    A.   Who specifically? We -- I have a
20 staff of two in my department. My Assistant A,
21 which is her title, keeps detailed books for every
22 employee, that includes a calendar. Those
23 calendars are maintained with sick time, vacation

Page 14
1  time, a birthday, holiday, even holiday if they're
2  out on work comp, if they're out on family leave,
3  if they're out on bereavement, and also if it's an
4  unexcused absence. And those absences then are
5  maintained in our HRIS and also in a manual book so
6  that we're all in line. We have three points of
7  reference at anytime to see when someone stands on
8  an occurrence.
9     Q.   What is HRIS?
10    A.   Human Resources Information System.
11    Q.   That's a computer program?
12    A.   Yeah.
13    Q.   Is the data stored in the Rantoul
14 facility of Conair?
15    A.   No. Actually it's routed through our
16 corporate office. It's maintained from them, we
17 have access only to our local employees.
18    Q.   What is Assistant A's name?
19    A.   Amber Stow, S-T-O-W.
20    Q.   Do you have an Assistant B?
21    A.   Assistant B would be Natalie Sumner,
22 S-U-M-N-E-R.
23    Q.   Is Natalie at all involved in keeping

Page 15
1  track of an employee's attendance?
2     A.   Yes. Yes.
3     Q.   And how so?
4     A.   Okay. Once we have -- we take them
5  directly off of our payroll records. So once we do
6  our payroll process we highlight anyone who is out
7  for, in Natalie's case, unexcused absences,
8  something that's not covered under any of the paid
9  time off or excused time off.
10         She in turn does two things. One, if
11 it warrants a write up, as we call it, or
12 disciplinary action, she prepares that; and then
13 she also keeps a notebook of each department with
14 each of their employees. So at anytime a
15 supervisor can access where that person stands on
16 their occurrences, when occurrences were and when
17 they're going to fall off.
18    Q.   Do you have a written absentee
19 policy?
20    A.   Yes. It's part of the House, Safety
21 and Attendance Rules.
22    Q.   And that was marked as Deposition
23 Exhibit 2 to Ms. Jacks' deposition?

Page 16
1     A.   Yes.
2     Q.   Okay. Is this a complete copy of the
3  absence and attendance rules?
4     A.   Yes.
5     Q.   Is there anything in there that
6  describes what is a -- an unexcused absence as
7  opposed to an excused absence?
8     A.   What we call an absence is -- shall I
9  read it to you?
10    Q.   Well, is there -- I'm just curious if
11 you could just point to me if there's anything in
12 it that differentiates between the two.
13    A.   Okay. I'm not sure what you're
14 asking me.
15    Q.   Okay. You had said that Natalie
16 Sumner highlights anyone that has been out for
17 unexcused absences?
18    A.   Uh-huh.
19    Q.   Am I characterizing --
20    A.   Uh-huh.
21    Q.   -- your testimony properly --
22    A.   Yes.
23    Q.   -- as you use the term unexcused

Page 17

1  absence?
2  A. Uh-huh.
3  Q. I'd like to know if there's any
4  similar reference to that term or the meaning of
5  that term in this attendance policy. Do you
6  understand the question?
7  A. Yes.
8  Q. Okay.
9  A. What we say here is an absence from
10 assigned work when there is no accrued sick time
11 available, that's what we consider an absence.
12 Q. Is that an unexcused absence?
13 A. If they have no sick time to cover
14 that absence, yes.
15 Q. Are there exceptions?
16 A. Not if there -- if we're dealing with
17 sick time only. An excused absence would be paid
18 sick time, paid family leave -- I mean, excused
19 family leave, approved family leave, I should be
20 more specific. Paid funeral leave, jury duty,
21 vacation, birthday, holiday.
22 Q. What's workers compensation?
23 A. That is just considered work comp.

Page 18

1  Q. Is that an unexcused absence?
2  A. No, not if they're out on work comp,
3  approved work comp.
4  Q. And the policy, though not written,
5  is if a person has approved FMLA that's not an
6  unexcused absence either?
7  A. If they have approved FMLA, it's just
8  considered FMLA.
9  Q. Okay. So a person wouldn't be fired
10 from missing work during a time where they have
11 approved FMLA?
12 A. If it's approved, yes.
13 Q. Okay. What do you mean by approved
14 FMLA?
15 A. Well, we have FMLA and we have
16 intermittent family leave. So the easy one is the
17 family leave where you're just off and you're put
18 off, you know, 'cause you're hospitalized and the
19 family leave paperwork documentation from the
20 physician says that you're off for two weeks.
21     The other one is called intermittent
22 family leave and that's where someone wouldn't
23 necessarily be off work but may need to take time

Page 19

1  for themselves or those qualifying dependents for
2  doctor's appointments or, you know, therapy or
3  anything like that.
4  Q. Okay. Now, I understand there is no
5  written policy at Conair relating to the Family
6  Medical Leave Act?
7  A. Right.
8  Q. Is there an oral policy?
9  A. What I explain is when someone
10 requests family leave is they've got 15 days to get
11 the paperwork filled out in accordance to the law.
12 They get up to 12 weeks for qualifying family leave
13 qualifying event for themselves and I explain who
14 the dependents are that qualifies them for. I do
15 let them know that it's the physician's
16 certification that qualifies them for the event.
17 Q. Is there an oral policy?
18 A. No.
19 Q. Okay. So nobody from Conair, that is
20 your superior, has said to you this is our FMLA
21 policy?
22 A. No.
23 Q. Okay. How -- strike that.

Page 20

1  Apparently you have some knowledge relating to
2  FMLA, correct?
3  A. Yes.
4  Q. How did you come about that
5  knowledge?
6  A. Through training, through the
7  paperwork that's provided me by our corporate
8  office to be made available to our employees.
9  Q. What is this paperwork?
10 A. It's the Family Leave Certification
11 paperwork.
12 Q. Any other paperwork besides the
13 Family Leave Certification --
14 A. No.
15 Q. -- paperwork? No?
16 A. No.
17 Q. How many pages is that?
18 A. Well, it's two that the physician
19 fills out and then there is an explanation that is
20 provided to the physician as well. I think it's
21 three pages.
22 Q. Do you have a copy of that
23 explanation?

Page 41

1 calendar, see -- and if you look at this I'll give
2 you a good example. Even though she was termed
3 before that time she had actually put in for
4 vacation days. We pencil those in, when they're
5 taken then you can see that they're a little
6 darker. That way an employee can see did I put in
7 for vacation time here. So it's a good tool for
8 them to see where they stand on their time.
9   Q.   Okay. What -- how do you mark an
10 FMLA?
11   A.   It's 20, I believe, under here. I
12 have to look. Yes, it's Number 20.
13   Q.   How do you know it's Number 20?
14   A.   'Cause it goes by this. Or that
15 could be how Amber puts it in since it's not up
16 there. That's just how she accounts for family
17 leave.
18   Q.   Okay. There is no -- well, strike
19 that question. Most entries have some sort of
20 corresponding definition up at the top, --
21   A.   Uh-huh.
22   Q.   -- right?
23   A.   This is a standard form that we

Page 42

1 receive. So if it didn't have it on there her
2 history has been that she's used 20, I guess, as to
3 demark that.
4   Q.   Your understanding is 20 means FMLA?
5   A.   Yes.
6   Q.   Approved FMLA?
7   A.   In this case -- that's a tricky
8 question to answer. Because an employee has 15
9 days to get me that paper. So I'm assuming, yes,
10 it's going to be approved based on what paperwork
11 they're going to provide me. So yes, until I get
12 the paperwork I've preliminary approved it, yes.
13   Q.   Okay. So where the 20's are --
14   A.   Yes.
15   Q.   -- there's a 20 for each day between
16 and including June 2nd through June 6th, correct?
17   A.   Yes.
18   Q.   And that's a -- as you described it,
19 a preliminary approved FMLA?
20   A.   Yes. She did not receive any
21 occurrences for any of that whole week off.
22   Q.   Okay. Then on the 9th, there's a
23 notation. What does that mean?

Page 43

1   A.   Yeah. Amber put in no call, no show.
2   Q.   Okay. Is that described anywhere on
3 this form?
4   A.   Again, that could be through local
5 history. Because again, this form is provided us
6 from our corporate office, so...
7   Q.   That appears on this form to be the
8 only no call, no show, right?
9   A.   For 2003, yes.
10  Q.   Okay.
11       MR. KLECZEK: Mark this is 13,
12 please.
13       (At this point in the proceedings the
14 Court Reporter marked, for purposes of
15 identification, Deposition Exhibit Number 13, after
16 which the following proceedings were conducted;)
17       BY: MR. KLECZEK
18  Q.   Okay. Now I'm handing you what's
19 been marked as Deposition Exhibit 13. This would
20 be the corresponding 2002 --
21  A.   Yes.
22  Q.   -- absentee calendar?
23  A.   Yes.

Page 44

1   Q.   This document, in terms of storage
2 and reliance, is the same as Deposition Exhibit 5,
3 correct?
4   A.   Yes.
5   Q.   There is one marking of no call, no
6 show --
7   A.   Yes.
8   Q.   -- for 2002, correct?
9   A.   Yes.
10  Q.   Okay. All right. I'm handing you
11 what's been marked as deposition -- Sharon Jacks'
12 Deposition Exhibit 2.
13  A.   Yes.
14  Q.   All right. Under the definition of
15 no call, no show, --
16  A.   Yes.
17  Q.   -- you see a written definition
18 there, right?
19  A.   Yes.
20  Q.   All right. And that is defined as
21 the failure to call in at least one hour prior?
22  A.   Or to report to work.
23  Q.   Or to report to work?

Page 45

1  A.  Yes.
2  Q.  And two no call, no shows in a one
3  year period will result in job abandonment?
4  A.  Yes.
5  Q.  Okay. That appears to be the only
6  place that job abandonment is mentioned in this
7  document; am I correct?
8  A.  Yes.
9  Q.  Okay. Yet Ms. Jacks was classified
10 as termination due to job abandonment, right?
11 A.  On her internal records, yes.
12 Q.  Okay. I just want to understand
13 absentee policy. There are occurrences and there
14 are final warnings, right?
15 A.  Yes.
16 Q.  And each of those are significant
17 relating to the absentee policy?
18 A.  Yes.
19 Q.  All right. What is an occurrence?
20 A.  Occurrence is anytime that an
21 employee is absent, does not have sick time to
22 cover that absenteeism, and is not scheduled for
23 any approved time off, vacation, sick time.

Page 46

1  Q.  FMLA?
2  A.  FMLA.
3  Q.  Okay. And how many occurrences is a
4  person entitled to before any sort of disciplinary
5  action is taken?
6  A.  If they're in their 30 days it's
7  different -- I mean, their probationary period is
8  different from a person who's made it outside of
9  their probation.
10 Q.  I'm not interested in the
11 probationary period.
12 A.  All right. So an employee who gets
13 two occurrences after their probationary period
14 will get a verbal, at three they get a written, and
15 four they get a final. Now, we have, as a courtesy
16 to employees, most of the time that if they hit --
17 they go from a three and a half to a four and a
18 half or they've got a three and they go to a three
19 and a half, we will sometimes make them aware of
20 that. Sometimes occurrences don't fall neatly as
21 two, three, four, or four and a half, they may go
22 from a three and a half to a four and a half so
23 they'll get a final at four and a half.

Page 47

1  Q.  And this is within a 12 month period?
2  A.  Yes. They fall off.
3  Q.  Okay. Irrespective of vacation or
4  sick time or FMLA, right?
5  A.  Right.
6  Q.  Okay. Meaning that those don't
7  increase the 12 month period, right?
8  A.  No.
9  Q.  Okay.
10 A.  The 12 month period is from the day
11 of the first occurrence and it falls off a year
12 later.
13 Q.  A rolling 12 month period?
14 A.  Yes.
15 Q.  And nothing can expand --
16 A.  Right.
17 Q.  -- that 12 month period?
18 A.  Right.
19 Q.  Okay. Now, explain this. You said
20 sometimes as a courtesy a person who has three and
21 a half occurrences, what do you mean?
22 A.  Well, if they go from three and a
23 half to four and a half or they go from three and a

Page 48

1  half to four when we do the four -- it depends on
2  what -- every circumstances is different. But
3  like, let's say, someone went from a three and a
4  half to a four and a half and they didn't -- in
5  their minds they didn't get a final warning at four
6  we'll put that on there that they went from three
7  and a half to four and a half. Because they got a
8  full occurrence instead of a half occurrence.
9  Sometimes the math isn't as neat to go along with
10 that.
11 Q.  Okay. So going above the four
12 threshold, whether you arrive at four --
13 A.  Or four and a half.
14 Q.  -- or you go to four and a half,
15 you're going to get a final warning?
16 A.  Right.
17 Q.  Okay. And three final warnings
18 within a 12 month period results in termination?
19 A.  Yes.
20 Q.  Okay. And Ms. Jacks, as we
21 discussed, had received a written warning, which is
22 different from a final warning, on May 5th, 2003?
23 A.  Yes.

Page 57

1  A.  Yes.
2  Q.  And what does that signature mean?
3  A.  That means that I have reviewed it,
4  approved for any kind of increase that she's
5  eligible for. And in this case I make any notes,
6  tell them -- so that the employee is aware of any
7  improvements that are necessary.
8  Q.  Okay. If I recall, Ms. Jacks got
9  that 50 cent raise right around the time of this
10 review, right?
11 A.  She got a 35 cent increase. I think
12 -- yeah, she got, according to this, a 35 cent
13 increase from 9.45 to 9.80.
14 Q.  And her overall evaluation was 55?
15 A.  5.5.
16 Q.  And that's on a ten scale?
17 A.  Yes.
18 Q.  How would you rate that in terms of
19 is that good, bad?
20 A.  That's average.
21 Q.  That's average?
22 A.  Sure.
23 Q.  Okay. So Ms. Jacks, would you

Page 58

1  categorize her overall as an average worker?
2  A.  Performance, yes.
3  Q.  But this form also takes into
4  consideration attendance, right?
5  A.  Yes.
6  Q.  So performance, attendance,
7  everything, you would categorize her as an average
8  worker?
9  A.  No. It's delineated here as well
10 that she was at four and a half occurrences at the
11 time of this review.
12 Q.  Okay. But the overall performance --
13 A.  Yes.
14 Q.  -- is a 5.5?
15 A.  Yes. It would have much higher had
16 she gotten more than a zero from her supervisor's
17 rating.
18 Q.  And I know it's hard, just let me
19 finish my questions --
20 A.  I'm sorry.
21 Q.  -- so that she can get everything
22 down. Okay. But in -- and in terms of
23 performance, Ms. Jacks had what appears to be

Page 59

1  sevens and sixes, a five, an eight, a five, a six.
2  Everything except for attendance was either at
3  average or above average?
4  A.  Yes.
5  Q.  Okay. You would agree that she was
6  -- her performance was good?
7  A.  Yes.
8  Q.  And that was throughout her tenure --
9  A.  Yes.
10 Q.  -- at Conair? Okay. You were
11 notified by Ms. Jacks on June 2nd, 2003 that her
12 husband had injured himself, right?
13 A.  Yes.
14 Q.  And that he needed her to take care
15 of him, right?
16 A.  That's what she said, yes.
17 Q.  She called you?
18 A.  Yes.
19 Q.  And did you, at that time, discuss
20 FMLA?
21 A.  Yes.
22 Q.  And do you recall that conversation?
23 A.  Yes. She just called and said that

Page 60

1  Kenny had hurt his back and she needed to take care
2  of him. And I asked her if she was looking for
3  family leave and she said yes. I said I would get
4  the paperwork ready for her.
5     I did not speak with her when she
6  picked them up on Monday but I pulled out the
7  paperwork, had it in front of me, and said you're
8  going to need to fill in your name, Kenny's name,
9  make sure you sign it, and then have the doctor
10 fill it out. And then I gave her our fax number so
11 she could fax it to me.
12 Q.  So faxing it to you was an
13 appropriate --
14 A.  Yes.
15 Q.  -- method of communicating it to you,
16 right?
17 A.  Yes.
18 Q.  Okay. And you would agree that you
19 received a faxed document from Dr. Katner on June
20 6th, 2003?
21 A.  Yes. He sent it after hours so I did
22 not receive them until Monday morning.
23     MR. KLECZEK: Do you have a stapler?

Page 61

1  THE REPORTER: No.
2  MR. KLECZEK: Do you have stapler?
3  MR. GARBUTT: No. Sorry.
4  MR. KLECZEK: You can go off the
5  record.
6  (At this point in the proceedings an
7  off the record discussion was held, after which the
8  following proceedings were conducted;)
9  BY: MR. KLECZEK
10  Q.  Did you -- after Ms. Jacks called on
11  June 2nd, 2003, --
12  A.  Uh-huh.
13  Q.  -- did you talk to her any more that
14  week?
15  A.  No. She did not contact me at all
16  that week.
17  Q.  Okay. You had understood that her
18  husband's injury, at least what she had told you,
19  was going to last for a period of time, right?
20  A.  All she said was he'd hurt his back,
21  she needed to be off with him, did not go any --
22  did not say how much time she needed or anything.
23  Q.  Okay. Now, she didn't call on

Page 62

1  Tuesday, right?
2  A.  She didn't need to. Once she
3  requested the family leave I put her on family
4  leave.
5  Q.  Okay. Under law she's entitled to up
6  to 12 weeks --
7  A.  Right.
8  Q.  -- if it's approved, right?
9  A.  Yes.
10  Q.  Okay. And do you know what day she
11  picked up the form?
12  A.  She picked them up Monday.
13  Q.  You weren't there though?
14  A.  No. But I prepared them and Natalie
15  told me that she had picked them up that day.
16  Q.  Okay. This was the three-page
17  document we had talked about one being an
18  explanatory document and the other being a fill-in
19  the blanks document?
20  A.  Right.
21  Q.  The other two pages being a fill-in
22  the blacks document?
23  A.  Right.

Page 63

1  Q.  I'm handing you what's been marked as
2  Deposition Exhibit 12.
3  A.  Uh-huh.
4  Q.  Is this the document that was faxed
5  to your office on June 6h, 2003?
6  A.  Yes.
7  Q.  Okay. Because there are differences
8  between Burris Deposition Exhibit Number 12 and
9  Jacks' Deposition Exhibit Number 6, and they're on
10  the second page.
11  A.  Okay. Yes, I signed it, I made
12  notes, and I underlined transportation.
13  Q.  Okay. But the document in Burris
14  Deposition Exhibit Number 12 is the one that was
15  actually faxed to your office?
16  A.  Yes.
17  Q.  And this was the state it was in when
18  you received it on Monday, --
19  A.  Yes.
20  Q.  -- June 9th, --
21  A.  Yes.
22  Q.  -- 2003?
23  A.  Yes.

Page 64

1  Q.  Okay. Now, Sharon Jacks testified
2  that she filled out the top portions, Number 1 and
3  2?
4  A.  Uh-huh.
5  Q.  And she did not fill out the
6  remainder --
7  A.  Right.
8  Q.  -- of Page 1? On Number 3 it asks
9  the form filler-outer to check a number which
10  appears to be defined by this third page?
11  A.  Yes.
12  Q.  Do you know what these six categories
13  are?
14  A.  I believe one is hospitalization, two
15  is repeated care, you know, follow-up appointments,
16  that kind of thing, I don't remember what the rest
17  of them are.
18  Q.  Okay. At any rate, Number 2 was
19  checked?
20  A.  Yes.
21  Q.  You don't know exactly what that
22  means at this point?
23  A.  No.

Page 65

1   Q.   Okay. And Number 4 it was written,
2   the patient will be seeing pain management for
3   injections and then to physical therapy, --
4   A.   Yes.
5   Q.   -- right?
6   A.   Yes.
7   Q.   Okay. Number 5 asks for the date the
8   condition began and the duration of the condition,
9   right?
10  A.   Yes.
11  Q.   And they indicated it began on May
12  29th, 2003, right?
13  A.   Yes.
14  Q.   The duration was undetermined but the
15  next office visit was June 23rd, 2003?
16  A.   Yes.
17  Q.   You would agree that this infers the
18  condition will last through June 23rd, 2003?
19  A.   Yes.
20  Q.   Okay. Under 5B it's asked whether
21  the employee will only work intermittently or less
22  than a full-time schedule. There's no answer
23  there, right?

Page 66

1   A.   No.
2   Q.   A chronic condition under C. If the
3   chronic condition caused the patient's being
4   incapacitated. There's no answer there either,
5   right?
6   A.   No. I'm sorry.
7   Q.   There's no answer under 6A asking for
8   the number of treatments, right?
9   A.   Correct.
10  Q.   Okay. And there's no answer under 6B
11  for the nature of the treatments, right?
12  A.   Correct.
13  Q.   Okay. 6C, no answer?
14  A.   Correct.
15  Q.   And 7A, B, and C, no answer?
16  A.   Correct.
17  Q.   Okay. Under 8 it's asked if leave is
18  required to care for a family member of an employee
19  with a serious health condition, does the patient
20  require assistance for basic medical or personal
21  needs or safety or for transportation, that's the
22  question, right?
23  A.   Yes.

Page 67

1   Q.   And the answer is yes?
2   A.   Yes.
3   Q.   And then it says also unable to drive
4   due to pain level and medications, right?
5   A.   Yes.
6   Q.   Okay. Doesn't say anything about
7   driving to and from medical appointments, right?
8   A.   No.
9   Q.   Okay. And then it's signed by Dr.
10  Katner?
11  A.   Yes.
12  Q.   Okay. You don't dispute that he
13  approved this, right?
14  A.   I have no basis to dispute that, no.
15  Q.   Okay. Dated June 6, 2003?
16  A.   Yes.
17  Q.   All right. This is a form that
18  Conair has drafted, correct?
19  A.   No. I believe that they -- it's not
20  something they've drafted. I believe that they've
21  gotten that from some family leave site, I'm not
22  sure.
23  Q.   Okay. All right. Under 5A --

Page 68

1   A.   Yes.
2   Q.   -- there is the term incapacity, do
3   you see it?
4   A.   Yes.
5   Q.   And there's a Footnote 2?
6   A.   Yes.
7   Q.   Now, incapacity is defined at the
8   bottom of this page, right?
9   A.   Yes.
10  Q.   Okay. Can you read the definition of
11  incapacity?
12  A.   "Incapacity, for purpose of family
13  leave, is defined to mean inability to work, attend
14  school, or perform other regular daily activities
15  due to the serious health condition and treatment
16  therefore or recovery therefrom."
17  Q.   Okay. So what this answer is telling
18  you is that Mr. Jacks had an incapacity as defined
19  beginning May 29th with an undetermined length of
20  time?
21  A.   Yes.
22  Q.   Okay. Now, when you received this
23  you underlined the word transportation?

Page 69

1  A.  No.
2  Q.  Okay. Who underlined that?
3  A.  I did it but not when I received it.
4  Q.  Okay. When was it underlined?
5  A.  After I spoke with Dr. Katner's
6  office.
7  Q.  Did you ever speak with Dr. Katner?
8  A.  No. I didn't need to speak with him
9  because his medical condition was not what was in
10 dispute.
11 Q.  You're not disputing that Mr. Jacks
12 had a serious medical condition?
13 A.  No. Not, not at all.
14 Q.  Are you disputing that Mr. Jacks was
15 incapacitated pursuant to the definition that we
16 just talked about?
17 A.  No.
18 Q.  At the bottom you marked that the
19 FMLA leave is approved?
20 A.  Yes.
21 Q.  And then did you simultaneously --
22 A.  Yo.
23 Q.  -- write this additional language?

Page 70

1  A.  Yes.
2  Q.  And what does that say?
3  A.  "For doctor appointments, therapy, et
4  cetera, per nurse. Patient does not require 24/7
5  care."
6  Q.  And that's from the nurse, --
7  A.  Yes.
8  Q.  -- from you talking with the nurse?
9  A.  Yes. Talking -- yes.
10 Q.  Okay. Now, approximately what time
11 did you receive this?
12 A.  When I got to work at six o'clock on
13 that Monday.
14 Q.  Okay. And what this is telling you
15 is that -- well, strike that question. Based on
16 you receiving this Monday morning, was Sharon
17 Jacks, in your opinion, required to call in sick on
18 Monday?
19 A.  No. What I needed to do -- no, she
20 wasn't. She needed to be notified that her request
21 for family leave to be off 24/7, which is what she
22 felt she needed, did not correspond to what the
23 physician's documentation provided.

Page 71

1  Q.  Okay. Did you talk to Ms. Jacks that
2  day?
3  A.  Yes.
4  Q.  Who called who first?
5  A.  I believe I called her first.
6  Q.  Okay.
7  A.  I did not reach her.
8  Q.  Did you leave a message?
9  A.  And she called me back after lunch to
10 ask me if I'd gotten the paperwork.
11 Q.  Did she tell you if she was at the
12 courthouse?
13 A.  No, not at that -- that was right
14 after lunch. We did have one more conversation
15 that day and that's when she told me she was at
16 court.
17 Q.  So in terms of -- you heard Ms. Jacks
18 testify about the conversations that day?
19 A.  Yes.
20 Q.  Do you recall anything that you
21 dispute remembering listening to Ms. Jacks'
22 testimony?
23 A.  She made it sound like we only had

Page 72

1  one conversation that day, we did have two, one was
2  right after lunch when she contacted me to make
3  sure I got the paperwork.
4  Q.  Okay.
5  A.  I told her I had.
6  Q.  That was right after lunch?
7  A.  Yes.
8  Q.  So she called you?
9  A.  She called me right after lunch, yes.
10 Q.  And approximately what time was that?
11 A.  It had to have been after -- let's
12 say between 12 and 12:30. I don't want to be
13 specific to that but it was right after lunch, yes.
14 Q.  It wasn't any later that one o'clock?
15 A.  No.
16 Q.  Okay. And at that time did she say
17 that she wasn't going to be in that day?
18 A.  No. What she -- no.
19 Q.  Okay. What did she say to you?
20 A.  She called to ask me if I'd received
21 the paperwork.
22 Q.  And what did you say?
23 A.  I said I had but the paperwork did

Page 73
1  not corroborate that she needed to be off 24/7 with
2  Kenny, that she just needed to provide him
3  transportation. I told her that I had contacted
4  the doctor's office to see if -- you know, there
5  was a dispute in the paperwork, to clar -- I needed
6  to clarify. Because what she was telling me and
7  what the paperwork said weren't the same. She said
8  she would call the doctor's office herself too.
9      Q.   Okay. What was she telling you?
10     A.   That she wanted to be off with Kenny.
11     Q.   Okay. That Kenny required her care?
12     A.   She said that she felt she needed to
13  be off with Kenny. And what I said to her was
14  that's not what the doctor's paperwork said. And I
15  did encourage her to call the doctor's office too.
16     Q.   Did she say that Kenny requires my
17  care, I need to be with him?
18     A.   No. She said she felt she needed to
19  be off with Kenny.
20     Q.   Okay. Was it understood that she was
21  not going to come in to work --
22     A.   No.
23     Q.   -- Monday?

Page 74
1      A.   No. Because I explained to her, I
2   said, based on this paperwork I received you won't
3   be approved to be off with him tonight. Then I
4   went through the process of telling her where she
5   was on her final warnings, that that would get her
6   -- even if it would only take her to four and a
7   half, she wouldn't be fired for occurrences but
8   that would give her her third final in one year.
9      Q.   Okay.
10     A.   And that's what made her really
11  adamant. She said, well, I'm going to call the
12  doctor's office to get them to change the
13  paperwork.
14     Q.   Okay. This was on the first
15  conversation?
16     A.   Yes.
17     Q.   Then the second conversation, I think
18  you indicated, she was at the courthouse?
19     A.   Yeah.
20     Q.   And she had called you then?
21     A.   Yes.
22     Q.   She must have?
23     A.   Yes, yes.

Page 75
1      Q.   And what occurred in that
2   conversation?
3      A.   I explained to her that I had heard
4   back from the doctor's office. And I told her I'd
5   even left a message on her telephone at home
6   letting her know that the doctor did not believe --
7   that Joe from the doctor's office told me that they
8   were standing by the paperwork, that she did not
9   need to provide care 24/7.
10     Q.   Okay. And then what did you say to
11  her?
12     A.   I told Sharon, I said, Sharon, that
13  means you've got to come to work.
14     Q.   And what did Sharon say?
15     A.   She didn't think she could make it.
16     Q.   Did she tell you why?
17     A.   She says I'm at court, yeah.
18     Q.   Okay. Did she tell you why she was
19  at court?
20     A.   No.
21     Q.   Okay. Did she give you any other
22  reason why she said she couldn't make it to work?
23     A.   No. All she said was that she was at

Page 76
1   court, she didn't think she'd make it in time.
2      Q.   So it was understood, at least you
3   understood that she wasn't coming in to work that
4   day, at this point?
5      A.   I'm not -- no, I'm going to say no to
6   that. Because she was out and providing him
7   transportation, she could have arrived anytime that
8   night and that part would have been covered under
9   FMLA.
10     Q.   Okay. Did you talk to her anymore
11  that day?
12     A.   No.
13     Q.   When was the next time you talked to
14  Sharon?
15     A.   I don't believe I talked to Sharon
16  again.
17     Q.   Okay. Did you ever inform her that
18  she was terminated?
19     A.   I don't believe so.
20     Q.   Did you terminate her the next day?
21     A.   Yes.
22     Q.   And what's the process of terminating
23  somebody?

Page 77

1  A. First of all, I did not do anything
2  on that Monday because she still had an opportunity
3  to arrive at work. So I had to wait 'til I came in
4  the next day to check the time clock to see if she
5  had come in at work and she hadn't. Basing that on
6  the fact that if she was providing him
7  transportation, let's say for him, she would have
8  still had ample time. She had 'til 12:15, I mean
9  the shift went to 12:15. So I couldn't do anything
10 on that day because I couldn't assume that she
11 wasn't going to come to work.
12 Q. Okay.
13 A. So when I came in and checked the
14 time clock and there were no hours for her I did
15 wait a little while because I wanted to talk to the
16 supervisor thinking, you know, did she show up, did
17 you talk to her. And so I called the supervisor
18 that morning and he hadn't heard anything from her.
19 Q. You called the supervisor at home?
20 A. Yes.
21 Q. Okay. So based on your understanding
22 that she didn't come in, what did you do?
23 A. I terminated her.

Page 78

1  Q. And what's -- I mean, what's the
2  process for that, filling out forms?
3  A. Yes. Just as we went through the
4  checklist.
5  Q. Okay. So at this point Sharon Jacks
6  had been terminated from employment --
7  A. Yes.
8  Q. -- as of June 10th, 2003, right?
9  A. Yes.
10 Q. Effective June 9th, 2003?
11 A. Yes. Because that would have been
12 her last -- that would have been the date she was
13 expected at work.
14 Q. And was she eligible for rehire or
15 not eligible for rehire?
16 A. She would have been eligible for
17 rehire had she notified us. Usually when we --
18 once we get to this, because of attendance at three
19 final warnings, --
20 Q. Had she notified you of what?
21 A. You know, she would have said, yes,
22 I'm coming in. We don't have a strict policy on
23 rehire.

Page 79

1  Q. Okay. But because she didn't notify
2  you --
3  A. Well, it's considered job
4  abandonment. If it's considered job abandonment we
5  do not rehire anyone who's abandoned their
6  position.
7  Q. So did she have an opportunity to get
8  her position back?
9  A. She never contacted me again. She
10 came in and picked up her check on that Thursday
11 and we talked briefly.
12 Q. Okay. And what did you talk about?
13 A. She blamed Kenny for losing her job.
14 Q. What did she say?
15 A. She said she was pissed at him
16 because he'd made her lose her job.
17 Q. Was that everything she said?
18 A. They were having difficulties. I
19 offered to call a women's shelter for her.
20 Q. What kind of difficulties?
21 A. She didn't get into it. Wasn't my
22 business. I was just there to offer any help that
23 I could.

Page 80

1  Q. Okay. You -- did she say that Kenny
2  was hitting her?
3  A. No.
4  Q. Or threatening her?
5  A. No.
6  Q. Or abusing her?
7  A. No.
8  Q. Just wanted to be sure.
9  A. Sure.
10 Q. Because you mentioned the women's
11 center.
12 A. Yeah.
13 Q. Did she infer that in any way?
14 A. No. She didn't -- she inferred it,
15 she didn't -- she implied it, I should say.
16 Q. How did she imply it?
17 A. She was just crying. And I walked
18 outside with her and I said, are you okay, and she
19 said she blamed Kenny for making her lose her job.
20 Q. Okay. At anytime, did you tell her
21 that if she got the FMLA form changed that she
22 could get her job back?
23 A. When we talked on that day, on the

Page 81

1   9th.
2   Q.   Okay.
3   A.   The ball was in her court at that
4   point to get them changed. And had I received
5   updated forms that day to have her off she'd have
6   been off, she'd have been approved.
7   Q.   What if she brought in updated forms
8   say on June 11th?
9   A.   That would -- we would have had to
10  have considered it.
11  Q.   You would have had to have considered
12  it?
13  A.   Yeah.
14  Q.   Okay. But you never told her after
15  she picked up her check Friday that she could still
16  bring in the forms?
17  A.   No. She didn't even bring it up.
18  Q.   Okay. She was never -- did you ever
19  send her any letters?
20  A.   No.
21  Q.   And you never sent her any additional
22  forms?
23  A.   No.

Page 82

1   Q.   Okay. And I want to understand, your
2   words to her on Monday were that if you don't get
3   us an updated form or you don't show up tonight you
4   will be terminated?
5   A.   No. What I said to her was, based on
6   these forms she had to report for her shift and if
7   she didn't she would terminate because that would
8   take her to three final warnings.
9   Q.   Okay. So it's reasonable for her to
10  have understood that she would be fired if she
11  didn't come in that day?
12  A.   I believe so, yes.
13  Q.   Okay. And did you at all ever
14  discuss reinstatement?
15  A.   It was never -- no, it was never a
16  topic.
17  Q.   Okay. All right. On June 9th you
18  had made various phone calls to Dr. Katner's
19  office?
20  A.   Yes.
21  Q.   And you first called Dr. Katner at
22  8:05 in the morning?
23  A.   After I -- right after they opened up

Page 83

1   the office, yes.
2   Q.   But you had to leave a message for
3   somebody?
4   A.   Yes.
5   Q.   Did somebody call you back?
6   A.   Yes.
7   Q.   And who was that?
8   A.   Her name was Jo.
9   Q.   Do you remember the time?
10  A.   No.
11  Q.   All right. But they didn't call you
12  back -- strike that. They called you back -- Dr.
13  Katner's office called you back after you talked to
14  Sharon the first time?
15  A.   Yes.
16  Q.   Okay. Your notes indicate -- I'm
17  handing you what's been marked Burris Deposition
18  Exhibit 9. Your notes indicate that Jo called you
19  back at approximately 3:15 in the afternoon.
20  A.   Yes.
21  Q.   Okay. And do you know who Jo was?
22  A.   No.
23  Q.   How did this person identify

Page 84

1   themselves?
2   A.   This is Jo from Dr. Katner's office.
3   Q.   A male or female?
4   A.   Female.
5   Q.   A nurse or receptionist?
6   A.   I would not know.
7   Q.   Okay. They didn't in any way
8   indicate they were a medical provider?
9   A.   No.
10  Q.   All right. And they said that -- or
11  she said the paperwork was correct?
12  A.   Yes.
13  Q.   And she's standing by the paperwork?
14  A.   Yes.
15  Q.   Okay. Did she indicate that she had
16  filled out the paperwork?
17  A.   No.
18  Q.   Did she explain what the paperwork
19  meant to you?
20  A.   Could you clarify that?
21  Q.   Did she explain in further depth what
22  the paperwork meant?
23  A.   All -- it meant -- I asked her if

Page 85

1  Sharon needed to provide 24/7 care. That was
2  Sharon's terminology so I used the same terminology
3  with her. No, Dr. Katner's office stood by the
4  fact that she only needed to provide him
5  transportation.
6  Q. What was she referring to when she
7  said this?
8  A. The Family Leave paperwork where it
9  doesn't say that Sharon needs to be off work to
10 provide round the clock care.
11 Q. Okay. So she was interpreting this
12 FMLA paperwork that you had in front of you as
13 well?
14 A. Yes.
15 Q. Okay. She didn't in any way indicate
16 that she had discussed this matter with either --
17 with any of the treating medical providers?
18 A. Yes. Because when I called and left
19 a message she apologized for getting back with me
20 so late because she had to meet with the doctor to
21 clarify.
22 Q. Okay.
23 A. Actually to follow-up on my request.

Page 86

1  Q. Did she say why or what she discussed
2  with the doctor?
3  A. No.
4  Q. Did the doctor indicate what kind of
5  transportation or the frequency of the
6  transportation that Sharon needed to provide?
7  A. No.
8  Q. But that all transportation for Kenny
9  Jacks needed to be provided by Sharon Jacks, that
10 was your understanding?
11 A. Yes.
12 Q. Okay. Did you have any other
13 conversations with Dr. Katner's office after
14 talking with Jo?
15 A. No.
16 Q. That was the only conversation you
17 had with them?
18 A. Yes.
19 Q. Okay. What was Sharon Jacks', what
20 was her shift?
21 A. Second shift.
22 Q. And what are the hours of second?
23 A. 3:45 to 12:15 in the morning, Monday

Page 87

1  through Friday.
2  Q. How far is the Champaign courthouse
3  from the Conair facility?
4  A. I don't know.
5  Q. Would you say that it's over a 15
6  minute drive?
7  A. It's probably 15, 20 minutes, yes.
8  Q. Okay. And Ms. Jacks called you at
9  3:30, according to Deposition Exhibit --
10 A. Yes.
11 Q. -- Number 8, correct?
12 A. Yes.
13 Q. And she said she was at the
14 courthouse at that time?
15 A. Yes.
16 Q. Okay. Okay. At some point Sharon
17 told you that she needed to be home with Kenny
18 24/7?
19 A. Yes.
20 Q. When was that?
21 A. That Monday.
22 Q. Which Monday?
23 A. That she requested the family leave.

Page 88

1  Q. Okay. All right. So it's fair that
2  you understood that she was communicating that she
3  wasn't going to be at work for an extended period
4  of time, right?
5  A. Yes.
6  Q. Okay. I mean, Monday the 9th things
7  hadn't changed in her insistence that Kenny needed
8  24/7 care, right?
9  A. Her need hadn't change, no.
10 Q. Okay. But I'm saying she didn't say
11 that, okay, Kenny doesn't require 24/7 care as of
12 Monday the 9th?
13 A. No.
14 Q. All right. So a fair interpretation
15 would be that she wasn't going to come in Monday
16 the 9th due to Kenny's condition or her belief of
17 Kenny's condition?
18 A. Right.
19 Q. And that's what you understood at the
20 time?
21 A. Yes.
22 Q. Okay. Now, you received a letter
23 from me, correct?