E-FILED
Monday, 01 May, 2006  04:51:27 PM
Clerk, U.S. District Court, ILCD

SHARON S. JACKS, JANUARY 17, 2006

```
 1            UNITED STATES DISTRICT COURT
              CENTRAL DISTRICT OF ILLINOIS
 2                  URBANA DIVISION

 3                                              COPY

 4   SHARON JACKS,              )
                                )
 5      Plaintiff,              )
                                )
 6      -vs-                    )   No. 04-2230
                                )
 7   CONAIR CORPORATION,        )
                                )
 8      Defendant.              )

 9

10

11

12           THE DISCOVERY DEPOSITION of SHARON S.
     JACKS, the plaintiff herein, called by the
13   Defendant for examination pursuant to agreement and
     pursuant to the provisions of the Code of Civil
14   Procedure and the Rules of the Supreme Court
     thereof pertaining to the taking of depositions,
15   taken before me, Jill A. Bleskey, CSR-RPR, License
     No. 084-004430, a Notary Public in and for the
16   State of Illinois, at Brookens Administrative
     Building, 1776 East Washington Street, in the City
17   of Urbana, County of Champaign, and State of
     Illinois on the 17th day of January, A.D., 2006,
18   commencing at 9:00 a.m.

19

20
                     Jill A. Bleskey, RPR
21                     CSR #084-004430

22                                         RECEIVED JAN 2 7 2006
23
```

ESQUIRE DEPOSITION SERVICES - CHICAGO
312.782.8087  800.708.8087  FAX: 312.704.4950


Exhibit B

SHARON S. JACKS, JANUARY 17, 2006

| | | |
|---|---|---|
| 1 | A. | 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. |
| 2 | Q. | 52, okay. Thank you. |
| 3 | A. | Uh-huh. |
| 4 | Q. | Where do you reside now? |
| 5 | A. | Rantoul. |
| 6 | Q. | What's the address there? |
| 7 | A. | 1231 Cypress, Rantoul, Illinois. |
| 8 | Q. | How long have you lived there? |
| 9 | A. | About nine years. |
| 10 | Q. | Is that a home? |
| 11 | A. | Trailer. |
| 12 | Q. | Trailer? |
| 13 | A. | Uh-huh. |
| 14 | Q. | You own it? |
| 15 | A. | Yes. |
| 16 | Q. | Do you own it yourself or -- |
| 17 | A. | Me and my husband. |
| 18 | Q. | Who resides there with you? |
| 19 | A. | My husband, my daughter. |
| 20 | Q. | What's your daughter's name? |
| 21 | A. | Amanda. |
| 22 | Q. | Your husband is Kenny Jacks? |
| 23 | A. | Kenny. |

1  June 8th was a Sunday.  Weren't you, in fact,
2  discharged by Conair after an absence on Monday,
3  June 9th, 2003?
4      A.    I guess so.
5      Q.    And you -- do you claim in this
6  lawsuit that you were entitled to be off work under
7  the Family Medical Leave Act on Monday June 9th,
8  2003?
9            MR. KLECZEK:  Objection, calls for a
10 legal conclusion.  You can try to answer the
11 question.
12           THE WITNESS:  I'm not sure.
13           BY:  MR. GARBUTT
14     Q.    Before that date, had you ever taken
15 time off work under the Family Medical Leave Act?
16           MR. KLECZEK:  Are you talking June
17 9th, 2003?
18           MR. GARBUTT:  Well, before.
19           BY:  MR. GARBUTT
20     Q.    The week before June 9th, 2003 you
21 didn't work either, correct?
22     A.    Right.
23     Q.    The full week, Monday through Friday,

1  before June 9th and then June 9th itself you were
2  absent from work, right?
3       A.    Right.
4       Q.    Before those dates, had you ever
5  taken time off work under the Family Medical Leave
6  Act?
7       A.    You mean before this time that we're
8  talking about right now?
9       Q.    Yes.
10      A.    No.
11            MR. KLECZEK: Same objection, object
12 to the form. I think it calls for a legal
13 conclusion. You can answer, I think you did.
14            MR. GARBUTT: She did.
15            BY: MR. GARBUTT
16      Q.    So the last date that you actually
17 worked for Conair was Friday, May 30th, 2003,
18 right?
19      A.    Right.
20      Q.    Now, you were scheduled to work the
21 following week, June 2nd through the 6th, right?
22      A.    Yes, sir.
23      Q.    And you were scheduled to work on

1  Monday, June 9th?
2      A.    Yes, sir.
3      Q.    And all of those days you were
4  scheduled to work on your normal shift starting at
5  3:45 in the afternoon, right?
6      A.    Right.
7      Q.    Why did you not work those days?
8      A.    Because my husband had hurt his back,
9  he couldn't move, he couldn't -- I mean, he was in
10 serious pain.
11     Q.    When did he hurt his back?
12     A.    He hurt his back on the 29th, I
13 believe it was.  It was a Thursday, I'm not sure of
14 the date.  He went back to work Friday and
15 Saturday.  Sunday he got severely bad pain and that
16 Monday morning is when I took him in to Christie in
17 Rantoul.
18     Q.    What happened on Sunday to result in
19 him experiencing that extremely bad pain?
20     A.    We didn't really do anything.  We had
21 went out to the lake, we had a picnic, and he
22 started complaining that it was bothering him and
23 by that evening it was so bad he was in tears.

SHARON S. JACKS, JANUARY 17, 2006

```
 1  following proceedings were conducted;)
 2              BY:  MR. GARBUTT
 3      Q.      Back on the record.  You ready?
 4      A.      All right.
 5      Q.      At some point, Ms. Jacks, did you
 6  talk to Stephanie Burris about taking time off from
 7  work during this interval in June of 2003 we've
 8  been focusing on?
 9      A.      Yes, I did.  I knew my occurrences
10  was up there so -- and with him as bad as he was I
11  knew I was going to have to take some time off so I
12  talked to her about the Family Medical Leave.
13      Q.      When you say you knew your
14  occurrences were up there, you're talking about the
15  number of occurrences against the attendance
16  policy --
17      A.      Right.
18      Q.      -- we talked about before?
19      A.      Yes, sir.
20      Q.      You knew you were at the point that
21  another occurrence could mean your discharge,
22  right?
23      A.      Right.
```

```
 1      A.      Uh-huh.
 2      Q.      Now, it's true, isn't it, that Ms.
 3  Burris made an FMLA medical certification form
 4  available for you to pick up at work --
 5      A.      Yes, sir.
 6      Q.      -- to take to Kenny's doctors?
 7      A.      Yes, sir.
 8      Q.      Is that a yes?
 9      A.      Yes, sir.
10      Q.      I'm sorry --
11      A.      Sorry.
12      Q.      -- but we're talking over each
13  other --
14      A.      Sorry.
15      Q.      -- at the same time so I need to
16  make sure that your answer gets on the record.  You
17  remember when you picked that FMLA certification
18  form up from Conair, do you remember what day that
19  was?
20      A.      I'm not sure of the day.  I know it
21  was before I went to -- before we went to see Dr.
22  Katner.
23      Q.      And Kenny was referred to Dr. Katner
```

SHARON S. JACKS, JANUARY 17, 2006

1  from Provena on June 4th, right?
2       A.      Right.
3       Q.      And it was June 5th, the next day,
4  that he actually went to see Dr. Katner, correct?
5       A.      Right, I believe so.
6       Q.      So did you take the FMLA medical
7  certification form with you to Dr. Katner's office?
8       A.      Yes, I did.
9       Q.      Did you go with Kenny --
10      A.      Yes, sir, I did.
11      Q.      -- to his visit with Dr. Katner?
12      A.      I drove him over there.
13      Q.      What vehicle did you use for that
14  trip?
15      A.      I believe the van.  The van was more
16  comfortable.  Even though it was a little bit
17  harder for him to get in and out of, it was more
18  comfortable than his pick-up truck.
19      Q.      Did anybody besides you go with Kenny
20  to see Dr. Katner on June 5th?
21      A.      No.
22      Q.      And when you -- Dr. Katner's office
23  is in Bloomington; is that correct?

```
 1      A.      Yes, sir.  I believe so.
 2      Q.      And when you got to Dr. Katner's
 3 office once again Kenny walked into the office on
 4 his own power, correct?
 5      A.      Yes, sir.
 6      Q.      And when you left Dr. Katner's office
 7 that day once again he walked out under his own
 8 power?
 9      A.      Correct.
10      Q.      Is that a yes?
11      A.      Yes, sir.
12      Q.      Did you ever see the medical
13 certification form?
14      A.      No, sir.  After it was filled out are
15 you referring to?
16      Q.      Yes.
17      A.      No, sir.  The nurse told me that she
18 would fax it to Stephanie.
19      Q.      Did you fill out part of the form
20 yourself?
21      A.      I believe I did.
22              MR. GARBUTT:  I'm going to mark this
23 as Deposition Exhibit 6.
```

1    A.    I don't think so.
2    Q.    Did Kenny see any other doctors that
3  day?
4    A.    Not that I remember.
5    Q.    Kenny didn't see any other doctors
6  that week, did he?
7    A.    I don't believe so.
8    Q.    When was Kenny's next medical
9  appointment after the June 5 visit with Dr. Katner?
10   A.    I'm not real sure. I could find out
11 through his medical records and files but -- for
12 certain dates and stuff.
13   Q.    On Monday, June 9th, Kenny did not
14 have any medical appointment with doctors or
15 medical providers, did he?
16   A.    No, sir, I don't think so.
17   Q.    Did you and Kenny go anywhere on
18 Monday, June 9th?
19   A.    He had to go to court that day.
20   Q.    And where did he have to go to court?
21   A.    To the courthouse in Urbana.
22   Q.    The state court or federal?
23   A.    State.

```
 1      Q.    That was on a traffic violation?
 2      A.    I don't remember what it was for.  I
 3 believe so.
 4      Q.    What time was his court appearance,
 5 do you know?
 6      A.    I don't know.  They're usually either
 7 at ten or one, I think is usually the Court picked
 8 times.
 9      Q.    But you don't know what time --
10      A.    No, uh-uh.
11      Q.    How did Kenny get to court --
12      A.    I drove.
13      Q.    -- on June 9th?  You drove him?
14      A.    I had to drive him, yeah.
15      Q.    Did you again drive him in the mini
16 van?
17      A.    I believe so.
18      Q.    What time did you leave to get him to
19 court?
20      A.    Thirty, 45 minutes before we was
21 supposed to get there.
22      Q.    That's the approximate driving
23 time --
```

1    Q.    What did you say to her?
2    A.    I told -- I had -- I think I was
3 asking her about the paperwork and told her I
4 wouldn't be able to be in today.
5    Q.    What did she say?
6    A.    She told me that -- I think this is
7 when she told me that I had to come in because the
8 paperwork wasn't right -- stated that I only needed
9 him for transportation or something, I believe.
10 I'm not sure of the exact words.
11        (At this point in the proceedings an
12 off the record discussion was held, after which the
13 following proceedings were conducted;)
14        MR. KLECZEK:   I'm sorry, what's the
15 answer that you got?
16        MR. GARBUTT:   Could you read it back.
17        (At this point in the proceedings the
18 Court Reporter read aloud the aforesaid question,
19 after which the following proceedings were
20 conducted;)
21        BY: MR. GARBUTT
22    Q.    So are you saying, Ms. Jacks, that
23 Stephanie Burris told you that the FMLA medical

1 certification form only authorized you to be off
2 when it was necessary for you to transport Kenny?
3    A.    Right.
4    Q.    What did you say to that?
5    A.    I told her I wouldn't be able to make
6 it in, that I had to take care of him, he couldn't
7 be on his own.
8    Q.    Did you discuss with Stephanie what
9 the medical certification form said?
10    A.    I believe she told me what it said
11 about the transportation part.
12    Q.    Did you tell Stephanie that you were
13 going to call the doctor's office to ask them to
14 clarify the form?
15    A.    I believe so.
16    Q.    Did you do that?
17    A.    Yes, I did.
18    Q.    And did you call the office?
19    A.    I called them.
20    Q.    Who did you talk to?
21    A.    I believe one of the nurses.
22    Q.    Was it the nurse you talked to the
23 day before?

```
 1      Q.      But you didn't come to work?
 2      A.      No.
 3      Q.      And you didn't call anybody at work,
 4  did you?
 5      A.      I don't think I talked to her that
 6  evening.  I'm not sure.
 7      Q.      Now, after -- when were you informed
 8  that Conair had terminated your employment?
 9      A.      Well, I was assuming that they fired
10  me that day because she said if I didn't make it in
11  that night I would be fired.
12      Q.      When were you actually informed that
13  you had been discharged?
14      A.      I'm not sure.
15              MR. KLECZEK:  I object.  It's asked
16  and answered.
17              MR. GARBUTT:  No, she just did answer
18  it.
19              MR. KLECZEK:  She said she was told
20  that day on the 9th.
21              MR. GARBUTT:  But your objection was
22  after she answered the question.
23              MR. KLECZEK:  I can still object to
```