STEPHANIE D. BURRIS, JANUARY 17, 2006

ORIGINAL

```
 1              UNITED STATES DISTRICT COURT
                CENTRAL DISTRICT OF ILLINOIS
 2                    URBANA DIVISION

 3

 4   SHARON JACKS,                   )
                                     )
 5        Plaintiff,                 )
                                     )
 6        -vs-                       )   No. 04-2230
                                     )
 7   CONAIR CORPORATION,             )
                                     )
 8        Defendant.                 )

 9

10

11

12            THE DISCOVERY DEPOSITION of STEPHANIE
     D. BURRIS, the deponent herein, called by the
13   Plaintiff for examination pursuant to notice and
     agreement and pursuant to the provisions of the
14   Code of Civil Procedure and the Rules of the
     Supreme Court thereof pertaining to the taking of
15   depositions, taken before me, Jill A. Bleskey,
     CSR-RPR, License No. 084-004430, a Notary Public in
16   and for the State of Illinois, at Brookens
     Administration Building, Meeting Room 2, 1776 East
17   Washington Street, in the City of Urbana, County of
     Champaign, and State of Illinois on the 17th day of
18   January, A.D., 2006, commencing at 11:00 a.m.

19
     ------------------------------------------------
20

21                  Jill A. Bleskey, RPR
                     CSR #084-004430
22

23
```

RECEIVED JAN 2 7 2006

ESQUIRE DEPOSITION SERVICES - CHICAGO
312.782.8087   800.708.8087   FAX: 312.704.4950

Exhibit A

1  you use yes and no as opposed to uh-huh and uh-uh
2  as those can be confused on the record.  Does that
3  make sense?
4      A.      Yes.
5      Q.      If you have any questions or in any
6  way don't understand my questions please ask me to
7  repeat or rephrase my question before answering,
8  okay?
9      A.      Yes.
10     Q.     Are you on any medication today?
11     A.     No.
12     Q.     Is there any reason that you could
13 not truthfully testify?
14     A.     No.
15     Q.     Okay.  Who's your current employer?
16     A.     Conair Corporation.
17     Q.     How long have you worked for them?
18     A.     It will be five years in April.
19     Q.     So you started April 2001?
20     A.     Yes.
21     Q.     What were you hired on as?
22     A.     Human resources manager.
23     Q.     What kind of training do you have as

STEPHANIE D. BURRIS, JANUARY 17, 2006

1    A.    E-R-N-S-T.
2    Q.    Since starting at Conair, have you
3 always been the human resource manager?
4    A.    Yes.
5    Q.    What are your duties as human
6 resource manager?
7    A.    To hire, interview, go through all
8 the process to fill head count or to fill any
9 staffing needs, any disciplinary actions.  I do job
10 counseling, I assist our supervisors with job
11 appraisals.  Did I mention terminations, I do those
12 as well.  I do benefits administration.
13   Q.    You don't outsource that?
14   A.    No.  Well, I did -- our benefits are
15 provided outsource, yes, but I do all the benefits
16 administration locally.
17   Q.    Who do you outsource the benefits
18 administration to?
19   A.    Well, I am a division of a
20 corporation.  We do have a benefits department that
21 is at our Conair Corporation at East Winchester,
22 New Jersey.
23   Q.    You don't use a third-party

1  for themselves or those qualifying dependents for
2  doctor's appointments or, you know, therapy or
3  anything like that.
4      Q.    Okay.  Now, I understand there is no
5  written policy at Conair relating to the Family
6  Medical Leave Act?
7      A.    Right.
8      Q.    Is there an oral policy?
9      A.    What I explain is when someone
10 requests family leave is they've got 15 days to get
11 the paperwork filled out in accordance to the law.
12 They get up to 12 weeks for qualifying family leave
13 qualifying event for themselves and I explain who
14 the dependents are that qualifies them for.  I do
15 let them know that it's the physician's
16 certification that qualifies them for the event.
17     Q.    Is there an oral policy?
18     A.    No.
19     Q.    Okay.  So nobody from Conair, that is
20 your superior, has said to you this is our FMLA
21 policy?
22     A.    No.
23     Q.    Okay.  How -- strike that.

1  Q.   Okay. All right. You recall being
2  asked to produce various documents at my request?
3  A.   Yes.
4  Q.   Do you recall being asked to produce
5  documents relating to Sharon Jacks' husband's
6  medical condition which is the subject of her
7  medical claim?
8  A.   Which is what I provided as the FMLA
9  completed form.
10 Q.   But you didn't provide the third
11 explanatory sheet, did you?
12 A.   No.
13 Q.   Okay. Would you agree that that was
14 responsive to my request?
15       MR. GARBUTT: Objection. This is
16 argumentative. We'll produce it. We don't agree
17 that it was asked for though.
18       THE WITNESS: We'll provide that,
19 yes.
20       BY: MR. KLECZEK
21 Q.   Ms. Jacks, do you know when she was
22 hired?
23 A.   May of 2001.

```
 1     Q.      Did you hire her?
 2     A.      Yes.
 3     Q.      You were here for Ms. Jacks'
 4  deposition, correct?
 5     A.      Yes.
 6     Q.      She was asked some questions about
 7  her application for employment?
 8     A.      Yes.
 9     Q.      Handing you what's been marked as
10  Deposition Exhibit 1 for Ms. Jacks, is that a true
11  and correct copy of her application for employment?
12     A.      Yes.
13     Q.      Nowhere in there does it request a
14  history of Ms. Jacks' criminal record, does it?
15     A.      No.
16     Q.      Did you ask her about her history for
17  criminal record?
18     A.      No.
19     Q.      She never misrepresented --
20     A.      No.
21     Q.      -- her criminal record to anyone,
22  correct?
23     A.      No.
```

1  receive.  So if it didn't have it on there her
2  history has been that she's used 20, I guess, as to
3  demark that.
4        Q.     Your understanding is 20 means FMLA?
5        A.     Yes.
6        Q.     Approved FMLA?
7        A.     In this case -- that's a tricky
8  question to answer.  Because an employee has 15
9  days to get me that paper.  So I'm assuming, yes,
10 it's going to be approved based on what paperwork
11 they're going to provide me.  So yes, until I get
12 the paperwork I've preliminary approved it, yes.
13       Q.     Okay.  So where the 20's are --
14       A.     Yes.
15       Q.     -- there's a 20 for each day between
16 and including June 2nd through June 6th, correct?
17       A.     Yes.
18       Q.     And that's a -- as you described it,
19 a preliminary approved FMLA?
20       A.     Yes.  She did not receive any
21 occurrences for any of that whole week off.
22       Q.     Okay.  Then on the 9th, there's a
23 notation.  What does that mean?

1   Kenny had hurt his back and she needed to take care
2   of him. And I asked her if she was looking for
3   family leave and she said yes. I said I would get
4   the paperwork ready for her.
5              I did not speak with her when she
6   picked them up on Monday but I pulled out the
7   paperwork, had it in front of me, and said you're
8   going to need to fill in your name, Kenny's name,
9   make sure you sign it, and then have the doctor
10  fill it out. And then I gave her our fax number so
11  she could fax it to me.
12       Q.    So faxing it to you was an
13  appropriate --
14       A.    Yes.
15       Q.    -- method of communicating it to you,
16  right?
17       A.    Yes.
18       Q.    Okay. And you would agree that you
19  received a faxed document from Dr. Katner on June
20  6th, 2003?
21       A.    Yes. He sent it after hours so I did
22  not receive them until Monday morning.
23             MR. KLECZEK: Do you have a stapler?

1            THE REPORTER:  No.

2            MR. KLECZEK:  Do you have stapler?

3            MR. GARBUTT:  No.  Sorry.

4            MR. KLECZEK:  You can go off the

5    record.

6            (At this point in the proceedings an

7    off the record discussion was held, after which the

8    following proceedings were conducted;)

9            BY:  MR. KLECZEK

10       Q.   Did you -- after Ms. Jacks called on

11   June 2nd, 2003, --

12       A.   Uh-huh.

13       Q.   -- did you talk to her any more that

14   week?

15       A.   No.  She did not contact me at all

16   that week.

17       Q.   Okay.  You had understood that her

18   husband's injury, at least what she had told you,

19   was going to last for a period of time, right?

20       A.   All she said was he'd hurt his back,

21   she needed to be off with him, did not go any --

22   did not say how much time she needed or anything.

23       Q.   Okay.  Now, she didn't call on

STEPHANIE D. BURRIS, JANUARY 17, 2006

1  Tuesday, right?
2      A.      She didn't need to.  Once she
3  requested the family leave I put her on family
4  leave.
5      Q.      Okay.  Under law she's entitled to up
6  to 12 weeks --
7      A.      Right.
8      Q.      -- if it's approved, right?
9      A.      Yes.
10     Q.      Okay.  And do you know what day she
11 picked up the form?
12     A.      She picked them up Monday.
13     Q.      You weren't there though?
14     A.      No.  But I prepared them and Natalie
15 told me that she had picked them up that day.
16     Q.      Okay.  This was the three-page
17 document we had talked about one being an
18 explanatory document and the other being a fill-in
19 the blanks document?
20     A.      Right.
21     Q.      The other two pages being a fill-in
22 the blacks document?
23     A.      Right.

1   Q.      I'm handing you what's been marked as
2   Deposition Exhibit 12.
3   A.      Uh-huh.
4   Q.      Is this the document that was faxed
5   to your office on June 6h, 2003?
6   A.      Yes.
7   Q.      Okay.  Because there are differences
8   between Burris Deposition Exhibit Number 12 and
9   Jacks' Deposition Exhibit Number 6, and they're on
10  the second page.
11  A.      Okay.  Yes, I signed it, I made
12  notes, and I underlined transportation.
13  Q.      Okay.  But the document in Burris
14  Deposition Exhibit Number 12 is the one that was
15  actually faxed to your office?
16  A.      Yes.
17  Q.      And this was the state it was in when
18  you received it on Monday, --
19  A.      Yes.
20  Q.      -- June 9th, --
21  A.      Yes.
22  Q.      -- 2003?
23  A.      Yes.

1   Q.    Okay. Now, Sharon Jacks testified
2  that she filled out the top portions, Number 1 and
3  2?
4   A.    Uh-huh.
5   Q.    And she did not fill out the
6  remainder --
7   A.    Right.
8   Q.    -- of Page 1? On Number 3 it asks
9  the form filler-outer to check a number which
10 appears to be defined by this third page?
11  A.    Yes.
12  Q.    Do you know what these six categories
13 are?
14  A.    I believe one is hospitalization, two
15 is repeated care, you know, follow-up appointments,
16 that kind of thing, I don't remember what the rest
17 of them are.
18  Q.    Okay. At any rate, Number 2 was
19 checked?
20  A.    Yes.
21  Q.    You don't know exactly what that
22 means at this point?
23  A.    No.

1    Q.    Okay. And Number 4 it was written,
2  the patient will be seeing pain management for
3  injections and then to physical therapy, --
4    A.    Yes.
5    Q.    -- right?
6    A.    Yes.
7    Q.    Okay. Number 5 asks for the date the
8  condition began and the duration of the condition,
9  right?
10    A.    Yes.
11    Q.    And they indicated it began on May
12  29th, 2003, right?
13    A.    Yes.
14    Q.    The duration was undetermined but the
15  next office visit was June 23rd, 2003?
16    A.    Yes.
17    Q.    You would agree that this infers the
18  condition will last through June 23rd, 2003?
19    A.    Yes.
20    Q.    Okay. Under 5B it's asked whether
21  the employee will only work intermittently or less
22  than a full-time schedule. There's no answer
23  there, right?

1    A.    No.
2    Q.    A chronic condition under C.  If the
3 chronic condition caused the patient's being
4 incapacitated.  There's no answer there either,
5 right?
6    A.    No.  I'm sorry.
7    Q.    There's no answer under 6A asking for
8 the number of treatments, right?
9    A.    Correct.
10   Q.    Okay.  And there's no answer under 6B
11 for the nature of the treatments, right?
12   A.    Correct.
13   Q.    Okay.  6C, no answer?
14   A.    Correct.
15   Q.    And 7A, B, and C, no answer?
16   A.    Correct.
17   Q.    Okay.  Under 8 it's asked if leave is
18 required to care for a family member of an employee
19 with a serious health condition, does the patient
20 require assistance for basic medical or personal
21 needs or safety or for transportation, that's the
22 question, right?
23   A.    Yes.

STEPHANIE D. BURRIS, JANUARY 17, 2006

```
 1      Q.    And the answer is yes?
 2      A.    Yes.
 3      Q.    And then it says also unable to drive
 4 due to pain level and medications, right?
 5      A.    Yes.
 6      Q.    Okay.  Doesn't say anything about
 7 driving to and from medical appointments, right?
 8      A.    No.
 9      Q.    Okay.  And then it's signed by Dr.
10 Katner?
11      A.    Yes.
12      Q.    Okay.  You don't dispute that he
13 approved this, right?
14      A.    I have no basis to dispute that, no.
15      Q.    Okay.  Dated June 6, 2003?
16      A.    Yes.
17      Q.    All right.  This is a form that
18 Conair has drafted, correct?
19      A.    No.  I believe that they -- it's not
20 something they've drafted.  I believe that they've
21 gotten that from some family leave site, I'm not
22 sure.
23      Q.    Okay.  All right.  Under 5A --
```