```
 1        A.    No.

 2        Q.    Okay.  Who underlined that?

 3        A.    I did it but not when I received it.

 4        Q.    Okay.  When was it underlined?

 5        A.    After I spoke with Dr. Katner's

 6  office.

 7        Q.    Did you ever speak with Dr. Katner?  ·

 8        A.    No.  I didn't need to speak with him

 9  because his medical condition was not what was in

10  dispute.

11        Q.    You're not disputing that Mr. Jacks

12  had a serious medical condition?

13        A.    No.  Not, not at all.

14        Q.    Are you disputing that Mr. Jacks was

15  incapacitated pursuant to the definition that we

16  just talked about?

17        A.    No.

18        Q.    At the bottom you marked that the

19  FMLA leave is approved?

20        A.    Yes.

21        Q.    And then did you simultaneously --

22        A.    Yo.

23        Q.    -- write this additional language?
```

STEPHANIE D. BURRIS, JANUARY 17, 2006

```
 1          A.      Yes.

 2          Q.      And what does that say?

 3          A.      "For doctor appointments, therapy, et

 4  cetera, per nurse.  Patient does not require 24/7

 5  care."

 6          Q.      And that's from the nurse, --

 7          A.      Yes.

 8          Q.      -- from you talking with the nurse?

 9          A.      Yes.  Talking -- yes.

10          Q.      Okay.  Now, approximately what time

11  did you receive this?

12          A.      When I got to work at six o'clock on

13  that Monday.

14          Q.      Okay.  And what this is telling you

15  is that -- well, strike that question.  Based on

16  you receiving this Monday morning, was Sharon

17  Jacks, in your opinion, required to call in sick on

18  Monday?

19          A.      No.  What I needed to do -- no, she

20  wasn't.  She needed to be notified that her request

21  for family leave to be off 24/7, which is what she

22  felt she needed, did not correspond to what the

23  physician's documentation provided.
```

1  not corroborate that she needed to be off 24/7 with
2  Kenny, that she just needed to provide him
3  transportation.  I told her that I had contacted
4  the doctor's office to see if -- you know, there
5  was a dispute in the paperwork, to clar -- I needed
6  to clarify.  Because what she was telling me and
7  what the paperwork said weren't the same.  She said
8  she would call the doctor's office herself too.

9       Q.    Okay.  What was she telling you?

10      A.    That she wanted to be off with Kenny.

11      Q.    Okay.  That Kenny required her care?

12      A.    She said that she felt she needed to
13  be off with Kenny.  And what I said to her was
14  that's not what the doctor's paperwork said.  And I
15  did encourage her to call the doctor's office too.

16      Q.    Did she say that Kenny requires my
17  care, I need to be with him?

18      A.    No.  She said she felt she needed to
19  be off with Kenny.

20      Q.    Okay.  Was it understood that she was
21  not going to come in to work --

22      A.    No.

23      Q.    -- Monday?

```
 1   court, she didn't think she'd make it in time.
 2        Q.     So it was understood, at least you
 3   understood that she wasn't coming in to work that
 4   day, at this point?
 5        A.     I'm not -- no, I'm going to say no to
 6   that.  Because she was out and providing him
 7   transportation, she could have arrived anytime that
 8   night and that part would have been covered under
 9   FMLA.
10        Q.     Okay.  Did you talk to her anymore
11   that day?
12        A.     No.
13        Q.     When was the next time you talked to
14   Sharon?
15        A.     I don't believe I talked to Sharon
16   again.
17        Q.     Okay.  Did you ever inform her that
18   she was terminated?
19        A.     I don't believe so.
20        Q.     Did you terminate her the next day?
21        A.     Yes.
22        Q.     And what's the process of terminating
23   somebody?
```

```
 1        Q.        And what's -- I mean, what's the
 2   process for that, filling out forms?
 3        A.        Yes.   Just as we went through the
 4   checklist.
 5        Q.        Okay.   So at this point Sharon Jacks
 6   had been terminated from employment --
 7        A.        Yes.
 8        Q.        -- as of June 10th, 2003, right?
 9        A.        Yes.
10        Q.        Effective June 9th, 2003?
11        A.        Yes.   Because that would have been
12   her last -- that would have been the date she was
13   expected at work.
14        Q.        And was she eligible for rehire or
15   not eligible for rehire?
16        A.        She would have been eligible for
17   rehire had she notified us.   Usually when we --
18   once we get to this, because of attendance at three
19   final warnings, --
20        Q.        Had she notified you of what?
21        A.        You know, she would have said, yes,
22   I'm coming in.   We don't have a strict policy on
23   rehire.
```

STEPHANIE D. BURRIS, JANUARY 17, 2006

```
 1          Q.      Okay.  You -- did she say that Kenny
 2   was hitting her?
 3          A.      No.
 4          Q.      Or threatening her?
 5          A.      No.
 6          Q.      Or abusing her?
 7          A.      No.
 8          Q.      Just wanted to be sure.
 9          A.      Sure.
10          Q.      Because you mentioned the women's
11   center.
12          A.      Yeah.
13          Q.      Did she infer that in any way?
14          A.      No.  She didn't -- she inferred it,
15   she didn't -- she implied it, I should say.
16          Q.      How did she imply it?
17          A.      She was just crying.  And I walked
18   outside with her and I said, are you okay, and she
19   said she blamed Kenny for making her lose her job.
20          Q.      Okay.  At anytime, did you tell her
21   that if she got the FMLA form changed that she
22   could get her job back?
23          A.      When we talked on that day, on the
```

1 9th.

2       Q.    Okay.

3       A.    The ball was in her court at that

4 point to get them changed. And had I received

5 updated forms that day to have her off she'd have

6 been off, she'd have been approved.

7       Q.    What if she brought in updated forms -

8 say on June 11th?

9       A.    That would -- we would have had to

10 have considered it.

11       Q.    You would have had to have considered

12 it?

13       A.    Yeah.

14       Q.    Okay. But you never told her after

15 she picked up her check Friday that she could still

16 bring in the forms?

17       A.    No. She didn't even bring it up.

18       Q.    Okay. She was never -- did you ever

19 send her any letters?

20       A.    No.

21       Q.    And you never sent her any additional

22 forms?

23       A.    No.

STEPHANIE D. BURRIS, JANUARY 17, 2006

1      Q.      Okay.  And I want to understand, your
2  words to her on Monday were that if you don't get
3  us an updated form or you don't show up tonight you
4  will be terminated?

5      A.      No.  What I said to her was, based on
6  these forms she had to report for her shift and if
7  she didn't she would terminate because that would
8  take her to three final warnings.

9      Q.      Okay.  So it's reasonable for her to
10  have understood that she would be fired if she
11  didn't come in that day?

12      A.      I believe so, yes.

13      Q.      Okay.  And did you at all ever
14  discuss reinstatement?

15      A.      It was never -- no, it was never a
16  topic.

17      Q.      Okay.  All right.  On June 9th you
18  had made various phone calls to Dr. Katner's
19  office?

20      A.      Yes.

21      Q.      And you first called Dr. Katner at
22  8:05 in the morning?

23      A.      After I -- right after they opened up

```
1          A.      Yes.
2          Q.      And this letter is marked Burris
3   Deposition Exhibit Number 10?
4          A.      Yes.
5          Q.      And did you receive this letter?
6          A.      Yes.
7          Q.      In this letter she's asking for the
8   missed salary from the time that she was terminated
9   to the date of the letter, right?
10         A.      Yes.
11         Q.      Plus her job back?
12         A.      Yes.
13         Q.      And Conair did not feel this was
14  acceptable, right?
15         A.      I can't speak to that.
16         Q.      Okay.  Was there -- Sharon never
17  worked there again, right?
18         A.      I don't know that we've ever
19  discussed that.
20         Q.      Okay.  Did you present this letter to
21  anybody in Conair?
22         A.      Yes.  I sent it to my counsel.
23         Q.      Eric Glueck?
```

# TERMINATION CHECKLIST

| NAME OF EMPLOYEE: | Sharon Jacks | LAST DAY WORKED: | 5/30/2003 |
|---|---|---|---|

| | | EFFECTIVE DATE: | 6/10/2003 |
|---|---|---|---|

## REASON:

JOB ABANDONMENT ✓

VOLUNTARY QUIT

JOB PERFORMANCE

DISCHARGED

**VACATION DAYS:** 1

EXPLAIN: Job Abandonment -- No call no show

## FORMS TO PULL:

CALENDAR – VACATION/SICK ✓

PERSONAL HISTORY SHEET ✓

I-9 FORM TO BACK OF BOOK ✓

## DELETE FROM:

EVACUATION LIST ✓

LOCKER ASSIGNMENT ✓

E-TIME PROGRAM ✓

## COBRA FORM:

QUALIFYING EVENT FORM

(Faxed to Cathy – E.W. Benefits)

401K, if applicable ✓

Profit Sharing,

If applicable ✓

Faxed on: 6/10/03

## ITEMS RETURNED:

CONAIR WHITE BINDER

KEYS (if applicable) ---

ACCESS CARD (if applicable) ---

BADGE CARD (Time Card)

SAFETY SHOES  N/A

## UNIFORMS:

# OF PANTS

# OF SHIRTS  N/A

LAB COATS

PERSONNEL CHANGE FORM: ✓

(Original – Sylvia Stropkai – EW, Copy – our file)

POSTED ON COMPUTER: ✓

ADDED TO:

Termination Log (Microsoft Excel) ✓

Not Eligible Listing ✓



EXHIBIT

Burris #2

1-17-06   JAB

*onair*
*Shellhouse Dr.*

*Rantoul Ill.*
*61866*

**Certification of Health Care Provider**
(Family and Medical Leave Act of 1993)



1.   Employee's Name:   Sharon S. Jacks

2.   Patient's Name (if different from employee):   Kenny Jacks

3.   The attached sheet describes what is meant by a "serious health condition" under the Family and Medical Leave Act. Does the patient's condition[1] qualify under any of the categories described? If so, please check the applicable category:

   (1)___ (2)_✓_ (3)___ (4)___ (5)___ (6)___  or  None of the above___

4.   Describe the medical facts which support your certification, including a brief statement as to how the medical facts meet the criteria of one of these categories:
   *Pt will be seeing pain management for injections and then to physical therapy*

5.   a.   State the approximate date the condition commenced, and the probable duration of the condition (and also the probable duration of the patient's present incapacity[2] if different):
   *Began 5-29-03*      *duration undetermined*
   *next office visit 6-23-03*
   b.   Will it be necessary for the employee to take work only intermittently or to work on a less than full schedule as a result of the condition (including for treatment described in Item 6 below?

   If yes, give the probable duration:

   c.   If the condition is a chronic condition (condition #4) or pregnancy, state whether the patient is presently incapacitated[2] and the likely duration and frequency of episodes of incapacity[2]:

6.   a.   If additional treatments will be required for the condition, provide an estimate of th probable number of such treatments:

   If the patient will be absent from work or other daily activities because of treatment ( an intermittent or part time basis, also provide an estimate of the probable number a interval between such treatments, actual or estimated dates of treatment if known, a period required for recovery if any:

   b.   If any of these treatments will be provided by another provider of health services (e physical therapist), please state the nature of the treatments:

[1] Here and elsewhere on this form, the information sought relates only to the condition for which the employee is taking F leave.
[2] "Incapacity," for purposes of FMLA, is defined to mean inability to work, attend school or perform other regular activities due to the serious health condition, treatment therefor, or recovery therefrom.

RECEIVED NOV 0 7

c.  If a regimen of continuing treatment by the patient is required under your supervision, provide a general description of such regimen (e.g., prescription drugs, physical therapy requiring special equipment):

7.  a.  If medical leave is required for the employee's absence from work because of the employee's own condition (including absences due to pregnancy or a chronic condition), is the employee unable to perform work of any kind?

b.  If able to perform some work, is the employee unable to perform any one or more of the essential functions of the employee's job (the employee or the employer should supply you with information about the essential job functions)? _____ If yes, please list the essential functions the employee is unable to perform:

c.  If neither "a" nor "b" applies, is it necessary for the employee to be absent from work for treatment?

8.  a.  If leave is required to care for a family member of the employee with a serious health condition, does the patient require assistance for basic medical or personal needs or safety, or for transportation?        *yes*        *Unable to drive due to pain level and medicatio*

b.  If no, would the employee's presence to provide psychological comfort be beneficial to the patient or assist in the patient's recovery?

c.  If the patient will need care only intermittently or on a part-time basis, please indicate the probable duration of this need:

_____          6-6-03
(Signature of Health Care Provider)          (DATE)

1015 S Mercer Ave          309 662 7500
(Street Address, City, State, Zip Code)          (Telephone number)
Bloomington, IL 61701

TO BE COMPLETED BY THE EMPLOYEE NEEDING FAMILY LEAVE TO CARE FOR A FAMILY MEMBER:

State the care you will provide and an estimate of the period during which care will be provided, including a schedule if leave is to be taken intermittently or if it will be necessary for you to work less than a full schedule:

_____          6- -03
(Employee Signature)          (Date)

Leave is hereby approved/disapproved. _____
          Human Resource Manager          Date