**E-FILED**
Monday, 22 May, 2006  02:59:43 PM
Clerk, U.S. District Court, ILCD

# APPENDIX 4

**Deposition of Sharon Jacks,
excerpts and exhibits**

Page 1

```
 1           UNITED STATES DISTRICT COURT
 2            CENTRAL DISTRICT OF ILLINOIS
               URBANA DIVISION
 3
 4   SHARON JACKS,              )
                                )
 5      Plaintiff,              )
                                )
 6      -vs-                    )  No. 04-2230
                                )
 7   CONAIR CORPORATION,        )
                                )
 8      Defendant.              )
 9
10
11
12        THE DISCOVERY DEPOSITION of SHARON S.
     JACKS, the plaintiff herein, called by the
13   Defendant for examination pursuant to agreement and
     pursuant to the provisions of the Code of Civil
14   Procedure and the Rules of the Supreme Court
     thereof pertaining to the taking of depositions,
15   taken before me, Jill A. Bleskey, CSR-RPR, License
     No. 084-004430, a Notary Public in and for the
16   State of Illinois, at Brookens Administrative
     Building, 1776 East Washington Street, in the City
17   of Urbana, County of Champaign, and State of
     Illinois on the 17th day of January, A.D., 2006,
18   commencing at 9:00 a.m.
19
     --------------------------------------
20
21          Jill A. Bleskey, RPR
                CSR #084-004430
22
23
```

**ORIGINAL**

Page 2

```
 1              APPEARANCES
 2   For the Plaintiff:
 3   LAW OFFICES OF DAVID KLECZEK
        Attorneys at Law
 4      321 N.E. Madison Avenue
        Peoria, Illinois 61603
 5      (309)674-4141
        BY: Mr. David Kleczek
 6
     For the Defendant:
 7
     MECKLER, BULGER & TILSON, LLP
 8      Attorneys at Law
        123 North Wacker Drive, Suite 1800
 9      Chicago, Illinois 60606
        (312)474-7909
10      BY: Mr. J. Stuart Garbutt
11
                  INDEX
12
     EXAMINATION CONDUCTED BY:          PAGE:
13
     Mr. Garbutt                3
14
15             INDEX OF EXHIBITS
16   EXHIBIT NUMBER               PAGE
17   1 - Employment Application        18
     2 - House, Attendance and Safety
18       Rules                         23
     3 - 12-8-02 Final Warning     26
19   4 - 4-23-04 Final Warning     27
     5 - 5-5-03 Written Warning    27
20   6 - FMLA Certification of Health Care
         Provider                      55
21
22   NOTE:  Exhibits attached to transcripts
23
```



Page 3

```
 1                 SHARON S. JACKS,
 2        The witness, having been first duly
 3   sworn upon her oath, testified as follows:
 4           EXAMINATION CONDUCTED
 5           BY: MR. GARBUTT
 6      Q.    Will you state your name for the
 7   record, please?
 8      A.    Sharon Jacks.
 9      Q.    Is there a middle name?
10      A.    Sue.
11      Q.    Sue?
12      A.    (Witness nods head.)
13      Q.    My name is Stu Garbutt, I'm one of
14   the attorneys for Conair Corporation --
15      A.    Uh-huh.
16      Q.    -- in this lawsuit you've brought
17   against Conair.  Let the record show that this is
18   the deposition of Sharon Jacks taken pursuant to
19   the rules of the Illinois Code of Civil Procedure
20   and by agreement of the parties.  I'm going to be
21   asking you some questions about the lawsuit that
22   you've brought and what you know about the
23   circumstances underlying that lawsuit.
```

Page 4

```
 1        If at any point you don't -- you
 2   can't hear any question or you don't understand me
 3   please ask me to clarify it or repeat it so that
 4   you can hear me.  And if you would, I'm going to be
 5   asking you to answer everything audibly and to wait
 6   until I'm finished asking the question before you
 7   begin to state your answer so that both of us don't
 8   talk at the same time; --
 9      A.    Okay.
10      Q.    -- is that okay?
11      A.    Okay.
12      Q.    Now, you were born October 15th,
13   1956; is that correct?
14      A.    Right.
15      Q.    Where were you born?
16      A.    Champaign.
17      Q.    Right here in Champaign?
18      A.    Champaign.
19      Q.    Have you lived in Champaign all your
20   life?
21      A.    Yes.
22      Q.    And your Social Security number is
23   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?
```

ESQUIRE DEPOSITION SERVICES - CHICAGO
312.782.8087  800.708.8087  FAX: 312.704.4950

SHARON S. JACKS, JANUARY 17, 2006

Page 9

1    Q.    Your daughter, Amanda, is that a
2    child you had with Kenny Jacks?
3    A.    Yes.
4    Q.    And she was born in 1987; is that
5    correct?
6    A.    Yes.
7    Q.    Have you been married before your
8    marriage to Kenny?
9    A.    Yes, sir.
10    Q.    How many times have you been married?
11    A.    Once.
12    Q.    Once before Kenny?
13    A.    (Witness nods head.)
14    Q.    What was your previous husband's
15    name?
16    A.    Craig Nelson.
17    Q.    When were you married to Craig?
18    A.    Married him in '73.
19    Q.    And you were divorced from Craig?
20    A.    Yes, sir.
21    Q.    When did that divorce take place?
22    A.    '84.
23    Q.    You have any children with Craig

Page 10

1    Nelson?
2    A.    I have three boys.
3    Q.    What are their names?
4    A.    Jeremy, Michael, and Craig Junior.
5    Q.    Are those three boys still living?
6    A.    Yes.
7    Q.    They live here locally?
8    A.    Uh-huh.
9    Q.    In the Champaign area?
10    A.    Two live in Champaign, one lives in
11    Rantoul.
12    Q.    But none of them reside with you,
13    correct?
14    A.    No.
15    Q.    It's just you and your husband Kenny
16    and Amanda --
17    A.    Uh-huh.
18    Q.    -- that resides with you currently,
19    correct?
20    A.    Her boyfriend stays there too.
21    Q.    What's his name?
22    A.    Levi Johnson.
23    Q.    Now, you started work for Conair May

Page 11

1    24th, 2001; is that correct?
2    A.    Yeah. Yes.
3    Q.    Were you working elsewhere when you
4    applied for work at Conair?
5    A.    Yes. I was working at the Winksmart,
6    it's a gas station on 136 and Maplewood.
7    Q.    What did you do there?
8    A.    I was cashier, made pizzas. So I was
9    in food service and cashier.
10    Q.    And how long did you work at
11    Winksmart?
12    A.    Right at two years.
13    Q.    So that would have been going back to
14    sometime in 1999?
15    A.    Yeah.
16    Q.    Why did you want to leave Winksmart
17    to go to work at Conair?
18    A.    More money, benefits?
19    Q.    More money and?
20    A.    More money and benefits.
21    Q.    Did you have a job before you worked
22    at Winksmart?
23    A.    Yes, Casey's General Store.

Page 12

1    Q.    And where was that?
2    A.    Rantoul. It's on Century.
3    Q.    And what period of time did you work
4    at Casey's?
5    A.    Two years previous to the other gas
6    station.
7    Q.    For the two years before you worked
8    at Winksmart?
9    A.    Yes.
10    Q.    Did you leave work at Casey's in
11    order to go to work at Winksmart?
12    A.    Yes.
13    Q.    Why did you make that change?
14    A.    Better hours, little more money.
15    Q.    What kind of work did you do at
16    Casey's?
17    A.    Same thing. I was --
18    Q.    Cashier?
19    A.    I was assistant manager there,
20    cashier. I done scheduling, made pizzas, done some
21    of the book work.
22    Q.    And did you have a job before working
23    at Casey's?

ESQUIRE DEPOSITION SERVICES - CHICAGO
312.782.8087   800.708.8087   FAX: 312.704.4950

SHARON S. JACKS, JANUARY 17, 2006

Page 21

1    A.    James Long.
2    Q.    James Long?
3    A.    Yes.
4    Q.    Was he going to be your supervisor in
5 the job that you were hiring?
6    A.    Yes, sir.
7    Q.    You were hired to be a line operator
8 on the second shift; is that right?
9    A.    Right.
10    Q.    What were your duties in that job?
11    A.    At that time just whatever the line
12 consisted of, either filling shampoo bottles,
13 putting stamps on, packaging.
14    Q.    So it was a production line --
15    A.    Right.
16    Q.    -- making products --
17    A.    Right.
18    Q.    -- that Conair was manufacturing?
19    A.    Right.
20    Q.    And you were a machine operator or an
21 operator on that line?
22    A.    Right.
23    Q.    What time of day did you start work?

Page 22

1    A.    3:45 to 12:15, I believe.
2    Q.    3:45 in the afternoon?
3    A.    Yes, sir.
4    Q.    Until 12:15, just after midnight?
5    A.    Right.
6    Q.    And was that Monday through Friday?
7    A.    Yes, sir.
8    Q.    Did you start your work week on
9 Monday afternoon at 3:45?
10    A.    Yes, sir.
11    Q.    And your starting wage was eight
12 dollars an hour, right?
13    A.    Right.
14    Q.    How many hours per week did you work?
15    A.    Usually 40.
16    Q.    Did you work any overtime?
17    A.    When it was available.
18    Q.    How often did that happen?
19    A.    I'm not sure.
20    Q.    Once a week did you have overtime?
21    A.    Not necessarily.  I mean, it just --
22 whenever it was available.
23    Q.    Okay.  Now, Conair had an attendance

Page 23

1 policy, right?
2    A.    Right.
3    Q.    And under that policy employees were
4 permitted just a certain number of absence
5 occurrences; is that right?
6    A.    Right.
7    Q.    You received and signed for a copy of
8 the attendance policy, didn't you?
9    A.    Yes, sir.
10        MR. GARBUTT:  Let's make this Exhibit
11 2, please.
12        (At this point in the proceedings the
13 Court Reporter marked, for purposes of
14 identification, Deposition Exhibit Number 2, after
15 which the following proceedings were conducted;)
16        BY: MR. GARBUTT
17    Q.    Ms. Jacks, I'm showing you what we've
18 just marked as Deposition Exhibit 2.  It's a cover
19 page is a signature page.  Is that your signature
20 on it?
21    A.    Yes, sir.
22    Q.    Okay.  And then attached are Conair's
23 House, Attendance and Safety Rules?

Page 24

1    A.    Uh-huh.
2    Q.    Did you receive copies of these
3 rules?
4    A.    Yes, I'm sure I did.
5    Q.    And you were familiar with them while
6 you worked at Conair; is that correct?
7    A.    Yes, sir.
8    Q.    Now, it's true, isn't it, Mrs. Jacks,
9 that at least beginning in 2002, Conair was telling
10 you that your attendance needed to improve; isn't
11 that right?
12    A.    Yes, sir.
13    Q.    And the company periodically told you
14 how many absence occurrences you had accrued as of
15 that point in time; --
16    A.    Yes.
17    Q.    -- is that right?
18    A.    Yes.
19    Q.    And under the Conair policy, as you
20 understood it, it called for a final warning if an
21 employee had accumulated four occurrences in a 12
22 month period?
23    A.    Yes, sir.

6 (Pages 21 to 24)

Page 25

1    Q.    And the fifth occurrence within that
2 12 month period would result in your discharge,
3 right?
4    A.    Right.
5    Q.    And also it could mean discharge if
6 an employee accumulated three final warnings in any
7 12 month period, right?
8    A.    Excuse me?
9    Q.    Under the policy, an employee could
10 also be discharged -- would be discharged if they
11 had accumulated three final warnings --
12    A.    Right.
13    Q.    -- for attendance?
14    A.    Okay, right.
15    Q.    Now, you did receive some final
16 warnings for attendance while you were at Conair,
17 didn't you?
18    A.    I think so, yes.
19    Q.    Do you recall receiving one in
20 December of 2002?
21    A.    I'm not sure.
22        MR. GARBUTT: Let me mark this as
23 Exhibit 3.

Page 26

1        (At this point in the proceedings the
2 Court Reporter marked, for purposes of
3 identification, Deposition Exhibit Number 3, after
4 which the following proceedings were conducted;)
5        BY: MR. GARBUTT
6    Q.    Ms. Jacks, I'll hand you what we've
7 just marked as Deposition Exhibit Number 3.
8    A.    Okay.
9    Q.    This is captioned Conair Corporation
10 Disciplinary Attendance Action. Isn't this a final
11 warning for attendance that you received on
12 December 18th, 2002?
13    A.    Yes, sir.
14    Q.    You signed your name --
15    A.    Yes.
16    Q.    -- as receiving it on December 18th,
17 2002, right?
18    A.    Correct.
19    Q.    Now, you received another final
20 warning for attendance on April 23rd, 2003, did you
21 not?
22    A.    I'm not sure.
23        MR. GARBUTT: Let's mark this as

Page 27

1 Exhibit 4, please.
2        (At this point in the proceedings the
3 Court Reporter marked, for purposes of
4 identification, Deposition Exhibit Number 4, after
5 which the following proceedings were conducted;)
6        MR. KLECZEK: Do you have more
7 warnings that you're going to present?
8        MR. GARBUTT: Just one moment.
9        MR. KLECZEK: We can mark them all.
10        BY: MR. GARBUTT
11    Q.    Ms. Jacks, I'll hand you what we've
12 just marked as Deposition Exhibit Number 4. This
13 is a final warning for attendance you received
14 April 23rd, 2003, is it not?
15    A.    Yes, sir.
16    Q.    And you signed for this one as well?
17    A.    Yes, sir.
18    Q.    Now, in May of 2003, you received
19 another written warning about attendance, correct?
20    A.    I'm not sure.
21        MR. GARBUTT: Mark this as Number 5,
22 please.
23        (At this point in the proceedings the

Page 28

1 Court Reporter marked, for purposes of
2 identification, Deposition Exhibit Number 5, after
3 which the following proceedings were conducted;)
4        BY: MR. GARBUTT
5    Q.    I'll hand you, Ms. Jacks, what we've
6 just marked as Deposition Exhibit No. 5. This is a
7 two-page document marked at the top as a written
8 warning and you've signed for it dated May 5th,
9 2003, correct?
10    A.    Yes, sir.
11    Q.    So you received this written warning
12 on or about May 5th, 2003; is that correct?
13    A.    Yes, sir.
14    Q.    And if you look, the third paragraph
15 from the bottom on the first page, this warning
16 advised you that if you attained five or more
17 occurrences within a one year period or three final
18 warnings within a one year period it will mean
19 immediate discharge, correct?
20    A.    Correct.
21    Q.    Now, Ms. Jacks, your complaint in
22 this case says that Conair terminated your
23 employment on or about June 8th, 2003. I believe

ESQUIRE DEPOSITION SERVICES - CHICAGO
312.782.8087  800.708.8087  FAX: 312.704.4950

SHARON S. JACKS, JANUARY 17, 2006

Page 29

1 June 8th was a Sunday. Weren't you, in fact,
2 discharged by Conair after an absence on Monday,
3 June 9th, 2003?
4     A.    I guess so.
5     Q.    And you -- do you claim in this
6 lawsuit that you were entitled to be off work under
7 the Family Medical Leave Act on Monday June 9th,
8 2003?
9         MR. KLECZEK: Objection, calls for a
10 legal conclusion. You can try to answer the
11 question.
12        THE WITNESS: I'm not sure.
13        BY: MR. GARBUTT
14    Q.    Before that date, had you ever taken
15 time off work under the Family Medical Leave Act?
16        MR. KLECZEK: Are you talking June
17 9th, 2003?
18        MR. GARBUTT: Well, before.
19        BY: MR. GARBUTT
20    Q.    The week before June 9th, 2003 you
21 didn't work either, correct?
22    A.    Right.
23    Q.    The full week, Monday through Friday,

Page 30

1 before June 9th and then June 9th itself you were
2 absent from work, right?
3     A.    Right.
4     Q.    Before those dates, had you ever
5 taken time off work under the Family Medical Leave
6 Act?
7     A.    You mean before this time that we're
8 talking about right now?
9     Q.    Yes.
10    A.    No.
11        MR. KLECZEK: Same objection, object
12 to the form. I think it calls for a legal
13 conclusion. You can answer, I think you did.
14        MR. GARBUTT: She did.
15        BY: MR. GARBUTT
16    Q.    So the last date that you actually
17 worked for Conair was Friday, May 30th, 2003,
18 right?
19    A.    Right.
20    Q.    Now, you were scheduled to work the
21 following week, June 2nd through the 6th, right?
22    A.    Yes, sir.
23    Q.    And you were scheduled to work on

Page 31

1 Monday, June 9th?
2     A.    Yes, sir.
3     Q.    And all of those days you were
4 scheduled to work on your normal shift starting at
5 3:45 in the afternoon, right?
6     A.    Right.
7     Q.    Why did you not work those days?
8     A.    Because my husband had hurt his back,
9 he couldn't move, he couldn't -- I mean, he was in
10 serious pain.
11    Q.    When did he hurt his back?
12    A.    He hurt his back on the 29th, I
13 believe it was. It was a Thursday, I'm not sure of
14 the date. He went back to work Friday and
15 Saturday. Sunday he got severely bad pain and that
16 Monday morning is when I took him in to Christie in
17 Rantoul.
18    Q.    What happened on Sunday to result in
19 him experiencing that extremely bad pain?
20    A.    We didn't really do anything. We had
21 went out to the lake, we had a picnic, and he
22 started complaining that it was bothering him and
23 by that evening it was so bad he was in tears.

Page 32

1     Q.    After the -- after he hurt himself on
2 Thursday, May 29th, did he go to a doctor?
3     A.    No. He didn't go to a doctor 'til
4 Monday.
5     Q.    And Monday you said you took him to
6 what doctor?
7     A.    Christie Clinic up in Rantoul; took
8 him to see a doctor, I believe, Bueno, he give him
9 a shot of Toradol, said there was nothing he could
10 do for him in that severe pain and sent us to the
11 emergency room.
12    Q.    Is Christie Clinic also known as
13 Safeworks?
14    A.    No, sir.
15    Q.    What is Safeworks?
16    A.    Safeworks is --
17        MR. KLECZEK: That's Dr. Fletcher's
18 office.
19        THE WITNESS: Yeah.
20        MR. KLECZEK: He's an occupational
21 doctor in town.
22        MR. GARBUTT: All right.
23        BY: MR. GARBUTT

8 (Pages 29 to 32)

Page 49

1    Q.    And they told him again to continue
2  the ice packs and rest; is that right?
3    A.    Right.  And set him up with the
4  doctor, to go see the other doctor, Dr. Katner, I
5  believe it was.
6    Q.    They referred him to Dr. Katner?
7    A.    Yes, I think so.
8    Q.    And they made an appointment for him
9  to see Dr. Katner?
10    A.    Uh-huh.
11    Q.    Now, during this time, had you told
12  anybody at Conair that you were going to be off
13  work?
14    A.    I'm not sure.
15    Q.    Do you remember the first time you
16  did tell anyone at Conair?
17    A.    No, I don't.
18         THE WITNESS:  Can we take a break so
19  I can go to the restroom?
20         MR. KLECZEK:  Yeah.
21         MR. GARBUTT:  Off the record.
22         (At this point in the proceedings an
23  off the record discussion was held, after which the

Page 50

1  following proceedings were conducted;)
2         BY: MR. GARBUTT
3    Q.    Back on the record.  You ready?
4    A.    All right.
5    Q.    At some point, Ms. Jacks, did you
6  talk to Stephanie Burris about taking time off from
7  work during this interval in June of 2003 we've
8  been focusing on?
9    A.    Yes, I did.  I knew my occurrences
10  was up there so -- and with him as bad as he was I
11  knew I was going to have to take some time off so I
12  talked to her about the Family Medical Leave.
13    Q.    When you say you knew your
14  occurrences were up there, you're talking about the
15  number of occurrences against the attendance
16  policy --
17    A.    Right.
18    Q.    -- we talked about before?
19    A.    Yes, sir.
20    Q.    You knew you were at the point that
21  another occurrence could mean your discharge,
22  right?
23    A.    Right.

Page 51

1    Q.    Do you remember when it was that you
2  spoke to Stephanie Burris about this?
3    A.    I believe the first day that I took
4  off.
5    Q.    And did you say that Ms. Burris told
6  you that you might qualify for Family Medical
7  Leave?
8    A.    I'm not sure if she did or not.  I
9  knew I was eligible for it.
10    Q.    You did know?
11    A.    Because I had been there for a year,
12  yeah.
13    Q.    Okay.  How did you know about the
14  Family Medical Leave Act?
15    A.    They discussed it in our -- like in
16  the meetings that we had.
17    Q.    Conair had informed you about FMLA?
18    A.    Yeah.
19    Q.    And you knew that since you had been
20  at the company that you were eligible?
21    A.    Yes, sir.
22    Q.    Based on what Conair had explained to
23  you?

Page 52

1    A.    Uh-huh.
2    Q.    Now, it's true, isn't it, that Ms.
3  Burris made an FMLA medical certification form
4  available for you to pick up at work --
5    A.    Yes, sir.
6    Q.    -- to take to Kenny's doctors?
7    A.    Yes, sir.
8    Q.    Is that a yes?
9    A.    Yes, sir.
10    Q.    I'm sorry --
11    A.    Sorry.
12    Q.    -- but we're talking over each
13  other --
14    A.    Sorry.
15    Q.    -- at the same time so I need to
16  make sure that your answer gets on the record.  You
17  remember when you picked that FMLA certification
18  form up from Conair, do you remember what day that
19  was?
20    A.    I'm not sure of the day.  I know it
21  was before I went to -- before we went to see Dr.
22  Katner.
23    Q.    And Kenny was referred to Dr. Katner

Page 53

1  from Provena on June 4th, right?
2     A.    Right.
3     Q.    And it was June 5th, the next day,
4  that he actually went to see Dr. Katner, correct?
5     A.    Right, I believe so.
6     Q.    So did you take the FMLA medical
7  certification form with you to Dr. Katner's office?
8     A.    Yes, I did.
9     Q.    Did you go with Kenny --
10    A.    Yes, sir, I did.
11    Q.    -- to his visit with Dr. Katner?
12    A.    I drove him over there.
13    Q.    What vehicle did you use for that
14 trip?
15    A.    I believe the van.  The van was more
16 comfortable.  Even though it was a little bit
17 harder for him to get in and out of, it was more
18 comfortable than his pick-up truck.
19    Q.    Did anybody besides you go with Kenny
20 to see Dr. Katner on June 5th?
21    A.    No.
22    Q.    And when you -- Dr. Katner's office
23 is in Bloomington; is that correct?

Page 54

1     A.    Yes, sir.  I believe so.
2     Q.    And when you got to Dr. Katner's
3  office once again Kenny walked into the office on
4  his own power, correct?
5     A.    Yes, sir.
6     Q.    And when you left Dr. Katner's office
7  that day once again he walked out under his own
8  power?
9     A.    Correct.
10    Q.    Is that a yes?
11    A.    Yes, sir.
12    Q.    Did you ever see the medical
13 certification form?
14    A.    No, sir.  After it was filled out are
15 you referring to?
16    Q.    Yes.
17    A.    No, sir.  The nurse told me that she
18 would fax it to Stephanie.
19    Q.    Did you fill out part of the form
20 yourself?
21    A.    I believe I did.
22    MR. GARBUTT:  I'm going to mark this
23 as Deposition Exhibit 6.

Page 55

1     (At this point in the proceedings the
2  Court Reporter marked, for purposes of
3  identification, Deposition Exhibit Number 6, after
4  which the following proceedings were conducted;)
5     BY:  MR. GARBUTT
6     Q.    Ms. Jacks, I'll hand you what --
7     A.    Okay.
8     Q.    -- we just marked as Deposition
9  Exhibit 6.  Is this the medical certification form
10 for the FMLA that you at least partially completed?
11    A.    Yes, sir.
12    Q.    Can you tell me what parts of the
13 form did you fill out?
14    A.    Looks like one, two, --
15    Q.    One being employee's name, --
16    A.    Right.
17    Q.    -- you wrote your name in there, and
18 you wrote Ken --
19    A.    Patient's name.  And I wrote this up
20 here at the top, this is my writing, the Conair,
21 the address.
22    Q.    Okay.  Up at the top left-hand
23 corner --

Page 56

1     A.    Right.
2     Q.    -- where it says Conair and
3  Shellhouse Drive in Rantoul, and you wrote that?
4     A.    Yes, sir.
5     Q.    Is there anything else on the first
6  page of the form that you --
7     A.    Not on the first page.
8     Q.    Nothing else on the first page that
9  you filled out yourself?
10    A.    No, sir.
11    Q.    How about on the second page?
12    A.    I believe I did Number 8, it looks
13 like my writing.
14    Q.    And that's Number 8 you wrote the yes
15 and unable to drive due to pain level and
16 medication?
17    A.    Right.
18    MR. KLECZEK:  I'm sorry, I missed it.
19 What did you say you wrote on the first page?
20    THE WITNESS:  First page is just my
21 -- right here, this part and this part here.
22    MR. KLECZEK:  Did you write four and
23 five?

SHARON S. JACKS, JANUARY 17, 2006

Page 57

1    THE WITNESS: No, I didn't write...
2    MR. KLECZEK: And eight it looks like
3  the same handwriting as four.
4    THE WITNESS: No, I didn't write
5  that.
6    BY: MR. GARBUTT
7    Q.    You didn't write what's written under
8  Paragraph 4 on the first page?
9    A.    I don't think I did.
10   Q.    And under Paragraph 5A, the
11 handwriting under there, you don't think that is
12 your handwriting either?
13   A.    I don't believe so.
14   Q.    But under 8A on the second page, do
15 you think that that's something that you wrote
16 yourself as opposed to someone in the doctor's
17 office?
18   A.    Looks like my writing, yeah.
19   Q.    Do you remember writing it?
20   A.    I don't remember for sure writing it,
21 no. I believe I did.
22   Q.    Is there anything else on Page 2 of
23 the form that you think you may have written?

Page 58

1  There's a signature --
2    A.    My signature.
3    Q.    You signed your name there, --
4    A.    Yes.
5    Q.    -- employee signature?
6    A.    Yes.
7    Q.    And how about the date next to that,
8  did you write that?
9    A.    Yes.
10   Q.    What is that date that's written
11 there?
12   A.    Looks like 6 of '03. I started to
13 write five but it was 6 of '03.
14   Q.    So the six refers to the month of
15 June, correct?
16   A.    Right.
17   Q.    And '03 obviously is the year 2003?
18   A.    Right.
19   Q.    You left the actual date within the
20 month of June vacant?
21   A.    Right. Evidently I wasn't sure of
22 the date.
23   Q.    All right. So at the time you took

Page 59

1  this form with you to -- on Kenny Jacks' visit to
2  Dr. Katner, had you already filled out these
3  portions you just described to us?
4    A.    No. I filled it all out there while
5  at the doctor's office.
6    Q.    You filled it out while you were at
7  Dr. Katner's office?
8    A.    Yes, sir.
9    Q.    Did you see anybody else at the
10 doctor's office fill anything else on the form --
11   A.    No, sir.
12   Q.    -- before you left?
13   A.    No, sir.
14   Q.    So when you left the form with Dr.
15 Katner's office it contained just the sections that
16 you've testified --
17   A.    Right.
18   Q.    -- today you filled out?
19   A.    Right. She -- I believe she had told
20 me that they was busy at that time and she would
21 turn it over to the woman that handled the
22 paperwork.
23   Q.    And who is this she that you're

Page 60

1  referring to?
2    A.    The nurse.
3    Q.    Do you know what her name was?
4    A.    No, I'm not sure.
5    Q.    And did she indicate to you who the
6  person was who she was going to turn the form over
7  to?
8    A.    I don't remember, no. She may have
9  used a name but I don't remember.
10   Q.    Now, you did not take the completed
11 FMLA medical certification form back to Conair, did
12 you?
13   A.    No. She told me she would fax it.
14   Q.    She being this person --
15   A.    The nurse.
16   Q.    The nurse?
17   A.    Yes. I'm thinking at that time I was
18 supposed to have been under a certain time of
19 having -- needing to get it back in to Stephanie.
20 So she said that she would fax it, that she had 24
21 hours to fax the paperwork to Stephanie.
22   Q.    Did you actually speak to Dr. Katner
23 during this visit to his office on June --

15 (Pages 57 to 60)

Page 61

1  A.    I was --
2  Q.    -- 5th? Pardon me?
3  A.    I was in the room with him, yes,
4  while he examined him.
5  Q.    You were in the room while Dr. Katner
6  examined Kenny?
7  A.    Yes, sir.
8  Q.    Did you discuss with Dr. Katner that
9  you wanted an FMLA medical certification form
10 filled out?
11 A.    He said the nurse would take care of
12 that.
13 Q.    So you told him you needed the form
14 filled out?
15 A.    Yes, sir.
16 Q.    He said his nurse would take care of
17 that?
18 A.    (Witness nods head.)
19 Q.    Was it after that conversation with
20 Dr. Katner that you and the nurse -- that you
21 filled out the portions that you've described here
22 today?
23 A.    Yes, sir.

Page 62

1  Q.    And then you left it with the nurse?
2  A.    Yes, sir.
3  Q.    And she told you she was going to
4  turn it over to whoever's in charge of the
5  paperwork?
6  A.    Right.
7  Q.    Do you know when Dr. Katner's office
8  -- strike that. Do you know for a matter of fact
9  that Dr. Katner's office did fax the medical
10 certification form to Conair?
11 A.    No. I guess I don't know for a
12 matter of fact. I mean, she told me she would fax
13 it to Conair.
14 Q.    So I take it you don't know when they
15 faxed it to Conair?
16 A.    No, sir.
17 Q.    Did you ever discuss the medical
18 certification form with Stephanie Burris of Conair?
19 A.    I believe that following Monday I
20 called to make sure that the paperwork was all
21 straightened out. Because he hadn't gotten any
22 better, he was still in -- needing me to be there
23 to help him to get up, to sit down, to lay down, to

Page 63

1  whatever, get around.
2  Q.    So you think the following Monday?
3  Now, this would have been Monday, June 9th, right?
4  A.    Right.
5  Q.    You think on that Monday you
6  called --
7  A.    Right.
8  Q.    -- Stephanie Burris?
9  A.    Uh-huh.
10 Q.    What time did you call her?
11 A.    Sometime before my shift would have
12 started.
13 Q.    Sometime before 3:45 in the
14 afternoon?
15 A.    Uh-huh.
16 Q.    All right. Let's go back to the June
17 5th visit to Dr. Katner's office. What time did
18 you and Kenny Jacks leave Dr. Katner's office?
19 A.    I'm not sure.
20 Q.    Where did you go when you left there?
21 A.    Back to the trailer.
22 Q.    Did you stop anywhere on the way
23 back?

Page 64

1  A.    I don't think so.
2  Q.    Did Kenny see any other doctors that
3  day?
4  A.    Not that I remember.
5  Q.    Kenny didn't see any other doctors
6  that week, did he?
7  A.    I don't believe so.
8  Q.    When was Kenny's next medical
9  appointment after the June 5 visit with Dr. Katner?
10 A.    I'm not real sure. I could find out
11 through his medical records and files but -- for
12 certain dates and stuff.
13 Q.    On Monday, June 9th, Kenny did not
14 have any medical appointment with doctors or
15 medical providers, did he?
16 A.    No, sir, I don't think so.
17 Q.    Did you and Kenny go anywhere on
18 Monday, June 9th?
19 A.    He had to go to court that day.
20 Q.    And where did he have to go to court?
21 A.    To the courthouse in Urbana.
22 Q.    The state court or federal?
23 A.    State.

ESQUIRE DEPOSITION SERVICES - CHICAGO
312.782.8087  800.708.8087  FAX: 312.704.4950

SHARON S. JACKS, JANUARY 17, 2006

Page 65

1    Q.    That was on a traffic violation?
2    A.    I don't remember what it was for. I
3  believe so.
4    Q.    What time was his court appearance,
5  do you know?
6    A.    I don't know. They're usually either
7  at ten or one, I think is usually the Court picked
8  times.
9    Q.    But you don't know what time --
10    A.    No, uh-uh.
11    Q.    How did Kenny get to court --
12    A.    I drove.
13    Q.    -- on June 9th? You drove him?
14    A.    I had to drive him, yeah.
15    Q.    Did you again drive him in the mini
16  van?
17    A.    I believe so.
18    Q.    What time did you leave to get him to
19  court?
20    A.    Thirty, 45 minutes before we was
21  supposed to get there.
22    Q.    That's the approximate driving
23  time --

Page 66

1    A.    Right.
2    Q.    -- from where you live to court?
3    A.    Right. At that time we wasn't doing
4  much of anything, he wasn't able to do much of
5  anything at that time.
6    Q.    Besides going to court that day, did
7  Kenny have to go anywhere else?
8    A.    I don't believe so that day.
9    Q.    Did you stop anywhere on your way to
10  or from taking him to court?
11    A.    I don't think so. I'm not positive
12  on it.
13    Q.    Now, you say you remember talking to
14  Stephanie Burris that day sometime before --
15    A.    I called from the courthouse.
16    Q.    You called from the courthouse?
17    A.    Uh-huh.
18    Q.    After court was over?
19    A.    I believe while it was going on.
20    Q.    So you called Stephanie from court?
21    A.    Right.
22    Q.    Did you get ahold of her?
23    A.    Yes, I did.

Page 67

1    Q.    What did you say to her?
2    A.    I told -- I had -- I think I was
3  asking her about the paperwork and told her I
4  wouldn't be able to be in today.
5    Q.    What did she say?
6    A.    She told me that -- I think this is
7  when she told me that I had to come in because the
8  paperwork wasn't right -- stated that I only needed
9  him for transportation or something, I believe.
10  I'm not sure of the exact words.
11         (At this point in the proceedings an
12  off the record discussion was held, after which the
13  following proceedings were conducted;)
14         MR. KLECZEK: I'm sorry, what's the
15  answer that you got?
16         MR. GARBUTT: Could you read it back.
17         (At this point in the proceedings the
18  Court Reporter read aloud the aforesaid question,
19  after which the following proceedings were
20  conducted;)
21         BY: MR. GARBUTT
22    Q.    So are you saying, Ms. Jacks, that
23  Stephanie Burris told you that the FMLA medical

Page 68

1  certification form only authorized you to be off
2  when it was necessary for you to transport Kenny?
3    A.    Right.
4    Q.    What did you say to that?
5    A.    I told her I wouldn't be able to make
6  it in, that I had to take care of him, he couldn't
7  be on his own.
8    Q.    Did you discuss with Stephanie what
9  the medical certification form said?
10    A.    I believe she told me what it said
11  about the transportation part.
12    Q.    Did you tell Stephanie that you were
13  going to call the doctor's office to ask them to
14  clarify the form?
15    A.    I believe so.
16    Q.    Did you do that?
17    A.    Yes, I did.
18    Q.    And did you call the office?
19    A.    I called them.
20    Q.    Who did you talk to?
21    A.    I believe one of the nurses.
22    Q.    Was it the nurse you talked to the
23  day before?

17 (Pages 65 to 68)

Page 69

1    A.    Yeah, I think it was. That's who I
2  was trying to get ahold of.
3    Q.    Do you think you did get ahold of
4  her?
5    A.    I'm not sure if I got ahold of her
6  that day or not.
7    Q.    What did you say to this person that
8  you did get ahold of?
9    A.    Well, they had told us that they was
10  going to give me another week to help him out
11  because of him needing the help of getting around
12  and going and doing. And then they -- it went to
13  just transportation. So I was going to try to get
14  that straightened out to where -- that I was
15  covered anyway.
16    Q.    My question was, what did you say to
17  this person at Dr. Katner's office that you got
18  ahold of on the phone on June 9th?
19    A.    I was asking her about the difference
20  between just the transportation and being at home
21  with him.
22    Q.    So did you tell this person at Dr.
23  Katner's office that you wanted the form to say

Page 70

1  that you were entitled to be off work for a week to
2  take care of Kenny?
3    A.    I believe so. I'm not sure.
4    Q.    What did this person reply to you?
5    A.    I'm not -- I'm not sure how it went
6  from there.
7    Q.    After that conversation between you
8  and Dr. Katner's office, did you speak to Stephanie
9  Burris again?
10    A.    I'm not sure if I did or not.
11    Q.    Didn't Stephanie tell you that she
12  would also talk to the doctor's office to get a
13  clarification of what the form meant?
14    A.    I don't remember, I don't remember
15  that.
16    Q.    What did you do after you and Kenny
17  left court in Urbana on Monday, June 9th?
18    A.    I'm not sure. I'm assuming we went
19  straight back home. I know he wasn't doing
20  anything at that time but what had to be done. He
21  was in a lot of pain.
22    Q.    So he just wanted to go home again
23  after he was through in court?

Page 71

1    A.    Uh-huh.
2    Q.    He was well enough to go to court
3  then, right?
4    A.    Well, there's a difference in being
5  well enough to have to go and having to be there to
6  not get a warrant put out on you. So, I mean,
7  that's something that has to be done, so he had to
8  go to court that day.
9    Q.    Even though he was in serious pain
10  from his back --
11    A.    Right.
12    Q.    -- he had to go to court?
13    A.    Well, yeah.
14    Q.    And when you got to court, once again
15  Kenny walked into court under his own power, right?
16    A.    Right.
17    Q.    And --
18    A.    He used me a lot as a --I would say a
19  crutch or whatever. I mean, he held on to me and I
20  held on to him to help him, you know, keep his
21  balance and stuff because...
22    Q.    And he walked out of court on his own
23  power, --

Page 72

1    A.    Uh-huh.
2    Q.    -- correct? Is that a yes?
3    A.    Yes.
4    Q.    And was his court case called while
5  you were there?
6    A.    Yes.
7    Q.    He stood up in court on his own,
8  didn't he?
9    A.    Well, yes.
10    Q.    He never had a wheelchair at
11  anytime --
12    A.    No.
13    Q.    -- while he was in court, I take it?
14    A.    (Witness shakes head.)
15    Q.    You have to answer.
16    A.    No, sir.
17    Q.    Now, there was no trial that day, was
18  there?
19    A.    No, I don't believe so.
20    Q.    All that happened that day was the
21  case was set for trial the following week, right?
22    A.    Right. I believe so.
23    Q.    And Kenny didn't ask to put the trial

18 (Pages 69 to 72)

Page 73

1  off any longer because he was incapacitated, did
2  he?
3      A.    I don't -- I don't know what he --
4  I'm not sure.
5      Q.    Well, you were there with him,
6  weren't you?
7      A.    Right. But I don't remember, no.
8      Q.    Well, he didn't tell the judge he
9  was --
10     A.    No, I don't think so.
11     Q.    He didn't tell the judge that he had
12  a back injury and wasn't ready for trial, did he?
13     A.    No, I don't think so.
14     Q.    Now, Dr. Katner never saw your
15  husband Kenny as a patient after June 5th, did he?
16     A.    No, sir.
17     Q.    In fact, Dr. Katner refused to see
18  him again, didn't he?
19     A.    Right.
20     Q.    He said that Kenny had been abusive
21  and threatening; isn't that right?
22     A.    Yeah. There was something going on
23  there, I'm not sure what it was. Something about

Page 74

1  that, yeah.
2      Q.    Were you present when the abuse or
3  threats happened?
4      A.    I -- no. Well, I was there but I
5  don't know that there was any abusive or
6  threatening. But, yes, they did refuse to see him.
7      Q.    Did Kenny have any telephone
8  conversations with the -- with Dr. Katner's office
9  that you were not involved in?
10     MR. KLECZEK: I object. Lack of
11  foundation. I mean, how can she know about
12  telephone conversations that she wasn't involved
13  in.
14     BY: MR. GARBUTT
15     Q.    Do you understand the question? Do
16  you know if your husband, Kenny, had any --
17     A.    I don't know.
18     Q.    You don't know. Do you know what the
19  incident was that the doctor's office referred to
20  when she said that Kenny had been abusive and
21  threatening?
22     A.    No, I don't.
23     Q.    Now, did you tell me what time you

Page 75

1  got home from court with Kenny on June 9th?
2      A.    Did I tell you?
3      Q.    Yes.
4      A.    No, sir, I didn't because I don't
5  remember.
6      Q.    You don't remember when you got home?
7      A.    No, I don't.
8      Q.    Were you home for dinner?
9      A.    Yes, I'm sure we was.
10     Q.    You didn't come to work that night,
11  did you?
12     A.    No, I didn't.
13     Q.    And you never called in after you had
14  talked to Stephanie Burris before your shift
15  started?
16     A.    I was assuming I was on FMLA.
17     Q.    You were assuming you were on FMLA?
18     A.    Yeah. I'd had the paperwork filled
19  out, the last I can remember for sure.
20     Q.    But a moment ago you told me that in
21  your conversation with Stephanie Burris she had
22  told you that the paperwork, --
23     A.    Right.

Page 76

1      Q.    -- meaning the FMLA certification
2  form, did not, in her opinion at all, justify you
3  being off --
4      A.    Yeah.
5      Q.    -- at that time?
6      MR. KLECZEK: Objection. I object to
7  the testimony of that. She said that Stephanie
8  told her that the paperwork allowed her to be off
9  for transportation.
10     THE WITNESS: Right.
11     MR. KLECZEK: That's what her
12  testimony was.
13     BY: MR. GARBUTT
14     Q.    All right. Is that what your
15  testimony was --
16     A.    Right.
17     Q.    -- you recall Stephanie having told
18  you?
19     A.    Right.
20     Q.    So you were done transporting Kenny
21  when you got him home before dinnertime, correct,
22  on June 9th?
23     A.    Possibly, yeah.

19 (Pages 73 to 76)

Page 77

1   Q.   But you didn't come to work?
2   A.   No.
3   Q.   And you didn't call anybody at work,
4 did you?
5   A.   I don't think I talked to her that
6 evening. I'm not sure.
7   Q.   Now, after -- when were you informed
8 that Conair had terminated your employment?
9   A.   Well, I was assuming that they fired
10 me that day because she said if I didn't make it in
11 that night I would be fired.
12   Q.   When were you actually informed that
13 you had been discharged?
14   A.   I'm not sure.
15   MR. KLECZEK: I object. It's asked
16 and answered.
17   MR. GARBUTT: No, she just did answer
18 it.
19   MR. KLECZEK: She said she was told
20 that day on the 9th.
21   MR. GARBUTT: But your objection was
22 after she answered the question.
23   MR. KLECZEK: I can still object to

Page 78

1 the question.
2   BY: MR. GARBUTT
3   Q.   When did you file for unemployment
4 compensation?
5   A.   I'm not sure of the date, I would
6 have to look through my records.
7   Q.   Was it soon after June 9th?
8   A.   Uh-huh.
9   Q.   You did receive unemployment
10 compensation from June 9th forward, didn't you?
11   A.   After we -- after the appeal.
12   Q.   You eventually received unemployment
13 compensation for the period of time from June 9th
14 going forward; is that right?
15   A.   Yes.
16   Q.   For how long did you get unemployment
17 compensation?
18   A.   Whatever we get it for, nine months.
19   Q.   In your interrogatory answers in this
20 case -- do you remember answering written
21 interrogatories from Conair in this case?
22   A.   Do I remember what?
23   Q.   Answering written interrogatories,

Page 79

1 written questions from Conair in this case.
2   A.   No.
3   Q.   You signed a verification indicating
4 that you had read and approved those answers,
5 didn't you?
6   A.   Right.
7   MR. KLECZEK: He's talking about the
8 questions we sent you that you handwrote answers.
9   THE WITNESS: Okay. Yes. Yes, yes.
10   BY: MR. GARBUTT
11   Q.   In your interrogatory answers I
12 believe you said you received unemployment
13 compensation from June 8th, 2003 until September
14 5th, 2004?
15   A.   Might have.
16   Q.   That's a period over a year?
17   A.   Right. They have a -- what do they
18 call that? There's like an extended period or
19 something like that that you can file for.
20   Q.   You filed for extended benefit?
21   A.   I guess, yes.
22   Q.   And it's your recollection that you
23 were receiving unemployment compensation

Page 80

1 continuously from June 8th, 2003 until September of
2 2000?
3   A.   I guess.
4   Q.   Pardon me?
5   A.   I guess so.
6   Q.   Did you get all the -- collect all
7 the unemployment compensation that you were
8 eligible for?
9   A.   Yes.
10   Q.   Were you applying for jobs during
11 that period of time?
12   A.   Yes, I was.
13   Q.   Where did you apply?
14   A.   You want each place that I applied
15 at?
16   Q.   Yes. Do you know?
17   A.   I mean, all over Rantoul.
18   Q.   Where?
19   A.   Gas stations, factories, bars,
20 stores.
21   Q.   Did you keep any records of the
22 places you were applying for employment?
23   A.   I believe I sent you some -- I think

# HOUSE, ATTENDANCE AND SAFETY RULES

I have received, read and understand the House, Attendance and Safety Rules that are effective April 21, 2003

SHARON JACKS
Print Name

*Sharon Jacks*                4-21-03
Signed                         Date

DEPOSITION
EXHIBIT
Jacks #2
1-17-06    JAB

# HOUSE, SAFETY AND ATTENDANCE RULES

## PERSONAL CONDUCT AND JOB PERFORMANCE

The following rules are guides governing the conduct of all employees at the CONAIR Rantoul plant. The commission of any of the following acts or practices may subject an employee to immediate disciplinary action, up to and including discharge.

1. Bringing intoxicants, unlawful drugs or narcotics onto the premises, consuming or being under the influence of intoxicants, unlawful drugs or narcotics on the premises.

2. Possessing a weapon, concealed or otherwise on the premises.

3. Dishonesty with respect to the rights and property of other employees, the Company or other persons related to the operation of the company.

4. Misconduct, malicious mischief or horseplay that could result in injury or fear of injury or destruction of property of other employees of the Company.

5. Disorderly conduct or conduct not in accord with generally accepted standards of behavior.

6. Falsification of employment application, time cards, or other Company documents and records.

7. Insubordination or refusal to perform work as directed.

8. Neglect of duty.

9. Chewing gum or eating candy or food in the plant.

10. Violation of GMPs.

11. Violation of SOPs.

12. Failure to be ready to start work at the time your work schedule begins or stopping work before the work period ends. This rule applies to the overall work period including meal periods and other breaks.

13. Failure to punch time card "in" and "out" each day of work or when leaving the premises, punching a time card other than your own. (Report all mistakes immediately to Human Resources).

14. Littering of any plant premises or public areas adjacent to the plant or leaving any foreign objects in places that are a safety hazard.

15. Failure to keep the Company informed of your current address and telephone number where you may be readily contacted.

16. Publication, distribution or posting of written or printed material on Company property without authorization.

17. Defacing, removing or other interference with authorized notices, signs or publications on Company property.

18. Initiation or participation in any gambling activity.

19. All hourly employees must report to work in complete uniform or they will be sent home to change and receive ½ occurrence.

II.   SAFETY RULES

An employee may be subject to disciplinary action up to and including discharge for safety rule or procedure infractions. The following rules are in effect for your safety and the safety of your fellow workers.

1.  Follow the safety procedures of the machine or equipment you are working on.

2.  Review safety procedures before authorized operation of machinery and equipment.

3.  Equipment or machinery must not be operated without authorization.

4.  You must wear safety glasses and other protective devices and safety apparel as designated.

5.  You must observe all warning signs, tags and instructions.

6.  "Horseplay" or other conduct that represents a threat to your safety or the safety of others is prohibited.

7.  Riding a lift truck in any but the operator's position is prohibited.

8.  Faulty mechanical equipment, operating machinery or other unsafe conditions that may endanger your safety or the safety of others must be reported to a supervisor as soon as possible.

9.   Smoking is permitted only in designated areas.

10. Removing or making inoperative any safety devices or machine guards is prohibited except when authorized.

11. You are not to operate any machinery without the safety guards or devices provided unless specifically authorized.

12. Cleaning or repairing any machinery while it is running is prohibited. Equipment must be stopped and or locked/tagged-out as required.

13. You must report all injuries IMMEDIATELY to your supervisor.

14. Safety shoes are required for Compounding, Maintenance, Shipping, Receiving & Material Handlers. Safe, sturdy work shoes are required in other departments. Heels higher than one (1) inch are prohibited.

15. Approved personal protective equipment must be worn in designated areas when in the plant.

16. You must observe and follow all other Company, plant or departmental safety rules or procedures.

17. Keep floors clean and free of tripping hazards.

18. Containers are provided for waste materials – they must be used.

19. Keep your working area, your locker room and your lunch room clean.

20. Oily rags must not be left on floors or around machinery. Place them in metal containers.

21. Only lift reasonable weight – heavy lifting, get assistance.

22. Employees who have experienced a work-related injury and have been returned to work with restrictions must follow-all restrictions given to them by their treating doctor.


III.  ATTENDANCE AND PUNCTUALITY POLICY

Regular and punctual attendance by all employees is an essential part of responsible employment. All attendance is monitored and recorded. Employees who do not meet requirements will be counseled or disciplined as appropriate under the Policy.

A. NOTIFICATION OF ABSENCES

All absences require personal notice to the Call-In Line at least one hour prior to the start of the assigned work period. <u>Any employee not calling in within the one hour prior to the start of their work period will be considered a No Call/No Show.</u>

Telephone notice of absences must be directed to 217-892-4083. This is the dedicated call-in line. Please continue to call if the line is busy. Please leave:

>    Your first and last name.
>    Department you work in along with your supervisor's name
>    Reason for your absence

The following absences may subject an employee to disciplinary action. Each employee will be counseled and termination may follow when the employee's attendance for all causes does not meet our employment requirements.

1. No Call/No Show:  Is the failure to report to work as assigned and failure to notify the Company regarding the absence.   One No Call/No Show will result in an occurrence and a written warning. A second No Call/No Show in a one year period will be classified as employee job abandonment.

2. Absence:  Absence from assigned work period when no accrued sick time is available. Absence of 4 hours or less is 1/2 occurrence; 4 hours or more is one occurrence.

3. Leave Early:  Leaving early from work will result in 1/2 occurrence if the absence is 4 hours or less and there is no accrued sick time available.   Employees must inform their supervisor before leaving early.

4.  Late Arrival (Tardy):  Employee will receive 1/2 of an occurrence for being tardy if the absence is four hours or less and there is no accrued sick time available.  Employees should call the call-in line within one hour prior to work start time to report a late arrival.

## B.  CORRECTIVE ACTION PROCEDURE

When an employee's attendance record requires disciplinary action, the employee will be counseled or reprimanded before more severe action, including discharge is taken.

Progressive discipline will be as follows for those employees while in their probationary period:

- ❖ VERBAL WARNING – Employee has one occurrence during their first 3 consecutive months
- ❖ WRITTEN WARNING –Employee has two occurrences during their first 3 consecutive months
- ❖ FINAL WARNING – Employee has two and a half occurrences during their first 3 consecutive months
- ❖ TERMINATION – Employee has three occurrences during their first 3 consecutive months

Progressive discipline will be as follows for those employees who have completed their probationary period:

- ❖ VERBAL WARNING – Employee has two occurrences during the last 12 consecutive months
- ❖ WRITTEN WARNING –Employees has three occurrences during the last 12 consecutive months
- ❖ FINAL WARNING – Employee has four occurrences during the last 12 consecutive months
- ❖ TERMINATION – Employee has five occurrences during the last 12 consecutive months

<u>Any employee receiving three final warnings within a one year period will be terminated.</u>

## C.  MISSED PUNCHES

An employee who forgets their timecard and are unable to punch in or out must see Human Resources.  The employee will receive a mark for that day.    An employee that does not punch in or out will receive a mark for each missed punch.    When an employee has a total of five (5) marks in a six month period for missed punches, they will receive a 1/2 occurrence.  Missed punches will drop after six (6) months from time received.

## D.  PAY CHECK PICK-UP

IT IS THE COMPANY'S POLICY THAT ANY EMPLOYEE WHO CALLS IN SICK BUT COMES TO WORK TO PICK UP THEIR PAYCHECK OR RECEIVES THEIR PAYCHECK THEN GOES HOME SICK WILL RECEIVE AN OCCURRENCE, REGARDLESS IF THEY HAVE ACCRUED SICK TIME AVAILABLE.

**CONFIDENTIAL**

## CONAIR CORPORATION DISCIPLINARY ATTENDANCE ACTION

**TYPE OF WARNING:**

___ **VERBAL**    ____ **WRITTEN**    √ **FINAL**

**DATE: 12/12/02**

**NAME OF EMPLOYEE:** Sharon Jacks

**COMPANY STATEMENT: According to our records, you have __4__ occurrences. These are for the following days missed:**

> 12/12/02 ( unexcused absence ½ occurrence)
> 10/2/02 (unexcused absence ½ occurrence)
> 9/30/02 (unexcused absence ½ occurrence)
> 4/22/02 (unexcused absence – 1 occurrence)
> 3/13/02 (unexcused absence – ½ occurrence)
> 3/12/02 (no call, no show – 1 occurrence)



DEPOSITION
EXHIBIT
_Jacks #3_
_1-17-06    JAB_

**Regular and punctual attendance by all employees is an essential part of the responsible employment.**

If you attain five or more occurrences within a one-year period or **three final warnings within a one-year period, it will mean immediate discharge.**

**Policy states that a probationary employee may only incur 3 occurrences during their initial 90-day period or they will be terminated.**

**Any further violation of the House, Attendance, and Safety rules may mean your immediate discharge.**

**EMPLOYEE STATEMENT:**
I acknowledge my clear understanding of the Conair policy.

_Sharon Jacks_                    _12-18-02_
*EMPLOYEE'S SIGNATURE                    DATE

_[signature]_                    _12-18.02_
SUPERVISOR SIGNATURE                    DATE

_Stephanie D Burris_                    _12/19/02_
HUMAN RESOURCE SIGNATURE                    DATE

**\*Signing this form does not imply that you agree or disagree with the action taken, only that you are acknowledging receipt of such notice.**

POSTED
12/19/02
78

CONFIDENTIAL

## CONAIR CORPORATION DISCIPLINARY ATTENDANCE ACTION

**TYPE OF WARNING:**

___ VERBAL    ____ WRITTEN    _⊗_ FINAL

**DATE: 04/22/03**

**NAME OF EMPLOYEE:** Sharon Jacks

**COMPANY STATEMENT:** According to our records, you have __4__ occurrences. These are for the following days missed:

      4/22/03 (unexcused absence – 1 occurrence)
      1/29/03 (unexcused absence – ½ occurrence)
      12/12/02 (unexcused absence – ½ occurrence)
      10/2/02 (unexcused absence – ½ occurrence)
      9/30/02 (unexcused absence – ½ occurrence)
      4/22/02 (unexcused absence – 1 occurrence)

Regular and punctual attendance by all employees is an essential part of the responsible employment.

If you attain **five or more** occurrences within a one-year period or **three final warnings** within a one-year period, it will mean immediate discharge.

Policy states that a probationary employee may only incur 3 occurrences during their initial 90-day period or they will be terminated.

Any further violation of the House, Attendance, and Safety rules may mean your immediate discharge.

**EMPLOYEE STATEMENT:**

I acknowledge my clear understanding of the Conair policy.

_Sharon Jacks_      4 - 23 - 03
**\*EMPLOYEE'S SIGNATURE**      DATE

_[signature]_      4/23/03
**SUPERVISOR SIGNATURE**      DATE

_Stephanie Burris_      4/23/03
**HUMAN RESOURCE SIGNATURE**      DATE

**\*Signing this form does not imply that you agree or disagree with the action taken, only that you are acknowledging receipt of such notice.**

2nd Final Notice in 1 yr.

_JB_
4/23/03

DEPOSITION EXHIBIT
Jacks #4
1-17-06   JAB

POSTED

**CONFIDENTIAL**

## CONAIR CORPORATION DISCIPLINARY ATTENDANCE ACTION

**TYPE OF WARNING:**

___ VERBAL     **X**   WRITTEN   ____ FINAL

**DATE:  5/5/03**

**NAME OF EMPLOYEE:**  Sharon Jacks

**COMPANY STATEMENT:  According to our records, you have  __3 ½__  occurrences.  These are for the following days missed:**

> 5/1/03 (unexcused absence ½ occurrence)
> 4/22/03 (unexcused absence 1 occurrence)
> 1/29/03 (unexcused absence ½ occurrence)
> 12/12/02 (unexcused absence ½ occurrence)
>  10/2/02 (unexcused absence ½ occurrence)
> 9/30/02 (unexcused absence ½ occurrence)



**You have received your first final on 12/12/02 and your second final on 4/22/03. If you receive another final before 12/12/03, you will be terminated.**

**You are at 3 ½ occurrences now, if you receive another ½ before 9/30/03 you will be terminated. You do not drop off any occurrences until 9/30/03 and that will be a ½ of an occurrence.**

Regular and punctual attendance by all employees is an essential part of the responsible employment.

If you attain five or more occurrences within a one-year period or **three final warnings within a one-year period,** it will mean immediate discharge.

Policy states that a probationary employee may only incur 3 occurrences during their initial 90-day period or they will be terminated.

Any further violation of the House, Attendance, and Safety rules may mean your immediate discharge.



**EMPLOYEE STATEMENT:**
I acknowledge my clear understanding of the Conair policy.

_Sharon Jacks_      5-5-03
\*EMPLOYEE'S SIGNATURE      DATE

_Jim Klein_      5-5-03
SUPERVISOR SIGNATURE      DATE

_Stephanie OBrio_      5/5/03
HUMAN RESOURCE SIGNATURE      DATE

**\*Signing this form does not imply that you agree or disagree with the action taken, only that you are acknowledging receipt of such notice.**