E-FILED
Monday, 22 May, 2006 03:02:50 PM
Clerk, U.S. District Court, ILCD

# APPENDIX 6

## Electronic Case Authority Cited In Supporting Memorandum

1 of 1 DOCUMENT

**Robert A. Dittle, Plaintiff v. United States Postal Service, an Agency of the United States of America; Richard Weber, in his official capacity; and Ron Gustafson, in his official capacity, Defendants**

Civ. File No. 04-146 (PAM/RLE)

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MINNESOTA

*2005 U.S. Dist. LEXIS 1487; 151 Lab. Cas. (CCH) P35,002; 86 Empl. Prac. Dec. (CCH) P42,013*

**February 2, 2005, Decided**

**DISPOSITION:** The defendants' Motion for Summary Judgment was granted.

**COUNSEL:** [*1] For Robert A Dittel, Plaintiff: Joni M. Thome, Halunen & Associates, Minneapolis, MN

For United States Postal Service, an agency of the United States of America, Richard Weber, In his official capacity, Ron Gustafson, in his official Capacity, Defendant: Perry F Sekus, US Attorney, Mpls, MN

**JUDGES:** Paul A. Magnuson, United States District Court Judge

**OPINIONBY:** Paul A. Magnuson

**OPINION:**

### MEMORANDUM AND ORDER

This matter is before the Court on Defendants' Motion for Summary Judgment. For the reasons that follow, the Court grants the Motion. n1

> n1 Dittle brings claims under both the Family Medical Leave Act ("FMLA"), *29 U.S.C. § 2601 et seq.*, and the Minnesota Whistleblower Act, *Minn. Stat. § 181.932*. The United States Postal Service moved to dismiss the Minnesota Whistleblower Act claim, arguing lack of subject matter jurisdiction based on sovereign immunity. Dittle does not contest the dismissal. Dittle also brought FMLA claims against two Postal Service managers, but voluntarily dismisses those claims. See Pl.'s Memo, of Law in Opposition to Defs.' Mot. for Summ. J. at 1. Accordingly, this opinion only discusses Dittle's remaining FMLA claim against the Postal Service.

[*2]

### BACKGROUND

#### A. Plaintiff's Employment with the United States Postal Service

Plaintiff Robert Dittle worked for the United States Postal Service from May 1994 until October 2002. From November 1998 to October 2002, he was an Associate Supervisor of Distribution Operations, first at the Minneapolis Post Office Plant and then at the Airport Mail Center. He worked the 10:00 p.m. to 6:00 a.m. shift. As a supervisor, Dittle dealt with issues relating to the Family Medical Leave Act ("FMLA") and was trained on the FMLA in 1999.

Dittle had a surly relationship with his supervisor, Manager of Distribution ("MDO") Marvin Rainwater. The two clashed on numerous issues, causing Dittle to complain about Rainwater on several occasions. For example, on June 18, 2001, Dittle complained to other managers and human resource personnel that Rainwater had engaged in sexual harassment, racism, and military status discrimination. Lead MDO and Acting Manager Richard Weber responded by urging the men to treat each other respectfully and professionally, but did not address subsequent complaints.

As a supervisor, Dittle was required to contact an MDO when he was unable to report for duty. [*3] Although Dittle was aware of this requirement, he preferred to contact the Resource Management Database ("RMD"), a computer system used to track attendance, n2 because Dittle did not like calling Rainwater. Dittle believed that calling the RMD center was sufficient, as the RMD center immediately generated a fax to the department in which he was assigned and MDOs were to check regularly for faxes.

2:04-cv-02230-MPM-DGB    # 39-5    Page 3 of 12

Page 2

2005 U.S. Dist. LEXIS 1487, *3; 151 Lab. Cas. (CCH) P35,002;
86 Empl. Prac. Dec. (CCH) P42,013

n2 The RMD is the central location at each Postal Service facility where non-supervisory employees call if they will miss work. However, supervisors are required to call an MDO so that the MDO can ensure a substitute supervisor will be on duty.

### B. Dittle's Health Condition and Requests for FMLA leave

Dittle served in the Gulf War in 1991. As a result of his service, Dittle suffers from post-traumatic stress disorder, anxiety, and depression. Dittle contends that his condition worsened after his coworkers began harassing him in February 2001.

1. October 2001

On October 19, 2001, Dittle wrote his physician [*4] and informed him that he was experiencing increased irritability and impatience. He asked that the physician complete an FMLA certification so that Dittle could take time off from work. The physician completed the certification on October 22. The certification states that Dittle suffers from anxiety disorder and post-traumatic stress disorder, causing Dittle to experience increased irritability, anger, and intrusive thoughts when faced with heightened stress. The certification also notes that these conditions are chronic with intermittent exacerbations; thus, the conditions could result in episodic rather than continuing periods of incapacity. In addition, the certification states that Dittle could need one to three days off intermittently in times of high stress, but that Dittle was not then incapacitated. (See Defs.' Ex. E.) Dittle provided the certification to Plant Manager Ron Gustafson on October 26, but did not identify any needed absences at that time.

2. January 2002

In January 2002, Dittle began missing work due to his medical condition and invoked his FMLA rights. On January 14, the FMLA Coordinator for the Postal Service confirmed that Dittle had recently requested [*5] FMLA leave, and requested a new certification. The Coordinator provided Dittle with a certification form, as well as Publication 71, entitled "Notice for Employees Requesting Leave for Conditions Covered by the Family and Medical Leave Act," which details an employee's rights and obligations under the FMLA. The Coordinator requested that Dittle return the completed certification form within fifteen days. The Coordinator also quoted from Publication 71, which informs employees that certification must be provided within fifteen days of a request, and warns:

> Failure to provide complete medical certification could result in delaying of your FMLA protected leave. If the certification is not complete, it may be returned to you. If you fail to submit the medical certification as requested, your request for FMLA protected leave could be denied.

(Id. at Ex. D.)

Dittle's physician completed a certification on January 26. The certification is very similar to the certification provided in October 2001. For example, the certification states that Dittle could require one to three days off during periods of elevated stress. It also states that Dittle was not presently incapacitated. [*6] (Id. at Ex. F.)

3. May 2002

On May 22, 2002, Dittle provided the Postal Service with a letter from his doctor indicating that he had experienced an exacerbation in his medical condition causing him to miss work but that he could return to work for his next scheduled shift. That day, Weber prepared a warning letter, recognizing that Dittle had been absent from May 10 to May 15. The letter does not reprimand Dittle for missing work, but rather for Dittle's failure to comply with company call-in procedures. The letter notes that Dittle had been advised previously to call an MDO when unable to report to work, and informed Dittle that his failure to call an MDO interfered with operations, as Dittle's shift was without supervision on two nights. The letter warns that "future deficiencies will result in more severe disciplinary action being taken against you. Such action may include suspension, reduction in grade and/or pay, or removal from the Postal Service." (Id. at Ex. H.)

On June 22, Dittle e-mailed several managers to request that the warning be removed, and accused the managers of treating him unfairly. This resulted in a scathing e-mail exchange between Rainwater and [*7] Dittle about various issues. Although other MDOs were copied on the e-mail exchange, no one informed Dittle how they planned to address the obvious animosity between Dittle and his manager.

4. July through October 2002

Dittle was absent on July 13, 2002, and again requested FMLA leave. After Dittle had been absent for nearly a week, Weber e-mailed Dittle and instructed him to supply documentation covering the dates of his leave. In addition, Weber stated that Dittle's "FMLA paperwork needs to be updated immediately. Make sure it contains the duration of a possible absence and the frequency that it could occur." (Id. at Ex. J.) Dittle responded on July 23,

2:04-cv-02230-MPM-DGB    # 39-5    Page 4 of 12

Page 3

2005 U.S. Dist. LEXIS 1487, *7; 151 Lab. Cas. (CCH) P35,002;
86 Empl. Prac. Dec. (CCH) P42,013

stating that he would supply his documentation when he returned to work.

On August 5, Weber wrote Dittle again and directed him to follow call-in procedures. Specifically, Weber noted that Dittle had properly called an MDO for his absences on July 13 through July 15, but that had failed to follow procedures from July 16 to August 5. n3 Weber also noted that Dittle's certification covered only intermittent absences for a duration of one to three days, and therefore demanded that Dittle provide a new certification to substantiate [*8] his ongoing absences. He requested that Dittle submit medical documentation within five days of receipt of the letter and warned that disciplinary measures would be taken if Dittle failed to do so. Finally, Weber provided a resignation form for Dittle in case he "no longer wished to be employed by the United States Postal Service." Weber explained that by resigning, Dittle could avoid discharge and therefore could seek re-employment in the future or use the Postal Service as a reference. (Id. at Ex. K.)

> n3 Dittle attempted to reach Rainwater on several occasions, but reached either a disconnected number or a voice mailbox that did not confirm the recipient. As a result, Dittle stopped calling the MDO directly, and instead called the RMD center.

The same day, the FMLA Coordinator also wrote Dittle, requesting that he submit a certification by August 2 (fifteen days from the July 19 request by Weber). The Coordinator also noted that Dittle's current FMLA certification covered only intermittent leave of up to [*9] three days. Because Dittle had not reported to work for more than two weeks, the Coordinator requested that Dittle's physician specifically address the issue of whether Dittle's medical condition warranted extended periods of absences. The Coordinator also warned that "failure to provide complete medical certification could result in delaying your FMLA protected leave" and "if you fail to comply at all, your absences may not be FMLA protected and could be used in discipline." (Id. at Ex. L.) The Coordinator also enclosed another copy of Publication 71. n4

> n4 In his brief, Dittle claims that this was his first receipt of his rights and obligations under the FMLA relating to his request for leave. However, Dittle previously testified that he received FMLA training in 1999, that he was aware of the fifteen-day time limit to submit a medical certification, and that he believed the timeframe was reasonable. (Thome Aff. Ex. 28 at 9-11, 72 (Dittle Depo.).) In addition, Dittle previously responded to the FMLA Coordinator's January 14, 2002, letter, which details his rights and duties under the FMLA.

[*10]
On August 8, Dittle e-mailed Weber and Gustafson and informed them that he would submit FMLA paperwork upon his return to work, but did not specify when he would be returning. Dittle also alleged that he was being treated unfairly and that the Postal Service was requiring more updates and paperwork about his serious health condition than other employees. Dittle concluded the e-mail by providing extensive information about post-traumatic stress disorder.

On August 21, after Dittle had been absent from work for more than a month, the FMLA Coordinator notified Dittle that he was ineligible for FMLA leave because he had not provided the FMLA paperwork within fifteen days as requested. The Coordinator also stated: "Since your supervisor requested FMLA medical re-certification on July 19, 2002, your absences since that date are not FMLA protected and could be used in discipline." (Id. at Ex. M.) Dittle did not respond to the letter.

On August 27, the Postal Service sent Dittle "advance written notice that it is proposed to remove you from the Postal Service no sooner than 30 days from the date of your receipt of this letter." (Id. at Ex. N.) The notice explained that the removal [*11] was based on two grounds. First, Dittle had been absent since July 13, but had not provided any documentation to certify that his absences were covered by the FMLA. Second, Dittle had failed to follow call-in procedures since July 16, despite being specifically instructed to notify his MDO when unable to report for duty. n5 (Id.)

> n5 The notification letter provides Dittle with avenues to address the issues raised in the letter, including mediation and appeal. However, Dittle did not pursue those avenues.

In the meantime, Dittle made several attempts to contact his physician to obtain a new certification, but learned that his doctor was out of the country from July 31 to August 25. Dittle left a message with the Postal Service that his physician was out of the country, but did not request an extension to submit the appropriate documentation.

Dittle's physician completed a certification on August 30, and requested that the Postal Service apply the certification retrospectively. Notably, the certification closely [*12] follows the previous certifications, explaining that Dittle should work only intermittently (typically one to

2:04-cv-02230-MPM-DGB  # 39-5  Page 5 of 12

Page 4

2005 U.S. Dist. LEXIS 1487, *12; 151 Lab. Cas. (CCH) P35,002;
86 Empl. Prac. Dec. (CCH) P42,013

three days off) during periods of elevated stress. The physician also suggested that the Postal Service remove Dittle "from abnormally stressful conditions or work requiring altered sleep times on a permanent basis to prevent such [post-traumatic stress symptom] exacerbations." (Id. at Ex. O.) The physician therefore recommended that the Postal Service accommodate Dittle by placing him in a low stress, 8:00 a.m. to 5:00 p.m. position. (Id.) Dittle provided the Postal Service with the certification on September 6.

In response to receiving the certification, the FMLA Coordinator sent Dittle a letter on September 12, informing him that the certification did not explain why Dittle had been absent for two months and did not state that he was presently incapacitated. Based on these failures, the Coordinator concluded that Dittle's absences since July 13 were not protected under the FMLA. Dittle did not respond to the letter. The Postal Service informed Dittle of his termination on October 3, 2002.

## DISCUSSION

Dittle alleges that the Postal Service interfered [*13] with his FMLA rights and retaliated against him for seeking FMLA leave. The Postal Service denies that it interfered with any of Dittle's FMLA rights, and maintains that it terminated Dittle because he had been absent from work for more than two months without proper documentation to support an FMLA leave and because Dittle failed to comply with call-in procedures.

### A. Standard of Review

Summary judgment is proper when the evidence viewed in a light most favorable to the nonmoving party demonstrates that no genuine issue of material fact exists and that the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby. Inc., 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)*. Thus, only disputes of facts that might affect the outcome of the suit under the governing substantive law will preclude summary judgment. Id.

The moving party bears the burden of showing that there are no genuine issues of material fact and that the movant is entitled to judgment as a matter of law. *Fed. R. Civ. P. 56(c)*; *Celotex Corp. v. Catrett, 477 U.S. 317, 322, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)*. The nonmoving party is entitled to all inferences that may be reasonably drawn from the underlying [*14] facts in the record. *Meriwether v. Caraustar Packaging Co., 326 F.3d 990, 992-93 (8th Cir. 2003)*. However, the nonmoving party may not merely rest upon allegations or denials in its pleadings — it must set forth specific facts showing that there is a genuine issue for trial. *Anderson, 477 U.S. at 256*.

### B. Interference

The FMLA prohibits an employer from interfering with an employee's right to take medical leave. See *29 U.S.C. § 2615(a)(1)*. Any violation of the FMLA or its regulations constitutes interference. See *29 C.F.R. § 825.220(b)*. The Eighth Circuit imposes strict liability for violations of *§ 2615(a)(1)*. Thus, the employer's motive is not important and the plaintiff "need only demonstrate by a preponderance of the evidence that he was entitled to the benefit denied." *Carlsen v. Green Thumb, Inc., 2004 U.S. Dist. LEXIS 1781, Civ. No. 01-2076, 2004 WL 234406 at *6 (D. Minn. Feb. 4, 2004)* (Tunheim, J.) (citing *Strickland v. Water Works & Sewer Bd., 239 F.3d 1199, 1206-07 (11th Cir. 2001)*). Dittle asserts that the Postal Service interfered with his FMLA rights by violating several FMLA regulations. [*15]

1. Certification Requests

Dittle maintains that the Postal Service did not provide sufficient notice of the need for an updated certification. Specifically, he criticizes the fact that the July e-mail from Weber merely instructs Dittle to "update his paperwork" and points out that neither the July 19 nor the August 5 notice from the FMLA Coordinator expressly warns that a failure to comply with certification requirements would result in termination.

"An employer may require that a request for leave . . . be supported by a certification issued by the health care provider of the eligible employee." *29 U.S.C. § 2613(a)*. In addition, the employer may require that the employee obtain subsequent re-certifications on a reasonable basis. Id. at *§ 2613(e)*. If the employer does require a certification, it must provide written notice to the employee that it requires such certification, and advise the employee of the consequences of a failure to provide the certification. *29 C.F.R. §§ 825.305(a), (d)*. The employer must give the employee at least fifteen calendar days in which to submit the certification. Id. at *§ 825.305(b)*. In addition, the employer must [*16] advise an employee whenever the employer finds a certification incomplete, and provide the employee a reasonable opportunity to cure any deficiency. n6 Id. at *§ 825.305(d)*.

> n6 A certification is sufficient if it states (1) the date on which the serious health condition commenced, (2) the probable duration of the condition, (3) the appropriate medical facts within the knowledge of the health care provider regarding the condition, (4) that the employee is unable to perform the functions of his job, and (5) the expected duration of the intermittent leave. *29 U.S.C. § 2613(b)*.

2:04-cv-02230-MPM-DGB    # 39-5    Page 6 of 12

Page 5
2005 U.S. Dist. LEXIS 1487, *16; 151 Lab. Cas. (CCH) P35,002;
86 Empl. Prac. Dec. (CCH) P42,013

When an employer requests a certification, the employee must provide a copy of the certification in a timely manner. *29 U.S.C. § 2613(a)*. Specifically, "the employee must provide the requested certification to the employer within the time frame requested by the employer . . . unless it is not practicable under the particular circumstances to do so despite the employee's diligent good faith [*17] efforts." *29 C.F.R. § 825.305(b)*.

Dittle argues that the July 19 e-mail provided him insufficient notice of the Postal Service's request for a certification that covered his extended period of absence. The Court disagrees. When Weber e-mailed Dittle about the certification, Dittle had already missed six days of work. The e-mail apprised Dittle that his January 2002 certification covered only intermittent leave, and therefore his paperwork needed to be updated to cover a period of absences exceeding three days. Moreover, Weber specified that Dittle needed to have his physician identify the duration and frequency of Dittle's medical condition. This notice was sufficiently clear to notify Dittle that the January 2002 certification did not cover his extended period of absence, and that a new certification was needed.

Dittle also maintains that the July 19 and August 5 requests were insufficient because they did not explicitly warn Dittle that he would be discharged if he did not provide a certification. He relies on *Paulson v. Superior Plating, Inc., 2004 U.S. Dist. LEXIS 19383, File No. 03-3118, 2004 WL 2203408 (D. Minn. Sept. 27, 2004)* (Kyle, J.), for the proposition that an employer must warn [*18] the employee that a failure to provide certification will result in termination. However, the Court finds that both Paulson and *Chenoweth v. Wal-Mart Stores, Inc., 159 F. Supp. 2d 1032 (S.D. Ohio 2001)*, the case on which the Paulson decision relies, are distinguishable. In Paulson, the employer merely told the employee that his absences would count against him under the employer's attendance policy — and never warned that the employee would be disciplined in any other way. *2004 U.S. Dist. LEXIS 19383, 2004 WL 2203408 at *1*. In Chenoweth, the employer merely told the plaintiff to return the certification as soon as possible. *159 F. Supp. 2d at 1038*.

In contrast, Weber's August 5 letter warns that Dittle's failure to follow call-in instructions "will lead to further disciplinary actions" and his failure to submit a certification "may result in management taking appropriate disciplinary measures." (Defs.' Ex. K.) In addition, it sets forth the requirement that employees regularly attend work or "provide acceptable evidence for absences." (Id.) It also gives Dittle the option of resigning to avoid discharge. Similarly, the August 5 letter from the FMLA [*19] Coordinator states that failure to provide a certification could result in his absences being used in discipline. (Id. at Ex. L.) The letters explain that Dittle was violating attendance rules, and consequently that discipline — even termination — was possible. This is sufficient notice that Dittle would face adverse action if he did not provide a certification. See *29 C.F.R. § 825.305* (employer must advise employee of consequences for failure to provide adequate certification).

2. Classifying Dittle as AWOL

Dittle also claims that the Postal Service interfered with his FMLA rights by placing him on absent without leave ("AWOL") status and offering him resignation over discharge during the fifteen day period provided to obtain a certification. On August 5, Weber informed Dittle that he was classified as AWOL pending an investigation because Dittle did not call either an MDO or the RMD on July 16. Weber also warned that disciplinary action would result if Dittle failed to follow call-in procedures, and if Dittle failed to provide medical documentation covering his extended leave.

Dittle contends that this letter was a form of discipline that interfered with his FMLA [*20] rights. The Court disagrees. When Weber wrote the August 5 letter, Dittle had failed to report to work for over two weeks. Weber explained that Dittle was placed on AWOL status because Dittle had completely failed to call in. He further explained that the status was pending an investigation, which provided, Dittle an opportunity to explain his absence. Thereafter, the Postal Service afforded Dittle several other opportunities to explain why his absences should be excused. Yet, Dittle did not respond until a month later. And even then, the certification related only to intermittent leave of up to three days — and not his extended period of absence. Rather than imposing discipline on Dittle, the letter merely warned Dittle of the ramifications if Dittle failed to provide an appropriate certification.

Similarly, the statement about resignation was in the context of an extensive explanation of leave possibilities and procedures. Weber simply recognized that Dittle had failed to report to work and had not complied with leave procedures, and therefore provided Dittle the option of resigning if he chose not to report to work again. Because Dittle has not presented any evidence that he suffered [*21] any negative consequences or that he was intimidated not to use FMLA leave as a result of the August 5 letter, his argument on this point fails.

3. Requiring Dittle to Contact an MDO

Dittle also claims that the Postal Service interfered with his FMLA rights by requiring him to contact Rainwater instead of the RMD. Although an employer

2:04-cv-02230-MPM-DGB   # 39-5   Page 7 of 12

Page 6

2005 U.S. Dist. LEXIS 1487, *21; 151 Lab. Cas. (CCH) P35,002;
86 Empl. Prac. Dec. (CCH) P42,013

may require an employee to comply with its notice procedures for requesting leave, "failure to follow such internal employer procedures will not permit an employer to disallow or delay an employee's taking FMLA leave if the employee gives timely verbal or other notice." *29 C.F.R. § 825.302(d)*. However, if the employee fails to give proper notice of his need for FMLA leave, he cannot sustain an interference claim. See *Bones v. Honeywell Int'l, Inc., 223 F. Supp. 2d 1203, 1215-18 (D. Kan. 2002)*.

Dittle knew that he was required to call an MDO when he was unable to report to work. He was counseled on his failure to follow call-in procedures, and informed that his failure resulted in operational difficulties for the Postal Service. Yet, Dittle continued to call the RMD. By blatantly refusing to follow Postal Service policy that required [*22] him to contact an MDO, Dittle failed to give proper notice under the FMLA. See id.

Moreover, it is important to note that the Postal Service did not deny Dittle FMLA leave because he failed to follow internal call-in procedures. Rather, the record shows that the Postal Service was willing to cover all of his absences (including those where he called in to the wrong department) if Dittle provided a certification to cover his extended period of absence. Accordingly, Dittle has failed to show that requiring him to contact an MDO interfered with his FMLA rights.

4. Rainwater's Criticism

Dittle also claims that Rainwater interfered with his FMLA rights by criticizing Dittle for taking FMLA leave. Specifically, Dittle alleges that Rainwater stated that "some people use FMLA to get out of work" in January 2002. In addition, in June 2002, Rainwater informed Dittle that he had taken more sick leave than anyone, and had more FMLA call-ins than any other employee.

On this point, the instant case resembles *McKinzie v. Sprint/United Mgmt. Co.*, 2004 U.S. Dist. LEXIS 23417, File No. 03-2348, 2004 WL 2634444 (D. Kan. Nov. 16, 2004). In McKinzie, the plaintiff claimed that the manager of employee [*23] relations made sarcastic and derogatory comments about the plaintiff taking time off for FMLA leave, asked her to get re-certified, and continued to keep track of her work time even after the plaintiff took FMLA leave. In addition, she claimed a coworker e-mailed the manager detailing problems with the plaintiffs recent work performance. The district court rejected the interference claim, finding that the plaintiffs own statements demonstrated that she was allowed to take FMLA leave each time she needed to do so. Thus, the plaintiff failed to show that the defendant's conduct created any kind of chilling effect that caused the plaintiff to feel that she needed to stay at work rather than take FMLA leave. *2004 U.S. Dist. LEXIS 23417 at *9-10*.

The same is true here. Although Dittle presents some evidence of inappropriate comments by Rainwater, he presents no evidence that those comments dissuaded him seeking FMLA leave. To the contrary, Dittle requested FMLA leave after the comments were made and until his termination. Based on this evidence, the Court concludes that Rainwater's alleged harassment did not chill Dittle from exercising his FMLA rights.

5. Termination

Dittle also claims that the Postal [*24] Service interfered with his FMLA rights by notifying him that it intended to terminate him before making any effort to determine why Dittle had not provided a certification. However, the record does not support this argument. On several occasions, the Postal Service requested that Dittle provide a certification to support his two-month leave of absence. Dittle merely responded to each request by stating that he would provide the certification upon his return to work, without ever stating when he would indeed return. Once an employer requires a certification, it is the employee's duty to provide the certification in a timely manner. *29 C.F.R. § 825.305(b)*. The FMLA does not place on the employer the additional burden to investigate why an employee fails to meet that duty. Thus, Dittle's argument on this point fails.

Finally, Dittle contends that the Postal Service should have considered the tardy certification by Dittle's physician. The Court disagrees. An employee must provide a requested certification within fifteen days "unless it is not practicable under the particular circumstances to do so despite the employee's diligent, good faith efforts." Id. at *§ 825.305(b)*. Weber [*25] first requested a new certification on July 19. Dittle did not contact his physician for a certification until after July 31, when he discovered that his physician was out of the country. After learning that his physician was unavailable to provide a certification, Dittle did not request an extension. Instead, he simply ignored the numerous requests for a certification to cover his extended leave of absence. Moreover, the certification that Dittle eventually submitted on September 6 covers only intermittent absences of up to three days. Based on these undisputed facts, the Court finds that no reasonable jury could find that Dittle made good faith efforts to obtain a certification covering his two-month absence.

Construing the facts in a light most favorable to Dittle, the Court concludes that Dittle has failed to present evidence that the Postal Service violated any FMLA regulations or otherwise interfered with his FMLA rights. To the contrary, it was Dittle's failure to produce a proper certification that denied Dittle the rights to which he was

2:04-cv-02230-MPM-DGB    # 39-5    Page 8 of 12

Page 7

2005 U.S. Dist. LEXIS 1487, *25; 151 Lab. Cas. (CCH) P35,002;
86 Empl. Prac. Dec. (CCH) P42,013

otherwise entitled. Thus, the FMLA interference claim fails as a matter of law.

### . Retaliation

The FMLA makes it unlawful for an [*26] employer to discharge or in any other manner discriminate against an individual for opposing a practice made unlawful by the FMLA. *29 U.S.C. § 2615(a)(2)*. Similarly, FMLA regulations provide that an employer may not use an employee's use of FMLA leave as a "negative factor in employment actions, such as hiring, promotions or disciplinary actions." *29 C.F.R. § 825.220(d)*. The paradigm developed under *McDonnell Douglas v. Green, 411 U.S. 792, 802-03, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973)*, applies to FMLA retaliation claims. *Smith v. Allen Health Sys., 302 F.3d 827, 832 (8th Cir. 2002)*. For purposes of this Motion, the Postal Service assumes that Dittle can establish a prima facie case. Thus, the Court focuses on whether the Postal Service has presented a legitimate, non-retaliatory reason for Dittle's termination and whether Dittle can establish that the proffered reason is pretextual. See *302 F.3d at 833*.

The Postal Service maintains that it terminated Dittle because he missed two months of work without providing a medical certification to support his leave, and because he refused to follow the call-in procedures as expressly instructed. [*27] These proffered reasons are legitimate reasons for a termination. See *Mercer v. City of Cedar Rapids, 308 F.3d 840, 845 (8th Cir. 2002)* (failure to comply with work rules is a legitimate reason for termination); *Hopper v. Hallmark Cards, Inc., 87 F.3d 983, 988-89 (8th Cir. 1996)* (excessive, unexcused absenteeism is a legitimate reason for termination).

Dittle advances several arguments in an attempt to establish pretext. First, Dittle claims that he never received proper notice of the need for medical certification. However, the record shows that Dittle received full notice of his FMLA rights and obligations by August 5. Moreover, undisputed facts show that Dittle was absent from work since July 13 and was asked several times for medical documentation to justify his leave, yet he failed to respond to those requests.

Dittle also maintains that the MDOs exchanged several e-mails to develop a scheme to fire him. The Court does not find support in the record for this argument. Rather, the record shows that the e-mail exchanges addressed how to deal with Dittle, an employee who was absent without justification for two months and who refused to follow [*28] Postal Service call-in procedures.

Finally, Dittle argues that the Postal Service has changed its reasons for its adverse actions. "Substantial changes over time in the employer's proffered reason for its employment decision support a finding of pretext." *Smith, 302 F.3d at 835* (quoting *Kobrin v. Univ. of Minn., 34 F.3d 698, 703 (8th Cir. 1994)*). The Postal Service initially warned Dittle that he was on AWOL status because he did not follow call-in procedures on July 16. However, the Postal Service eventually discharged Dittle because he did not follow call-in procedures and because he failed to submit a certification to substantiate his two-month absence. These are not substantive changes in the Postal Service's reasons, but part of a stream of events that ultimately led to Dittle's termination.

Dittle has not carried the burden of showing that the Postal Service's proffered reasons for his termination were pretextual and that the real reason was retaliation for his exercise of FMLA rights. Thus, his retaliation claim fails as a matter of law.

### CONCLUSION

For the foregoing reasons, and upon all of the files, records, and proceedings herein, [*29] **IT IS HEREBY ORDERED** that Defendants' Motion for Summary Judgment (Clerk Docket No. 8) is **GRANTED**.

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

Dated: February 2, 2005

Paul A. Magnuson

United States District Court Judge

1 of 1 DOCUMENT

DEBRA COLLINS, Plaintiff, v. MERCK-MEDCO RX SERVICES, OF TEXAS, L.L.C., Defendant.

Case No. 3:00-CV-1852-X

UNITED STATES DISTRICT COURT FOR THE NORTHERN DISTRICT OF TEXAS, DALLAS DIVISION

2001 U.S. Dist. LEXIS 15143; 144 Lab. Cas. (CCH) P34,378; 81 Empl. Prac. Dec. (CCH) P40,756; 7 Wage & Hour Cas. 2d (BNA) 1134

September 24, 2001, Decided
September 24, 2001, Filed; September 25, 2001, Entered

**DISPOSITION:** [*1] Defendant's Motion for Summary Judgment in all things GRANTED.

**COUNSEL:** For DEBRA COLLINS, plaintiff: Kenneth W Byford, Attorney at Law, Bennett Weston & LaJone, Dallas, TX USA.

For MERCK-MEDCO RX SERVICES OF TEXAS LLC, defendant: Lincoln H Goodwin, Attorney at Law, Harris Co District Attorney's Office, Timothy M Watson, Attorney at Law, Seyfarth Shaw, Houston, TX USA.

For MERCK-MEDCO RX SERVICES OF TEXAS LLC, defendant: Gina K Culpepper, Attorney at Law, Munsch Hardt Kopf & Harr, Dallas, TX USA.

COURTENAY LEE BASS, ADR Provider, Pro se, Dallas, TX USA.

**JUDGES:** JOE KENDALL, UNITED STATES DISTRICT JUDGE.

**OPINIONBY:** JOE KENDALL

**OPINION:**

### MEMORANDUM OPINION AND ORDER

Before the Court is: Defendant's Motion for Summary Judgment, filed May 9, 2001; Plaintiff's Response to the Motion for Summary Judgment, filed May 31, 2001; and Defendant's Reply in Support of the Motion for Summary Judgment, filed July 30, 2001. For the reasons stated below, the Court **GRANTS** Defendant's Motion for Summary Judgment.

### I. BACKGROUND

Plaintiff, Debra Collins ("Collins"), brought this action against her former employer, Merck-Medco RX Services of Texas, L.L.C. ("Merck-Medco") for denying [*2] her leave under the Family Medical Leave Act of 1993 ("FMLA") and retaliating against her for exercising her rights under the FMLA.

Collins began working for Merck-Medco in 1997 as a customer service representative. Her primary responsibility was to answer calls from doctors and patients regarding prescriptions. In 1999, Collins began to have medical problems which included tumors on her uterus. Collins last day of work was March 7, 2000. On March 8, 2000, Collins visited her physician, Dr. Linda Prentice, complaining of intense abdominal pain. She began a treatment plan with Dr. Prentice which included surgery to remove the tumor. Collins requested certification forms so she could take leave under the FMLA. Collins filled out her portion of the forms and submitted the certification forms to Dr. Prentice. On March 23, 2000, Merck-Medco received the completed certification form. Dr. Prentice had indicated that Collins suffered from a "serious health condition" but stated that Collins was not incapacitated and could perform the essential functions of her job. *See* Def. App. at 86-87.

Based on this certification from Dr. Prentice, Merck-Medco denied Collins FMLA leave. Collins was [*3] not happy with this decision and urged Elizabeth Brown, Merck-Medco's Human Resources Representative, to reconsider the FMLA application in light of short-term disability paperwork that was to be submitted by Dr. Prentice. At some point, Merck-Medco received the short-term disability paperwork from Dr. Prentice. n1 Dr. Prentice indicated that Collins could "perform her own job with breaks for times when she has excessive bleeding and pain." Def. App. at 94.

2001 U.S. Dist. LEXIS 15143, *3; 144 Lab. Cas. (CCH) P34,378;
81 Empl. Prac. Dec. (CCH) P40,756; 7 Wage & Hour Cas. 2d (BNA) 1134

n1 There is a dispute among the parties as to when Merck-Medco received the short-term disability papers and from whom the paperwork was received. However, this dispute is not material and does not impact the Court's decision to grant summary judgment.

As of April 21, 2000, Collins had missed over four weeks of work without excuse since she was certified by her own physician to be capable of work. Thus, Merck-Medco sent a letter to Collins terminating her for excessive absences. *See* Def. App. at 95. On May 8, 2000, Dr. Prentice faxed an addendum to Merck-Medco [*4] indicating that Collins was placed on total disability until six weeks after Collins was to have surgery. *See* Def. App. at 102. Upon receiving this addendum, David Garza, Merck-Medco's Senior Manager of Human Resources, phoned Collins and indicated that she was being reinstated.

On September 13, 2000, Dr. Prentice released Collins for work but Collins did not go back to Merck-Medco. Because she did not return to work, Merck-Medco terminated Collins for job abandonment on October 2, 2000.

## II. ANALYSIS

### A. Summary Judgment Standard

Summary judgment is appropriate when, viewing evidence in the light most favorable to the nonmoving party, the summary judgment record demonstrates that no genuine issue of material fact exists, and therefore, the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett, 477 U.S. 317, 322-24, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986)*. Once the movant has met this threshold, the burden shifts to the nonmovant to establish, with significant probative evidence, that a material issue of fact exists. *See Kansa Reins. Co., Ltd. v. Congressional Mortgage Corp. of Texas, 20 F.3d 1362, 1371 (5th Cir. 1994)*. [*5] A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *See Anderson v. Liberty Lobby, 477 U.S. 242, 248, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986)*. The nonmovant may not rest on the pleadings, conclusory allegations or unsubstantiated assertions, but must identify specific facts that establish a genuine issue exists for trial. *See Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994)*. The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986)*. The nonmovant must "set forth specific facts showing that there is a genuine issue for trial." *Liberty Lobby, 477 U.S. at 256.*

Furthermore, the summary judgment movant need not supply evidence disproving the opponent's case. "Once the movant establishes that there is an absence of evidence to support the nonmovant's case, the burden is on the nonmovant to make a showing sufficient to establish an issue of fact for each element [*6] as to which that party will have the burden of proof at trial." *Epps v. NCNB Texas Nat'l Bank, 838 F. Supp. 296, 299 (N.D. Tex. 1993)* (citing *Celotex, 477 U.S. at 322-25)*. Courts do not assume, in the absence of any proof, "that the moving party could or would prove the necessary facts." *See Little, 37 F.3d at 1075* (citing *Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 111 L. Ed. 2d 695, 110 S. Ct. 3177 (1990))*.

### B. FMLA Claims

Merck-Medco challenges both of Collins's FMLA claims. First, Merck-Medco argues that it did not violate the FMLA because Collins was not entitled to take leave under the FMLA. Second, Merck-Medco argues that Collins has produced no evidence to support her claim for retaliation. For the reasons set forth below, the Court agrees with both of these arguments.

#### 1. FMLA Leave

The FMLA applies to private-sector employers of 50 or more employees. *See 29 U.S.C. § 2611(4)*. Employees are eligible for FMLA leave if they have worked for a "covered" employer for at least 1,250 hours during the preceding 12 months. *See 29 U.S.C. § 2611(2)*. [*7] Under the FMLA, an eligible employee is entitled to twelve weeks of leave in a twelve month-period because of: (1) the birth of a child; (2) the adoption of a child; (3) to care for certain family members who have a serious health condition; or (4) if the employee has a "serious health condition that makes the employee unable to perform the functions of the position of such employee." *29 U.S.C. § 2612(a)(1)*. An employee needs to provide at least verbal notice sufficient to make the employer aware that the employee needs FMLA leave. *See 29 C.F.R. § 825.302(c)*. It is undisputed that Merck-Medco is an employer that is covered by the FMLA and Collins is an employee covered by the FMLA. It is also undisputed that Collins gave notice that she sought to take leave under the FMLA. The issue is whether Collins was entitled to take FMLA leave because of a "serious health condition."

Under the FMLA, an employer may require that requested leave "be supported by a certification issued by the health care provider of the eligible employee." *29 U.S.C. § 2613(a)*. If the requested certification indicates that the leave is [*8] not FMLA-qualifying, the employer must not designate it as FMLA leave. *See 29 C.F.R. § 825.208(e)(2)*. When an employer "requests from the em-

2001 U.S. Dist. LEXIS 15143, *8; 144 Lab. Cas. (CCH) P34,378;
81 Empl. Prac. Dec. (CCH) P40,756; 7 Wage & Hour Cas. 2d (BNA) 1134

ployee and receives a physician's certification that indicates than an employee's serious health condition does not require him to miss work, the employer may rely on that certification until the employee provides a contradictory medical opinion." *Stoops v. One Call, 141 F.3d 309, 313 (7th Cir. 1998).*

The undisputed evidence shows that Collins did request FMLA leave and had her physician, Dr. Prentice, fill out a certification form. Dr. Prentice indicated that Collins's medical condition did not prevent her from performing her job. *See* Def. App. at 86-87. This "negative certification" allowed Merck-Medco to deny Collins's requested FMLA leave because Collins's "serious health condition" did not render her unable to perform the functions of her job. When Collins failed to work for four weeks after her FMLA leave was denied, she was terminated pursuant to Merck-Medco's attendance policy. n2 Collins does not dispute the initial findings of Dr. Prentice, nor does she dispute that the forms were correct. [*9] Since Collins was not qualified to take leave Merck-Medco's decision to terminate her does not violate the FMLA.

> n2 In fact, Collins concedes that assuming her absences were not excused, it was proper for Merck-Medco to terminate her pursuant to the attendance policy. See Collins Depo. at 64-67, *reprinted in* Def. Appendix 18-19.

Collins argues that Merck-Medco should have waited for Dr. Prentice to submit the short-term disability certification before making the decision to terminate her. Even if Merck-Medco waited for these additional papers, the decision to terminate Collins would have been the same since Dr. Prentice again stated that Collins could work and was not disabled. *See* Def. App. at 94.

On May 8, 2000, Collins did provide Merck-Medco with a contradictory medical opinion—Dr. Prentice's addendum of disability regarding Collins's condition. Once Merck-Medco received this addendum from Dr. Prentice, it is undisputed that Collins was reinstated and granted FMLA leave. After her period of leave [*10] was over, Collins refused to return to work and could provide no additional explanation for her refusal. Because she refused to return to work, Merck-Medco terminated Collins. Since her FMLA leave was completed, Merck-Medco's decision to terminate her does not violate the FMLA.

Collins has provided no evidence to this Court which demonstrates that Merck-Medco violated the FMLA. While there may be factual discrepancies regarding the timeline of events between Merck-Medco and Collins, none are sufficient to raise a material issue of fact. Thus, the Court grants Merck-Medco's Motion for Summary Judgment on this claim. This holding, however, does not affect Collins's right to state a claim for retaliation under the FMLA.

**2. Retaliation**

To establish a prima facie case for discrimination or retaliation under the FMLA, the plaintiff must demonstrate that: (1) the employee is protected under the FMLA; (2) the employee suffered an adverse employment decision; and either (3a) that the plaintiff was treated less favorably than an employee who had not requested leave under the FMLA; or (3b) the adverse decision was made because of plaintiff's request for leave. *See Bocalbos v. Nat'l Western Life Ins. Co., 162 F.3d 379, 383 (5th Cir. 1998).* [*11] In this case, Collins has failed to meet the first-prong of the test since she was not engaged in a protected activity. Though requesting FMLA leave is a protected activity, Collins does not claim that her request is the basis for her retaliation claim. *See* Collins Depo. at 102, *reprinted in* Def. App. at 28. Rather, she claims it was her taking leave and subsequent termination that qualify as retaliation. However, Collins was never qualified for FMLA leave. Thus, her absence from work was not protected by the FMLA and Merck-Medco's decision to terminate does not violate the FMLA.

Even if Collins was engaged in a protected activity, she can provide no evidence of an adverse employment action. Merck-Medco's initial determination to terminate Collins was based on Dr. Prentice's negative certification and was reversed when she was reinstated and granted the leave she requested. Collins claims that she was billed for her medical expenses because of Merck-Medco's decision to terminate her, yet she has provided this Court with no evidence to support the claim. She also claims that she lost wages because of Merck-Medco's decision to terminate her but again she has failed to produce [*12] any evidence to support her claim. Thus, the Court grants Merck-Medco's Motion for Summary Judgment on this claim.

**III. CONCLUSION**

For the reasons stated above, Defendant's Motion for Summary Judgment is in all things **GRANTED.**

**SO ORDERED.**

Dated: September 24th, 2001.

JOE KENDALL

UNITED STATES DISTRICT JUDGE

**FINAL JUDGMENT - FILED SEP 25 2001**

On September 24, 2001, the Court granted

2:04-cv-02230-MPM-DGB    # 39-5    Page 12 of 12

Page 4

2001 U.S. Dist. LEXIS 15143, *12; 144 Lab. Cas. (CCH) P34,378;
81 Empl. Prac. Dec. (CCH) P40,756; 7 Wage & Hour Cas. 2d (BNA) 1134

Defendant's Motion for Summary Judgment. There are no further claims for relief being sought as the Motion for Summary Judgment disposed of all issues. The Court hereby renders a **FINAL JUDGMENT** in favor of Defendant. The Court denies all relief that is not granted in this judgment. This is a FINAL JUDGMENT.

**SO ORDERED**.

Dated: September 25th, 2001.

Joe Kendall

UNITED STATES DISTRICT JUDGE