# EXHIBIT A

**TO DEFENDANT CONAIR CORPORATION'S REPLY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT**

Page 21

1   A.   I don't, no.
2        MR. GARBUTT: You mean here today?
3        MR. KLECZEK: Yeah.
4        THE WITNESS: I don't.
5        BY: MR. KLECZEK
6   Q.   Okay. I haven't gotten a copy --
7   A.   Okay.
8   Q.   -- of that. I don't know what it
9   looks like. Is there -- can you provide one to
10  your attorney --
11  A.   Yes.
12  Q.   -- to give me a copy of that?
13  A.   Absolutely.
14  Q.   And that is, you said, an explanation
15  sheet?
16  A.   Yeah. It's three pages with a
17  directive to the physician. The only thing the
18  employee fills out is their name and the patient's
19  name and then they sign it. The rest is an
20  explanation to the doctor explaining what number
21  three means specifically so that they know what to
22  check and then what information they need to
23  provide in order -- as they fill out the paperwork.

Page 22

1   Q.   Okay. All right. You recall being
2   asked to produce various documents at my request?
3   A.   Yes.
4   Q.   Do you recall being asked to produce
5   documents relating to Sharon Jacks' husband's
6   medical condition which is the subject of her
7   medical claim?
8   A.   Which is what I provided as the FMLA
9   completed form.
10  Q.   But you didn't provide the third
11  explanatory sheet, did you?
12  A.   No.
13  Q.   Okay. Would you agree that that was
14  responsive to my request?
15       MR. GARBUTT: Objection. This is
16  argumentative. We'll produce it. We don't agree
17  that it was asked for though.
18       THE WITNESS: We'll provide that,
19  yes.
20       BY: MR. KLECZEK
21  Q.   Ms. Jacks, do you know when she was
22  hired?
23  A.   May of 2001.

Page 23

1   Q.   Did you hire her?
2   A.   Yes.
3   Q.   You were here for Ms. Jacks'
4   deposition, correct?
5   A.   Yes.
6   Q.   She was asked some questions about
7   her application for employment?
8   A.   Yes.
9   Q.   Handing you what's been marked as
10  Deposition Exhibit 1 for Ms. Jacks, is that a true
11  and correct copy of her application for employment?
12  A.   Yes.
13  Q.   Nowhere in there does it request a
14  history of Ms. Jacks' criminal record, does it?
15  A.   No.
16  Q.   Did you ask her about her history for
17  criminal record?
18  A.   No.
19  Q.   She never misrepresented --
20  A.   No.
21  Q.   -- her criminal record to anyone,
22  correct?
23  A.   No.

Page 24

1   Q.   Now, Ms. Jacks was at some point
2   entitled to various benefits?
3   A.   Yes.
4   Q.   Okay. Can you explain to me what
5   benefits she was entitled to?
6   A.   Okay. Thirty days after hire
7   employees are eligible to sign up for our medical
8   plan, life insurance, health insurance -- I'm
9   sorry. Dental insurance, optical insurance. I'm
10  leaving something out. Medical, dental, did I say
11  life insurance? Yes. That's it. The first month
12  following the 90 days an employee is eligible to
13  opt into our 401K plan.
14  Q.   Are there any disability benefits?
15  A.   Yes. Those go into effect also 30
16  days after hire. We pay the premiums for long term
17  and short term disability for our employees along
18  with we pay the premium for the life insurance.
19  Q.   Is it a term life insurance policy?
20  A.   Yes.
21  Q.   What's the coverage amount, do you
22  know?
23  A.   One and a half times the annual

Page 29

1  A.  No.
2  Q.  Okay. How much are the premiums for
3  the vision insurance?
4  A.  I don't know.
5  Q.  Is that only for the employee as
6  well?
7  A.  No.
8  Q.  That is --
9  A.  That's family coverage as well.
10  Q.  Individual or family coverage?
11  A.  Yes.
12  Q.  Does the employee pay any premiums
13  for the vision coverage?
14  A.  I do not know.
15  Q.  These are pretty good benefits.
16  A.  May I add that I left -- it's the
17  prescription plan is what I left off.
18  Q.  Oh, prescription plan?
19  A.  Yes.
20  Q.  Okay. That's for prescription drugs?
21  A.  Yes.
22  Q.  And again, is this family versus
23  individual coverage?

Page 30

1  A.  It's whatever the employee has, yes.
2  Whatever they signed up is what they're eligible
3  for.
4  Q.  Does the employee pay any portion of
5  the premium?
6  A.  Not any portion of the premium but
7  there is a copay.
8  Q.  But Conair would cover --
9  A.  Yes.
10  Q.  -- the premium?
11  A.  Yes.
12  Q.  Do you know how much the premium is?
13  A.  No.
14  Q.  You would have all those amounts
15  available though too, right?
16  A.  I would assume so.
17  Q.  And you would be able to give me the
18  amounts as of May 2003?
19  A.  Yes.
20  Q.  Okay. Do you know if Ms. Jacks was
21  contributing to her 401K?
22  A.  No, I do not.
23  Q.  If bonuses would be given, would they

Page 31

1  be given towards the December holiday period?
2  A.  Yes. And they're based on years of
3  service.
4  Q.  Okay. I take it you don't know if
5  and when specifically Ms. Jacks got bonuses?
6  A.  No.
7  Q.  Would that be information you would
8  have access to?
9  A.  Yes.
10  MR. KLECZEK: Do you mind just
11  starting to mark those.
12  (At this point in the proceedings the
13  Court Reporter marked, for purposes of
14  identification, Deposition Exhibit Numbers 1
15  through 12, after which the following proceedings
16  were conducted;)
17  MR. KLECZEK: Off the record.
18  (At this point in the proceedings an
19  off the record discussion was held, after which the
20  following proceedings were conducted;)
21  BY: MR. KLECZEK
22  Q.  All right. I'm handing you what's
23  been marked as deposition -- Burris Deposition

Page 32

1  Exhibit Number 1 which appears to be a personnel
2  change form, correct?
3  A.  Yes.
4  Q.  Are you familiar with this form?
5  A.  Yes.
6  Q.  And what does this form --
7  A.  This is just --
8  Q.  -- represent?
9  A.  -- a go to file to -- it's kind of a
10  tracking item to let us know the dispensation of
11  any of these four pieces of information for each
12  employee.
13  Q.  Okay. This particular form relates
14  to Sharon Jacks, right?
15  A.  Yes.
16  Q.  And it indicates that she was
17  terminated?
18  A.  Yes.
19  Q.  Does it give a reason?
20  A.  It says job abandonment.
21  Q.  What does job abandonment mean?
22  A.  Just didn't return to work.
23  Q.  Okay. Vacation days due?

Page 33

1    A.    Yes.
2    Q.    Does this mean she had one day due to
3  her?
4    A.    Yes.
5    Q.    And then there's a yes marked next to
6  any other benefits due, right?
7    A.    Yes.
8    Q.    And what does that mean?
9    A.    That would have been the 401K and
10 profit sharing which we spell out at the bottom.
11   Q.    Okay.
12   A.    So she was -- saying that she was
13 enrolled in 401K and she would be eligible for
14 profit sharing -- she had a contribution made to a
15 profit sharing.
16   Q.    Okay. So what this meant is she had
17 contributed and the money was being held --
18   A.    Yes.
19   Q.    -- by whoever was maintaining --
20   A.    Yes.
21   Q.    -- the 401K?
22   A.    Yes.
23   Q.    Okay. She didn't have additional

Page 34

1  profit sharing due to her?
2    A.    No. You have to work a complete year
3  in order to get that.
4    Q.    Okay, all right. Deposition Exhibit
5  2 is titled a Termination Checklist, right?
6    A.    Yes.
7    Q.    And what is this form?
8    A.    This is just another tracking form to
9  make sure that all information, everything that --
10 it starts the process for Cobra to make sure it was
11 a qualifying event that she is notified by Aetna to
12 continue that, if she has any items that needs to
13 be returned, make sure we did the personnel change
14 form and it was posted on the computer, and again
15 added to any of the HRIS programs that needed to
16 be.
17   Q.    Okay. There's an explanation under
18 reason for the qualifying event --
19   A.    Right.
20   Q.    -- which says, "Job abandonment-no
21 call, no show"?
22   A.    Yes.
23   Q.    What does that mean?

Page 35

1    A.    That means she did not call back, she
2  did not call in to our call outline as spelled out
3  in our policy.
4    Q.    Okay. Is this a form that you filled
5  out?
6    A.    No.
7    Q.    Who fills this out?
8    A.    Amber Stow.
9    Q.    Is this a form that is kept in the
10 ordinary course of business?
11   A.    Yes.
12   Q.    Is it stored in the Rantoul facility
13 of Conair?
14   A.    Yes. Are you specific to a blank
15 form or a completed form?
16   Q.    Well, a completed form.
17   A.    It goes into that person's personnel
18 file, yes.
19   Q.    Who has access to the individual's
20 personnel files?
21   A.    Amber Stow and myself. Natalie on
22 some occasions if she has to pull something for me.
23   Q.    Would you rely on the records kept in

Page 36

1  the personnel file --
2    A.    Yes.
3    Q.    -- in your course of business?
4    A.    Yes.
5    Q.    All right. Deposition Exhibit 1, is
6  this a document kept in the personnel file?
7    A.    Yes.
8    Q.    All right. Handing you what's been
9  marked as Deposition Exhibit 3 --
10   A.    Yes.
11   Q.    -- titled "Personal History Sheet".
12   A.    Uh-huh.
13   Q.    Does this give how much the
14 employee's salary was?
15   A.    Yes.
16   Q.    Okay. I show the last entry says
17 that Ms. Jacks was making $9.80 an hour?
18   A.    That included a 50 cent shift
19 differential.
20   Q.    And when had she first been given
21 this amount?
22   A.    2-12-03 she received it after a six
23 month review.

Page 89

1. A. Yes.
2. Q. And this letter is marked Burris
3. Deposition Exhibit Number 10?
4. A. Yes.
5. Q. And did you receive this letter?
6. A. Yes.
7. Q. In this letter she's asking for the
8. missed salary from the time that she was terminated
9. to the date of the letter, right?
10. A. Yes.
11. Q. Plus her job back?
12. A. Yes.
13. Q. And Conair did not feel this was
14. acceptable, right?
15. A. I can't speak to that.
16. Q. Okay. Was there -- Sharon never
17. worked there again, right?
18. A. I don't know that we've ever
19. discussed that.
20. Q. Okay. Did you present this letter to
21. anybody in Conair?
22. A. Yes. I sent it to my counsel.
23. Q. Eric Glueck?

Page 90

1. A. No. I sent it to John Glueck.
2. Q. Oh. John Glueck, okay.
3. A. Okay.
4. Q. And did you -- at that time did you
5. have the authority to accept this proposal?
6. A. No.
7. Q. Okay. And that's why you sent it to
8. John Glueck?
9. A. Yes.
10. Q. Okay. And after -- and anything that
11. happened after you sent it to John Glueck, in terms
12. of accepting or rejecting this proposal, you have
13. no knowledge as to?
14. A. Correct.
15. Q. That's a fair statement?
16. A. Yes, that's fair.
17. Q. Okay, all right. Let's take a break,
18. I just need to go over my notes.
19.     MR. GARBUTT: Okay.
20.     (At this point in the proceedings an
21. off the record discussion was held, after which the
22. following proceedings were conducted;)
23.     MR. KLECZEK: I don't have any other

Page 91

1. questions so you guys reserve?
2.     MR. GARBUTT: We'll reserve our
3. questions to the time of trial and we'll reserve
4. signature. Are you going to order it?
5.     MR. KLECZEK: I'm ordering this,
6. yeah. Are you ordering Sharon's?
7.     MR. GARBUTT: Yeah.
8.     MR. KLECZEK: I'll take a copy.

Page 92

1 CERTIFIED SHORTHAND REPORTER'S CERTIFICATION
2
    I, JILL A. BLESKEY, Certified
3 Shorthand Reporter, Registered Professional
  Reporter, and Notary Public of the State of
4 Illinois, do hereby certify that STEPHANIE D.
  BURRIS, the deponent herein, was by me first duly
5 sworn to tell the truth, the whole truth, and
  nothing but the truth in the aforementioned cause
6 of action.
    That the foregoing deposition was taken on
7 behalf of the Plaintiff on January 17th, 2006.
    That said deposition was taken down in
8 stenographic notes and afterwards reduced to
  typewriting under my instruction and said
9 transcription is a true record of the testimony
  given; and that it was agreed by and between the
10 witness and attorneys that said signature on said
   deposition would be reserved.
11  I do hereby certify that I am a
   disinterested person in this cause of action; that
12 I am not a relative of any party or any attorney of
   record in this cause, or an attorney for any party
13 herein, or otherwise interested in the event of
   this action, and am not in the employ of the
14 attorneys for either party.
    Dated this 23rd day of January, 2006.
15
16
17 _____
   Jill A. Bleskey, CSR-RPR
18
19
20
   "OFFICIAL SEAL"
21 Jill A. Bleskey
   Notary Public, State of Illinois
22 My Commission Expires 4/25/08
23

23 (Pages 89 to 92)

Page 45

1  A. Yes.
2  Q. And two no call, no shows in a one
3  year period will result in job abandonment?
4  A. Yes.
5  Q. Okay. That appears to be the only
6  place that job abandonment is mentioned in this
7  document; am I correct?
8  A. Yes.
9  Q. Okay. Yet Ms. Jacks was classified
10 as termination due to job abandonment, right?
11 A. On her internal records, yes.
12 Q. Okay. I just want to understand
13 absentee policy. There are occurrences and there
14 are final warnings, right?
15 A. Yes.
16 Q. And each of those are significant
17 relating to the absentee policy?
18 A. Yes.
19 Q. All right. What is an occurrence?
20 A. Occurrence is anytime that an
21 employee is absent, does not have sick time to
22 cover that absenteeism, and is not scheduled for
23 any approved time off, vacation, sick time.

Page 46

1  Q. FMLA?
2  A. FMLA.
3  Q. Okay. And how many occurrences is a
4  person entitled to before any sort of disciplinary
5  action is taken?
6  A. If they're in their 30 days it's
7  different -- I mean, their probationary period is
8  different from a person who's made it outside of
9  their probation.
10 Q. I'm not interested in the
11 probationary period.
12 A. All right. So an employee who gets
13 two occurrences after their probationary period
14 will get a verbal, at three they get a written, and
15 four they get a final. Now, we have, as a courtesy
16 to employees, most of the time that if they hit --
17 they go from a three and a half to a four and a
18 half or they've got a three and they go to a three
19 and a half, we will sometimes make them aware of
20 that. Sometimes occurrences don't fall neatly as
21 two, three, four, or four and a half, they may go
22 from a three and a half to a four and a half so
23 they'll get a final at four and a half.

Page 47

1  Q. And this is within a 12 month period?
2  A. Yes. They fall off.
3  Q. Okay. Irrespective of vacation or
4  sick time or FMLA, right?
5  A. Right.
6  Q. Okay. Meaning that those don't
7  increase the 12 month period, right?
8  A. No.
9  Q. Okay.
10 A. The 12 month period is from the day
11 of the first occurrence and it falls off a year
12 later.
13 Q. A rolling 12 month period?
14 A. Yes.
15 Q. And nothing can expand --
16 A. Right.
17 Q. -- that 12 month period?
18 A. Right.
19 Q. Okay. Now, explain this. You said
20 sometimes as a courtesy a person who has three and
21 a half occurrences, what do you mean?
22 A. Well, if they go from three and a
23 half to four and a half or they go from three and a

Page 48

1  a half to four when we do the four -- it depends on
2  what -- every circumstances is different. But
3  like, let's say, someone went from a three and a
4  half to a four and a half and they didn't -- in
5  their minds they didn't get a final warning at four
6  we'll put that on there that they went from three
7  and a half to four and a half. Because they got a
8  full occurrence instead of a half occurrence.
9  Sometimes the math isn't as neat to go along with
10 that.
11 Q. Okay. So going above the four
12 threshold, whether you arrive at four --
13 A. Or four and a half.
14 Q. -- or you go to four and a half,
15 you're going to get a final warning?
16 A. Right.
17 Q. Okay. And three final warnings
18 within a 12 month period results in termination?
19 A. Yes.
20 Q. Okay. And Ms. Jacks, as we
21 discussed, had received a written warning, which is
22 different from a final warning, on May 5th, 2003?
23 A. Yes.

12 (Pages 45 to 48)